## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re*<br>TRANSCARE CORPORATION, *et al.*,[1]<br><div align="right">Debtors.</div> | Chapter 7<br>Case No. 16−10407 (SMB)<br>(Jointly Administered) |
| SHAMEEKA IEN on behalf of herself and all others similarly situated,<br><div align="center">Plaintiff,</div><br><div align="center">v.</div><br>TRANSCARE CORPORATION, TRANSCARE NEW YORK, INC., TRANSCARE ML, INC., TC AMBULANCE GROUP, INC., TRANSCARE MANAGEMENT SERVICES, INC., TCBA AMBULANCE, INC., TC BILLING AND SERVICES CORPORATION, TRANSCARE WESTCHESTER, INC., TRANSCARE MARYLAND, INC., TC AMBULANCE NORTH, INC. AND TRANSCARE HARFORD COUNTY, INC., LYNN TILTON, ARK CLO 2001-1 LIMITED, ARK INVESTMENT PARTNERS II, L.P., PATRIARCH PARTNERS, LLC, and PATRIARCH PARTNERS III, LLC, | Adv. Proc. No. 16−01033-smb |

## NON-DEBTOR DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

---

[1] The Debtor Defendants are TransCare Corporation, TransCare New York, Inc., TransCare ML, Inc., TC Ambulance Group, Inc., TransCare Management Services, Inc., TCBA Ambulance, Inc., TC Billing and Services Corporation, TransCare Westchester, Inc., TransCare Maryland, Inc., TC Ambulance North, Inc., TransCare Harford County, Inc., TransCare Pennsylvania, Inc., TC Ambulance Corporation and TC Hudson Valley Ambulance Corporation (collectively, the "Debtors," "Debtor Defendants," or "TransCare").

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...............................................................................1

PROCEDURAL BACKGROUND: THE STATUTORY CLASS PERIODS ..............................5

CONCISE STATEMENT OF MATERIAL UNDISPUTED FACTS ...........................5

I.  TRANSCARE, PLAINTIFF AND THE NON-DEBTOR DEFENDANTS .....................5

II.  EVENTS LEADING TO TRANSCARE'S CHAPTER 7 BANKRUPTCY
FILING ...........................................................................................6

III.  TRANSCARE'S CHAPTER 7 BANKRUPTCY FILING.................................8

STANDARD OF REVIEW .....................................................................9

ARGUMENT....................................................................................10

I.  ALL CLAIMS AGAINST ARK CLO AND PATRIARCH III SHOULD BE
DISMISSED BECAUSE ARK CLO DID NOT EXIST AND PATRIARCH III
HAD CEASED FUNCTIONING AS A COLLATERAL MANAGER LONG
BEFORE THE STATUTORY CLASS PERIODS..........................................10

II.  ALL WARN ACT CLAIMS BROUGHT AGAINST NON-DEBTOR ENTITY
DEFENDANTS SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE
NOT ESTABLISHED A *PRIMA FACIE* CASE OF WARN ACT LIABILITY..............11

    A.  The Non-Debtor Entity Defendants Were Not Plaintiffs' Direct Employer..........11

    B.  The Federal and NY WARN Act Claims Against the Non-Debtor Entity
Defendants Are Ripe For Dismissal Because Plaintiffs Cannot Meet Their
High Burden of Proving a *Prima Facie* Case of Single Employer Liability.........14

        1.  None of the Non-Debtor Entity Defendants Exercised De Facto Control
Over TransCare...........................................................................15

        2.  None of the Non-Debtor Entity Defendants and TransCare Shared A Unity
of Personnel Policies Emanating from a Common Source.......................19

        3.  There Was No Dependency of Operations Among or Between the Non-
Debtor Entity Defendants and TransCare. ................................................21

        4.  Patriarch Partners and Ark CLO Could Not and Did Not Own TransCare,
and AIP II and Patriarch III Have Only a De Minimis Interest in
TransCare. ..............................................................................23

5.      There is Only One Common Director and/or Officer Between and Among
Patriarch Partners, AIP II, Patriarch III and TransCare. ...........................24

III.    THE FEDERAL AND NY WARN ACT CLAIMS ALSO SHOULD BE
DISMISSED BECAUSE THE LAYOFFS AT ISSUE OCCURRED DUE TO
UNFORESEEABLE BUSINESS CIRCUMSTANCES. ..................................................25

A.      The Unforeseeable Business Circumstances Exception Under the WARN
Acts ...........................................................................................................26

B.      TransCare's Chapter 7 Bankruptcy Filing Was Not Reasonably
Foreseeable. ...............................................................................................28

C.      The Chapter 7 Trustee's Unexpected Dispute Over Claims to Assets that
Were Foreclosed Upon Caused TransCare's Management Team to Issue a
February 26, 2016 Communication to Remaining Employees, Ending
Their Employment. .....................................................................................32

IV.     AS A MATTER OF LAW, NON-DEBTOR DEFENDANTS ARE NEITHER
JOINT NOR SINGLE EMPLOYERS FOR PURPOSES OF THE PA, NY AND
MD WAGE STATUTES AND SHOULD BE DISMISSED. ...........................................33

A.      There is No Contractual Relationship for the Payment of Wages Between
and/or Among the Non-Debtor Defendants and TransCare, and Plaintiffs'
PWCPL Claims Should Be Dismissed. ..................................................................34

B.      Plaintiffs Cannot Demonstrate Joint Employer or Individual Liability as to
the Non-Debtor Defendants Pursuant to the NYLL. .............................................35

C.      Plaintiffs Cannot Demonstrate Employer or Individual Liability Pursuant
to the MWPCL. ...........................................................................................38

CONCLUSION ......................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Alvarez-Soto v. B. Frank Joy, LLC*,
  258 F. Supp. 3d 615 (D. Md. 2017) ...................................................................................40

*Alarcon v. Keller Indus., Inc.*,
  27 F.3d 386 (9th Cir. 1994) ...............................................................................................28

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...........................................................................................................10

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .............................................................................................................9

*Chao v. Vidtape, Inc.*,
  196 F. Supp. 2d 281 (E.D.N.Y. 2002), *aff'd as modified*, 66 Fed. App'x 261
  (2d Cir.2003) .....................................................................................................................37

*Copantitla v. Fiskardo Estiatorio, Inc.*,
  788 F. Supp. 2d 253 (S.D.N.Y.2011) .................................................................................36

*Coppola v. Bear Stearns & Co., Inc.*,
  499 F.3d 144 (2d Cir.2007) ................................................................................15, 18, 19

*Dewey & LeBoeuf LLP*,
  507 B.R. 522 (Bankr. S.D.N.Y. 2014) ...............................................................................28

*Godlewska v. HDA*,
  916 F. Supp. 2d 246 (E.D.N.Y. 2013), *aff'd*, 561 F. App'x 108 (2d Cir. 2014) .....................38

*Gross v. Hale-Halsell Co.*,
  554 F.3d 870 (10th Cir. 2009) ...........................................................................................27

*Guippone v. BH S&B Holdings LLC*,
  737 F.3d 221 (2d Cir. 2013) ..............................................................................................14

*Halkias v. General Dynamics Corp.*,
  137 F.3d 333 (5th Cir. 1998) .................................................................................26, 27, 32

*Herman v. RSR Sec. Servs. Ltd.*,
  172 F.3d 132 (2d Cir. 1999) .............................................................................................35, 36

*Hollensteiner v. Waterfield Group*,
  793 F. Supp. 2d 730 (D. Md. 2010) .................................................................................39, 40

*Hotel Emps. & Rest. Emps. Int'l Union Local 54 v .Elsinore Shore Assocs*,
173 F.3d 175 (3d Cir. 1999) ...................................................................27

*In re AE Liquidation, Inc.*,
522 B.R. 62 (Bankr. D. Del. 2014) ...........................................26, 27, 31

*In re AE Liquidation, Inc.*,
866 F.3d 515 (2017)........................................................26, 27, 28, 32

*In re APA Transp. Corp. Consol. Litig.*,
541 F.3d 233 (3d Cir. 2008)..................................................19, 21

*In re Consol. Bedding, Inc.*,
432 B.R. 115 (3d Cir. 2010) ...........................................................21

*In re DHP Holdings II Corp.*,
447 B.R. 418 (Bankr. D. Del. 2010) .................................... passim

*In re Domino's Pizza, Inc.*,
No. 16-cv-2492, 2018 WL 4757944 (S.D.N.Y. Sept. 20, 2018) ...............................38

*In re Flexible Flyer Liquidating Trust*,
511 F. App'x 369 (5th Cir. 2013) ....................................................28

*In re Jevic Holding Corp.*,
492 B.R. 416 (Bankr. D. Del. 2013) ..........................................22, 23

*In re Jevic Holding Corp.*,
496 B.R. 151 (Bankr. D. Del. 2013) ...............................27, 29, 30, 31

*In re Soundview Elite Ltd.*,
594 B.R. 108 (Bankr. S.D.N.Y. 2018) ....................................................9

*Irizarry v. Catsimatidis*,
722 F.3d 99 (2d Cir. 2013)..............................................................36, 37

*Jean-Louis v. Metro. Cable Commc'ns, Inc.*,
838 F. Supp. 2d 111 (S.D.N.Y. 2011)......................................................38

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)........................................................................9

*Mohney v. McClure*,
568 A.2d 682 (1990), *aff'd*, 604 A.2d 1021 (1992)................................34

*Morales v. Holder*,
351 F. App'x 554 (2d Cir. 2010) ........................................................9

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*,
   875 F.3d 107 (2d Cir. 2017)................................................................................9

*PACA Trust Creditors of Lenny Perry's Produce, Inc. v. Genecco Produce Inc.*,
   913 F.3d 268 (2d Cir. 2019)................................................................................9

*Pearson v. Component Tech. Corp.*,
   247 F.3d 471 (3d Cir. 2001).......................................................................... passim

*Quickley v. Univ. of Md. Med. Sys. Corp.*,
   Civ. No. CCB-12-321, 2012 WL 4069757 (D. Md. Sept. 14, 2012)......................................39

*Rodriguez v. City of N.Y.*,
   72 F.3d 1051 (2d Cir.1995)................................................................................9

*Roquet v. Arthur Andersen LLP*,
   398 F.3d 585 (7th Cir. 2005) ....................................................................26, 27, 32

*Rosario v. First Student Mgmt. LLC*,
   No. CV 15-6478, 2016 WL 4367019 (E.D. Pa. Aug. 16, 2016).......................................34, 35

*Salinas v. Starjem Rest. Corp.*,
   123 F. Supp. 3d 442 (S.D.N.Y. 2015).............................................................35, 36, 37

*Thomas v. River Greene Constr. Group LLC*,
   17 Civ. 6954 (PAE), 2018 WL 6528493 (S.D.N.Y. Dec. 11, 2018) ......................................35

*United Steel Workers of Am. Local 2660 v. U.S. Steel Corp.*,
   683 F.3d 882 (8th Cir. 2012)................................................................................27

*Vogt v. Greenmarine Holding, LLC*,
   318 F. Supp. 2d 136 (SDNY 2004)...................................................................... passim

*Wang v. Hearst Corp.*,
   877 F.3d 69 (2d Cir. 2017)...............................................................................9, 10

*Watkins v. Brown*,
   173 F. Supp. 2d 409 (D. Md. 2011) ......................................................................39

*Watson v. Mich. Indus. Holdings, Inc.*,
   311 F.3d 760 (6th Cir. 2002) .............................................................................26

*Williams v. Epic Sec. Corp.*,
   358 F. Supp. 3d 284 (S.D.N.Y. 2019)....................................................................35

STATE CASES

*Int'l Ass'n of Theatrical Stage Emps., Local Union No. 3 v. Mid-Atl. Promotions, Inc.*,
856 A.2d 102 (2004) .......................................................................................34, 35

FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS

20 C.F.R. § 639.3(a)(2) ........................................................................................ passim

20 C.F.R. § 639.9(b) ...............................................................................................25

20 C.F.R. § 639.9(b)(1) ......................................................................................25, 31

20 C.F.R. § 639.9(b)(2) ...........................................................................................27

29 U.S.C. § 2101(a)(2) .............................................................................................12

29 U.S.C. § 2102(a)(1) .............................................................................................12

29 U.S.C. § 2102(b)(2)(A) ..................................................................................25, 31

Fed. R. Civ. P. 56(a) ..................................................................................................9

Fed. R. Civ. P. 56(c)(1)(a) .........................................................................................9

STATE: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS

12 NYCRR § 921-6.3 ..............................................................................................25

12 NYCRR § 921-6.3(a) ......................................................................................25, 31

12 NYCRR § 921-6.3(b) ..........................................................................................27

43 Pa. Stat. Ann. § 260.1, *et seq.* ..........................................................................33

43 Pa. Stat. Ann. § 260.2a ......................................................................................34

Md. Code Lab. & Emp. § 3-501, *et seq.* .............................................................33, 38

N.Y. Lab. Law § 190(3) ...........................................................................................35

N.Y. Lab. Law § 191 ...............................................................................................33

N.Y. Lab. Law § 860-a(6) ........................................................................................12

N.Y. Lab. Law § 860-b(1) ........................................................................................12

N.Y. Lab. Law § 860-c .......................................................................................25, 31

## NON-DEBTOR DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Non-Debtor Defendants Ark CLO 2001-1 Limited ("Ark CLO"),[2] Ark Investment Partners II, L.P. ("AIP II"), Patriarch Partners, LLC ("Patriarch Partners"), Patriarch Partners III, LLC ("Patriarch III," collectively "Non-Debtor Entity Defendants") and Lynn Tilton ("Tilton," together with the Non-Debtor Entity Defendants referred to as "Non-Debtor Defendants") submit this Memorandum of Law in Support of Non-Debtor Defendants' Motion for Summary Judgment, pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure, which incorporates Rule 56 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

After conducting discovery for almost three years, Plaintiffs (Named Plaintiff Shameeka Ien ("Ien") and the certified classes and sub-class) cannot substantiate the conclusory allegations set forth in their Adversary Class Action Complaint ("Complaint") ("Dkt. No. 1") against the Non-Debtor Defendants for alleged violations of the federal and New York Worker Adjustment and Retraining Notification ("WARN") Act and/or for alleged unpaid wages under the New York, Pennsylvania and Maryland wage laws.  Because discovery has proven that Plaintiffs' claims are wholly without any evidentiary basis, the Non-Debtor Defendants should be dismissed pursuant to Bankruptcy Rule 7056.

Plaintiffs improperly seek to impose liability upon Non-Debtor Defendants for alleged damages arising solely from the conduct of Debtor Defendant TransCare.  Plaintiffs are former employees of TransCare and its subsidiaries.[3]  Some Plaintiffs lost their jobs when TransCare filed

---

[2] As discussed in Argument Section I, *infra*, Ark CLO has never existed or had any relationship with TransCare or with any of the other Non-Debtor Defendants.

[3] *See* Fn. 1, *supra*.

for Chapter 7 Bankruptcy protection on February 24, 2016; the remaining Plaintiffs were terminated two days later on February 26, 2016.  Apparently concerned that TransCare will not have sufficient assets to compensate them for damages allegedly arising from TransCare's actions, Plaintiffs have disingenuously alleged that Non-Debtor Defendants Tilton (TransCare's sole Director), Ark CLO, AIP II, Patriarch III and Patriarch Partners are jointly and severally responsible for TransCare's actions.  As discussed below, however, there is no legal or factual basis for Plaintiffs' claims against the Non-Debtor Defendants.

In fact, two of the Non-Debtor Entity Defendants, Ark CLO and Patriarch III, had absolutely no relationship whatsoever with TransCare during the Statutory Class Periods (as defined below).  Without any such relationship, Ark CLO and Patriarch III can have no liability to Plaintiffs as a matter of law.  In that regard, Plaintiffs seek to impose liability on Ark CLO, an entity which does not now and never did exist.  Additionally, the indisputable evidence demonstrates that Patriarch III, which is a limited partner in AIP II and had been the collateral manager for AIP II, ceased its collateral management activities long before the Statutory Class Periods.  The utter lack of relationship between Ark CLO or Patriarch III and Plaintiffs' employment at TransCare necessitates dismissal of all of Plaintiffs' claims against them.

Plaintiffs' federal and NY WARN Act claims against Patriarch Partners and AIP II similarly fail as a matter of law.  Plaintiffs do not dispute that TransCare was Plaintiffs' direct employer, and they cannot prove that either Patriarch Partners or AIP II was a "single employer" with TransCare subject to WARN Act liability.  Single employer liability cannot be established because, among other things:  (i) Patriarch Partners had no ownership interest in TransCare, and AIP II only had a *de minimis* ownership interest; (ii) neither Patriarch Partners nor AIP II shared

any common personnel policies, payroll systems and/or benefits with TransCare;[4] (iii) neither Patriarch Partners nor AIP II shared employees, policies or daily operations with TransCare; and (iv) neither Patriarch Partners nor AIP II had the ability, power or authority to exercise *de facto* control over TransCare.  In sum, Patriarch Partners, AIP II and TransCare were each entirely separate and independent companies, with no dependency of operations between or among them.

The only commonality among Patriarch Partners, AIP II and TransCare was Tilton, and, as a matter of law, that link is insufficient to establish a single employer relationship.  Regardless, all of the actions taken by Tilton relevant to this matter were taken in connection with her position as TransCare's sole Director.  Tilton rescued TransCare from Chapter 11 bankruptcy in 2005.  Over the ensuing years as TransCare's sole Director, Tilton worked tirelessly with the TransCare Management Team to turn TransCare around, and AIP II, one of her personal investment vehicles, occasionally made secured loans to TransCare in furtherance of these efforts.  When TransCare struggled in late 2015 and early 2016, Tilton worked relentlessly in an attempt to restructure it by salvaging the profitable portions of TransCare's business and saving as many TransCare jobs as possible.  Patriarch Partners personnel assisted Tilton in her efforts.  The assistance provided by Patriarch Partners to Tilton and the secured loans from AIP II do not create a single employer relationship with between TransCare and either entity.  Further, as discussed above, Ark CLO did not exist, and Patriarch III ceased functioning as a collateral manager prior to the Statutory Class Periods; therefore, as a matter of law, they are not single employers under the federal and NY WARN Acts.  Accordingly, Plaintiffs' federal and NY WARN Act claims against all of the Non-

---

[4] AIP II is an investment fund that provided secured loans to TransCare at Tilton's direction; it did not have any employees.  (SOF ¶ 23-24.)

Debtor Entity Defendants, Ark CLO, Patriarch III, Patriarch Partners and AIP II, must be dismissed.

Alternatively, the "unforeseen business circumstances" exception to the federal and NY WARN Acts requires dismissal of Plaintiffs' federal and NY WARN Act claims against the Non-Debtor Entity Defendants.  It is indisputable that the events leading to TransCare's shutdown of operations, which was the proximate cause of Plaintiffs' loss of employment, were not reasonably foreseeable.  In fact, the evidence clearly shows that Tilton, with support from Patriarch Partners personnel, worked tirelessly to develop a restructuring plan that would: (i) salvage parts of TransCare's business for continued operation by a new corporate entity, and (ii) allow for an orderly wind down of those parts of TransCare's operations that were not salvageable.  It was only at the eleventh hour that Tilton's efforts were abruptly thwarted by Wells Fargo, TransCare's senior secured ABL lender, which refused to fund a wind-down unless TransCare filed for Chapter 7 bankruptcy protection (and then refused to fund the wind-down even after such filing).  TransCare's Trustee also prevented Tilton's restructuring efforts by disputing claims to certain foreclosed-upon assets necessary to operate those parts of TransCare that Tilton worked zealously to salvage.  There is no dispute that these unforeseeable actions (i) caused Plaintiffs' loss of employment and (ii) were not those of the Non-Debtor Entity Defendants.  For this alternative reason, Plaintiffs' federal and NY WARN Act claims should be dismissed as to the Non-Debtor Entity Defendants.

Finally, Plaintiffs' remaining wage claims under New York, Pennsylvania and Maryland law against the Non-Debtor Defendants should be dismissed.  As a matter of law, none of the Non-Debtor Defendants can be found to be a joint or single employer under these state wage statutes.

For these reasons and those set forth herein and in Non-Debtor Defendants' Bankruptcy Rule 7056-1 Statement of Undisputed Material Facts, Plaintiffs' claims against the Non-Debtor Defendants should be dismissed.

## PROCEDURAL BACKGROUND: THE STATUTORY CLASS PERIODS

On March 1, 2016, Ien commenced this Adversary Class Action by filing her Complaint in this Court, on behalf of herself and others similarly situated. (Dkt. No. 1.) On April 22, 2016, the Non-Debtor-Defendants filed an answer to the Complaint. (Dkt. No. 18.) On June 3, 2016, the Debtor Defendants filed an answer to the Complaint. (Dkt. No. 24.) On October 24, 2016, this Court certified a WARN Class, New York State WARN Sub-Class and Wage Class as defined in this Court's Order. (Dkt. No. 46.)

The relevant time period for purposes of Plaintiffs' NY WARN Act claim commenced on November 26, 2015 – 90 days prior to February 24, 2016 (90-days advance notice is required under the NY WARN Act, unless an exception applies). For purposes of the federal WARN Act claims, the relevant time period commenced on December 26, 2015 (60-days advance notice is required under the federal WARN Act, unless an exception applies). Collectively, these two time periods are referred to as the "Statutory Class Periods."

## CONCISE STATEMENT OF MATERIAL UNDISPUTED FACTS

## I.    TRANSCARE, PLAINTIFF AND THE NON-DEBTOR DEFENDANTS

Ien and members of the certified classes were employed by TransCare during the Statutory Class Periods. (SOF ¶ 5; Dkt. No. 46.) TransCare provided ambulance, paratransit transportation and life support services in New York, Maryland and Pennsylvania. (SOF ¶¶ 1, 12.) Tilton served as TransCare's sole Director. (*Id*.)

Tilton was also the Chief Executive Officer of Patriarch Partners and the Manager of AIP II and Patriarch III during the Statutory Class Periods. (SOF ¶¶ 14, 23, 28.) Certain affiliates of

Patriarch Partners (the "Patriarch Collateral Managers") were the collateral managers for certain lenders to TransCare including Zohar CDO 2003-1, Limited, Zohar II 2005-1 Limited and Zohar III Limited (collectively, the "Zohar Funds").[5]  (Tilton Dec. ¶ 9.)  AIP II, an investment fund, also provided occasional funding to TransCare at Tilton's direction.  (SOF ¶¶ 23-24.)  As an investment fund, however, AIP II had no employees and no daily operations.  (SOF ¶¶ 25, 27.)

During the Statutory Class Periods, the Patriarch Collateral Managers delegated their duties to, and such duties were performed by, Patriarch Partners.  (Tilton Decl. ¶ 9.)  In addition, Patriarch Partners supported Tilton in her role as TransCare's sole Director.  (SOF ¶14.)

During the Statutory Periods, Patriarch III had ceased functioning in any role with no employees or daily operations and was not a collateral manager.  (Tilton Decl. ¶ 7; SOF ¶¶ 30-31.)

During the Statutory Class Periods, Patriarch Partners never had an ownership interest in TransCare and did not have a contractual relationship in any form with TransCare.  (Tilton Decl. 8; SOF ¶¶ 16, 21.)  AIP II owns approximately 5.6% of TransCare's stock; Patriarch III is a limited partner of AIP III.  (SOF ¶¶ 26, 29.)

As noted above, Ark CLO did not exist nor ever existed.  (Tilton Decl. ¶¶ 3, 5; SOF ¶ 33.)

## II.    EVENTS LEADING TO TRANSCARE'S CHAPTER 7 BANKRUPTCY FILING

On or about October 13, 2006, TransCare entered into an asset-based lending arrangement ("ABL") with Wells Fargo Bank, N.A ("Wells Fargo").  (SOF ¶ 36.)  On December 22, 2015, Wells Fargo agreed to forbear from exercising its rights and remedies under the parties' loan agreement with respect to the events of default that had occurred, which were specified in the agreement.  (SOF ¶ 43.)

---

[5] The Patriarch Collateral Managers submitted their notices of resignation as collateral managers for the Zohar Funds on or about February 5, 2016.  Such resignation became effective on or about March 3, 2016, when a new collateral manager was appointed.  (Tilton Decl. ¶ 9.)

Based on Wells Fargo's insistence, and a requirement of Wells Fargo's continued funding, on or about January 7, 2016, TransCare retained Carl Marks Advisors ("Carl Marks") to, among other things, "manage, secure, [and] improve [TransCare's] financial performance and liquidity." (SOF ¶¶ 44-48.)  Carl Marks served as TransCare's CFO and reported directly to the Director of TransCare.  (SOF ¶ 48.)  Wells Fargo also requested budget plans from Carl Marks.  (SOF ¶ 49.)

Between January 29, 2016, and February 16, 2016, Wells Fargo granted six separate extensions on its forbearance agreement with TransCare.  (SOF ¶¶ 43, 51-52, 61, 65, 67.)  During the period January 15, 2016, to January 29, 2016, Tilton authorized the making of secured loans to TransCare from her personal investment vehicles, non-party Ark II CLO 2001-1 Limited ("Ark II") and Ark Angels II, LLC ("Ark Angels").  (SOF ¶ 50.)  These lenders collectively loaned more than $2 million dollars to TransCare to support its operations.  (*Id.*)

During this time, Tilton, with the assistance of TransCare, Wells Fargo, Carl Marks and Patriarch Partners employees, reporting to her in her capacity as TransCare's sole Director, devised a two-fold plan to restructure TransCare.  (SOF ¶¶ 55-58.)  Tilton's plan called for simultaneously: (i) winding down certain TransCare entities in a Chapter 11 bankruptcy, and (ii) forming a new corporate entity to take over the operations of certain TransCare subsidiaries through an Article 9 foreclosure sale.  (SOF ¶¶ 55-58, 60.)  Under the orderly wind-down plan, WARN notices would be issued to employees of the wound-down entities, and the remaining employees would continue working upon their acceptance of employment with the new company.  (SOF ¶¶ 57-58, 64, 66, 76.)  Two entities were formed on February 10, 2016, in anticipation of the Article 9 sale.  (SOF ¶ 59.)  A few days later, Tilton and her team of advisors considered hiring a Chief Restructuring Officer to assist with the planned restructuring of operations.  (SOF ¶ 70.)

7

## III.    TRANSCARE'S CHAPTER 7 BANKRUPTCY FILING

As plans were being devised for the orderly wind down, without forewarning, Wells Fargo refused to further extend the Forbearance Agreement.  (SOF ¶ 77.)  Within days, Wells Fargo made it clear to Tilton that it would no longer fund the restructuring plan unless the plan involved a Chapter 7 bankruptcy.  (SOF ¶ 82.)  Based on Wells Fargo's representations, Tilton, as TransCare's sole Director, authorized the Company to file for a Chapter 7 bankruptcy.  (SOF ¶ 83.)  Certain TransCare entities filed for bankruptcy on February 24, 2016.  (Dkt No. 1; SOF ¶ 84.)  That same day, TransCare's Management Team distributed communications: (i) to certain employees of the entities that were going to be wound-down (that were sufficient notice for WARN Act purposes), and (ii) to certain employees who were intended to become employees of the new entity once it became operational.  (SOF ¶¶ 86, 88-93.)

On February 25, 2016, Salvatore LaMonica ("LaMonica") was appointed as the interim Chapter 7 Trustee in the bankruptcy proceeding.  (SOF ¶ 95.)  Negotiations to fund TransCare's payroll continued through the evening of February 25, 2016.  (SOF ¶ 96.)  No agreement was reached, and, on or about February 26, 2016, TransCare ceased all remaining operations.  (SOF ¶ 97.)  That same day, TransCare's Management Team sent a communication (that was also sufficient to serve as WARN notice) to the remaining TransCare employees that TransCare would cease operations immediately.  (SOF ¶ 98.)

Wells Fargo and the Trustee entered into an arrangement pursuant to which Wells Fargo would continue to fund payroll for certain employees of TransCare after the bankruptcy filing.  (SOF ¶ 99.)  On or about April 25, 2016, the remaining TransCare entities filed for Chapter 7 bankruptcy.  (Joint Statement of Material Facts ("JSOF") ¶ 17, Dkt. No. 97.)

## STANDARD OF REVIEW

Rule 7056 of the Bankruptcy Rules incorporates Rule 56 of the Federal Rules of Civil Procedure and states that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see In re Soundview Elite Ltd.*, 594 B.R. 108, 125 (Bankr. S.D.N.Y. 2018) ("Bankruptcy Rule 7056 controls the procedure for adversary proceedings in bankruptcy, making Rule 56 of the Federal Rule of Civil Procedure applicable to this motion.").

The moving party "bears the burden of establishing that no genuine issue of material fact exists," and that the undisputed facts entitle the movant to judgment as a matter of law. *See Morales v. Holder*, 351 F. App'x 554, 555 (2d Cir. 2010) (quoting *Rodriguez v. City of N.Y.*, 72 F.3d 1051, 1060–61 (2d Cir.1995)). The movant must support its assertion that a fact is genuinely undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(a). To sufficiently rebut summary judgment, the nonmoving party must set forth specific facts that show relevant triable issues and cannot rely on pleadings containing mere allegations or denials. *See PACA Trust Creditors of Lenny Perry's Produce, Inc. v. Genecco Produce Inc.*, 913 F.3d 268, 275 (2d Cir. 2019) (the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts.") (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no genuine issue of material fact." *Wang v. Hearst Corp.*, 877 F.3d 69, 76 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

## ARGUMENT

I.    **ALL CLAIMS AGAINST ARK CLO AND PATRIARCH III SHOULD BE DISMISSED BECAUSE ARK CLO DID NOT EXIST AND PATRIARCH III HAD CEASED FUNCTIONING AS A COLLATERAL MANAGER LONG BEFORE THE STATUTORY CLASS PERIODS.**

Plaintiffs improperly named two entities, Ark CLO and Patriarch III, as Non-Debtor Defendants. Since they filed their Answer (Dkt. No. 18), Non-Debtor Defendants have repeatedly informed Plaintiffs that Ark CLO never existed. (SOF ¶ 34.) Moreover, Plaintiffs learned in discovery that Patriarch III ceased operating as a collateral manager long before the applicable Statutory Class Periods. (SOF ¶¶ 28, 30.) Therefore, Plaintiffs cannot fashion any claim, let alone present evidence in support of such claim, in which Ark CLO and Patriarch III may be held liable for their WARN Act and wage claims.

Although Non-Debtor Defendants have repeatedly informed Plaintiffs that Ark CLO simply does not exist, Plaintiffs have steadfastly refused to either voluntarily dismiss Ark CLO or otherwise amend their pleading. (SOF ¶ 34.) The time to do so has long passed; discovery is closed and the deadline to amend pleadings expired on or about May 13, 2016. Accordingly, Ark CLO should be dismissed from this case.

Similarly, dismissal of all claims against Patriarch III is warranted because the undisputed evidence demonstrates that Patriarch III is an entity that "no longer functions in any kind of role" vis-a-vis TransCare. (SOF ¶ 28.) Patriarch III "used to be the collateral manager for Ark Investment Partners II when it was a private equity fund" well before the Statutory Class Periods. (SOF ¶¶ 28, 30.)

Moreover, Ien's own deposition testimony further supports dismissal of these two Non-Debtor Defendants.  At her deposition, Ien confirmed that she never communicated with anyone from Ark CLO or Patriarch III, nor did she receive a paystub from Ark CLO or Patriarch III.  (SOF ¶¶ 32, 35.)

Plaintiffs cannot offer any evidence creating a genuine issue of fact as to the liability of Ark CLO or Patriarch III in connection with their WARN Act and wage claims.  Accordingly, Non-Debtor Defendants Ark CLO and Patriarch III should be dismissed from the case as a matter of law.

## II.    ALL WARN ACT CLAIMS BROUGHT AGAINST NON-DEBTOR ENTITY DEFENDANTS SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE NOT ESTABLISHED A *PRIMA FACIE* CASE OF WARN ACT LIABILITY.

Plaintiffs allege that they were "employed by Defendants" until on or about February 24, 2016.  (Dkt. No. 1 at ¶ 22.)  Based on this and other conclusory allegations, Plaintiffs claim that each of the Non-Debtor Entity Defendants are liable under the federal and New York WARN Acts. (Dkt. No. 1 at ¶¶ 80, 93.)  Plaintiffs do not even attempt, as required by Fed. R. Civ. P. 8, to distinguish among each of the Non-Debtor Entity Defendants in asserting whether each is liable under the federal and NY WARN Acts either as a direct employer or as a single employer.  (*See, e.g., id.* at ¶¶ 80, 102.)  Notwithstanding such noncompliance, it is undisputed that the Non-Debtor Entity Defendants were not Plaintiffs' direct employers.  It is further indisputable that the Non-Debtor Entity Defendants do not constitute a "single employer" under the federal and NY WARN Acts.  Therefore, summary judgment should be granted, and the federal and New York WARN Act claims dismissed as to each of the Non-Debtor Entity Defendants.

### A.    The Non-Debtor Entity Defendants Were Not Plaintiffs' Direct Employer.

Plaintiffs use the term "Defendants" or "Patriarch" in conclusory fashion, failing to distinguish the basis for their federal and NY WARN Act claims as to each Defendant.  However,

in order to assert a federal and/or NY WARN Act claim, Plaintiffs must show that *each* of the remaining Non-Debtor Entity Defendants was their "employer" under the WARN Acts. *See* 29 U.S.C. § 2102(a)(1); N.Y. Lab. Law § 860-b(1). The federal WARN Act requires an "employer" to provide 60 days' WARN notice to affected employees if there is a mass layoff or plant closing. 29 U.S.C. § 2102(a)(1). The New York WARN Act requires an employer to provide 90 days' notice of a mass layoff or plant closing. N.Y. Lab. Law § 860-b(1). Accordingly, to sustain claims as a matter of law pursuant to the federal and New York WARN Acts, Plaintiffs must demonstrate that (1) each remaining Non-Debtor Entity Defendant was their "employer;" (2) each remaining Non-Debtor Entity Defendant decided to close TransCare, which caused an employment loss of at least 50 employees (federal) and 25 employees (New York); and (3) each remaining Non-Debtor Entity Defendant failed to provide WARN notice to the employees within the time frame required by the WARN Acts. *See* 29 U.S.C. §§ 2101(a)(2); 2102(a)(1); N.Y. Lab. Law §§ 860-a(6); 860-b(1).

As an initial matter, neither Ark CLO nor Patriarch III can be found to be a direct employer pursuant to the WARN Acts for the reasons set forth in Section I, *supra*.

Patriarch Partners also is not a direct employer pursuant to the WARN Acts because it is indisputably an entity separate from TransCare. Patriarch Partners' sole involvement in TransCare's business was in connection with the provision of support and advice to Tilton in her capacity as TransCare's sole Director and the performance of collateral manager duties related to the monitoring of secured loans made to TransCare by various investment vehicles owned and managed by Tilton.

Nor is AIP II an "employer" for purposes of the WARN Acts. As Tilton's personal investment fund, AIP II is also a separate entity that solely "[p]rovided loan capital to TransCare."

(SOF ¶ 23.)  AIP II had no employees and no personnel policies (SOF ¶ 25); therefore, it could not have any involvement or control over TransCare's operations and employees.

Furthermore, it is undisputed that Ien knew and understood that TransCare—and not any of the Non-Debtor Entity Defendants—was her sole employer.  Ien confirmed under oath that she never interviewed with anyone representing the Non-Debtor Entity Defendants (or any of them) during the hiring process.  (SOF ¶ 6.)  During her employment with TransCare, Ien did not receive instruction from any of the Non-Debtor Entity Defendants nor did she communicate with any of them.  (*Id*.)  Ien further affirmed that she only received directives from the CFO of TransCare and worked on a daily basis solely with other TransCare employees.  (*Id*.)  In addition, Ien only received paystubs and other employment related forms from TransCare and not from any of the Non-Debtor Entity Defendants.  (SOF ¶¶ 7, 10.)  In fact, none of the certified class members received a paystub or other employment-related documents from the Non-Debtor Entity Defendants.  (SOF ¶¶ 22, 27, 32, 35.)  In sum, there is no evidence (either documentary or deposition testimony) that any member of the certified classes believed that any of the Non-Debtor Entity Defendants was their employer.

Even after certain TransCare entities filed for bankruptcy on February 24, 2016, Ien, along with a number of other employees of TransCare's finance, payroll, billing and customer service departments, continued to work at TransCare's premises.  (SOF ¶ 8.)  Ien and those other employees were paid by TransCare's senior lender, Wells Fargo, based on an arrangement between the Trustee and Wells Fargo.  (SOF ¶ 99.)  When Ien ceased to work at TransCare around the first week of March 2016, she collected her final paycheck from Anasha Ally, an employee of TransCare, in the lobby of the TransCare office building.  (SOF ¶ 9.)  Debtor-Defendant TransCare New York Inc. issued Ien's 2016 W-2.  (SOF ¶ 10.)  Plaintiffs have no evidence that any of the

Non-Debtor Entity Defendants were their direct employer during this post-bankruptcy period of time; they were not.

In sum, the uncontroverted evidence shows that TransCare—not any of the Non-Entity Defendants—was the "employer" of the Plaintiffs pursuant to the federal and NY WARN Acts, and dismissal of those claims against the Non-Debtor Entity Defendants is warranted.

> **B.    The Federal and NY WARN Act Claims Against the Non-Debtor Entity Defendants Are Ripe For Dismissal Because Plaintiffs Cannot Meet Their High Burden of Proving a *Prima Facie* Case of Single Employer Liability.**

As Plaintiffs cannot establish a direct employer relationship with any of the Non-Debtor Entity Defendants, in order to sustain their federal and NY WARN Act claims against them, Plaintiffs must prove each of the Non-Debtor Entity Defendants constituted a "single employer" with TransCare. There is no evidence to support such a finding.

Multiple circuits, including the Second Circuit, have adopted the Department of Labor's ("DOL") five-factor test for determining whether an employer and a related entity may be considered a "single employer" for purposes of WARN Act liability. *See Guippone v. BH S&B Holdings LLC*, 737 F.3d 221, 226 (2d Cir. 2013). Pursuant to the DOL regulations, these factors are: (1) common ownership, (2) common directors and/or officers, (3) unity of personnel policies; (4) dependency of operations, and (5) *de facto* control. 20 C.F.R. § 639.3(a)(2).

The balancing test is "intended to discover whether…nominally separate entities actually functioned as a single business, particularly with regard to labor policy." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 498 (3d Cir. 2001). Courts will examine whether "[p]laintiffs have put forth enough evidence to create a ***genuine issue of material fact*** so as to survive summary judgment" and will grant summary judgment where plaintiffs failed to come forward with sufficient evidence. *Id*. at 497 (emphasis added). No single factor is controlling, and Plaintiffs bear the burden of demonstrating the "high degree of integration" required to establish "single

employer" status as courts have been reluctant to "create jurisprudence that discourages loans in general or rescues of troubled business enterprises in particular." *Id*. at 502, 505 (3rd Cir. 2001); *see Vogt v. Greenmarine Holding, LLC*, 318 F. Supp. 2d 136, 142 (SDNY 2004).

### 1.   None of the Non-Debtor Entity Defendants Exercised *De Facto* Control Over TransCare.

Whether the related entity has exercised *de facto* control over the employer carries "special weight" in the single employer analysis. *Pearson*, 247 F.3d at 504; *see also Coppola v. Bear Stearns & Co., Inc.*, 499 F.3d 144, 150 (2d Cir.2007) (noting, with respect to lender liability under WARN, the primary focus is exercise of *de facto* control and stating "a creditor may exercise very substantial control in an effort to stabilize a debtor and/or seek a buyer so as to recover some or all of its loan or security without incurring WARN liability."). In evaluating *de facto* exercise of control, courts look to whether the alleged related entity "was the ***decisionmaker responsible for the employment practice giving rise to the litigation***." *Pearson*, 247 F.3d at 503–504 (emphasis added).

In *In re DHP Holdings II Corp.*, 447 B.R. 418 (Bankr. D. Del. 2010), the Court granted summary judgment finding no "single employer" liability in favor of a private equity firm defendant, HIG, which was a 70% owner of a holding company that owned all of the employer defendant, DHP (a manufacturer of outdoor heaters and lawn and other garden products). The Court absolved the firm of WARN liability because the plaintiffs failed to show *de facto* exercise of control, i.e., that the firm was the decision-maker responsible for the employee layoffs. The Court found that the HIG, did not exert *de facto* exercise of control even though HIG had "prepared cost-cutting plans" for the entity at issue. The court found that the undisputed evidence demonstrated that an individual appointed at the senior lenders' behest to be the Chief Restructuring Officer ("CRO") of DHP ultimately had the discretion to and did make the decision

to close the plant and lay off employees. *Id.* at 424. The Court noted that "[t]here is no evidence that HIG controlled that decision." *Id.* Moreover, the Court did not give weight to "the fact that both [the CRO] and the HIG directors reached the same conclusion regarding cost-cuts and facility closings" and found it "insufficient to support the conclusion that HIG directed the termination of the employees . . . ." *Id.* at 424. Significantly, the Court pointed out that "[t]he fact that the Debtors' boards (including HIG directors) approved the bankruptcy filing or facility closings, is insufficient to establish that HIG ordered the terminations." *Id.*

First, there is no evidence that either Ark CLO or Patriarch III had any relationship with, let alone any form of control over, TransCare during the Statutory Class Periods. *See* Section I, *supra*. Accordingly it is indisputable that Plaintiffs cannot satisfy this factor with respect to these two entities.

Second, the record is crystal clear that neither Patriarch Partners nor AIP II exercised *de facto* control over TransCare. In addition, neither of these entities made (or had any obligation to make) the decision to provide notice of termination for purposes of the WARN Acts to TransCare employees. The uncontested evidence shows:

- As the TransCare's sole Director, Tilton, not Patriarch Partners (or any of the other Non-Debtor Entity Defendants), had the authority to make decisions for TransCare along with TransCare's Management Team. (SOF ¶¶ 13, 14, 17.)

- The senior lender, Wells Fargo (not Patriarch Partners) controlled the amount of cash available on a daily basis to TransCare through an asset based loan secured by the inventory and receivables of TransCare. Wells Fargo developed strategies related to administrating the loan with TransCare's Management Team on a daily or weekly basis. (SOF ¶¶ 38-39.)

- The decision to retain the third party advisory firm, Carl Marks, in or around January 7, 2015, was driven by, and had to be approved by, Wells Fargo. (SOF ¶¶ 44-45.)

- TransCare engaged Carl Marks Advisors to serve as CFO and to assist the Company in building a turnaround by establishing a "process to develop a strategic operating plan for the business that would transform the business. . ." (SOF ¶¶ 45-46.)

16

- TransCare employees, not Patriarch Partners employees (or any of the other Non-Debtor Entity Defendants), were involved in the day-to-day operations of TransCare.  (SOF ¶¶ 4, 13, 40.)

- TransCare's CEO and CFO, not Patriarch Partners employees (or any of the other Non-Debtor Entity Defendants), were involved in day-to-day communications with the primary contact for TransCare at Wells Fargo.  (SOF ¶ 40.)

- Patriarch Partners did not make decisions for TransCare.  Patriarch Partners' employees were responsible for advising Tilton in her capacity as TransCare's sole Director on making decisions.  (SOF ¶¶ 14, 17.)

- In her capacity as TransCare's sole Director, Tilton, not Patriarch Partners (or any other Non-Debtor Entity Defendant), authorized TransCare to file for Chapter 7 bankruptcy.  Tilton's authorization was based on Wells Fargo's decision not to fund any additional money into TransCare unless TransCare filed for Chapter 7 bankruptcy.  (SOF ¶¶ 82-83.)

- On February 24, 2016, Glen Youngblood, TransCare's Vice President of Performance Excellence, distributed communications (sufficient for WARN Act purposes) to TransCare employees regarding the Chapter 7 bankruptcy filing, the closing of certain operations and the plan to continue certain operations of TransCare in the form of a new entity.  (SOF ¶¶ 3, 86, 88-93.)

- On February 26, 2016, when it was clear that the new entity that had been formed for the continued operation of parts of TransCare's business could not operate, Plaintiffs received a communication regarding their employment loss (sufficient for WARN Act purposes) from Tom Fuchs, Vice President of Transit Services at TransCare.  (SOF ¶¶ 97-98.)

- After TransCare filed for Chapter 7 bankruptcy, Wells Fargo continued to fund payroll for certain TransCare employees.  (SOF ¶ 99.)

Here, there is even less factual support for a finding of *de facto* exercise of control as there was in *DHP Holdings II Corp.*  As the undisputed material evidence demonstrates, Patriarch Partners **did not control the decision to layoff** TransCare employees as a result of the Chapter 7 bankruptcy filing.  (SOF ¶¶ 82-83, 86, 88-93.)  There is no dispute Patriarch Partners' employees' involvement in *any* TransCare matters were solely in connection with the performance of collateral manager duties or in their capacity as advisors to Tilton in her role as TransCare's sole Director.  (SOF ¶¶ 14-15, 17, 19.)  No Patriarch employee had any authority to direct TransCare or its

17

employees to take any actions; only Tilton and TransCare management had such authority. (SOF ¶ 13.) Indeed, TransCare adopted an Authority Matrix implemented by its sole Director, which made clear that Tilton, not Patriarch Partners, had the authority to make important operational decisions for TransCare. (*Id.*)

There is also no doubt that Tilton (and not Patriarch Partners or its employees) was the ultimate decision maker, with respect to TransCare's decision to file for Chapter 7 bankruptcy on February 24, 2016. Tilton's decision to file for Chapter 7 bankruptcy was precipitated by Wells Fargo's eleventh-hour decision to only fund a wind down plan in a Chapter 7 bankruptcy.[6] (SOF ¶¶ 82-83.) The undisputed material facts demonstrate that the communications that were received by TransCare employees regarding the employment losses caused by the Chapter 7 bankruptcy were not directed by Patriarch Partners, but came from TransCare's Management Team. (SOF ¶¶ 86, 88-93, 98.) While Patriarch Partners' employees may have provided some assistance in drafting the communications, such assistance was provided in connection with the support and advice provided to Tilton, the sole Director of TransCare. (SOF ¶ 87.)

For its part, there is no evidence that AIP II had any involvement with the day-to-day operations of TransCare or exercised any control over the decision related to the layoff of TransCare employees in relation to the Chapter 7 bankruptcy. (SOF ¶¶ 24-27.) Thus, there can be no dispute of material fact that AIP II did not exercise *de facto* exercise of control over TransCare and should be dismissed based on this factor alone. *See Coppola v. Bear Stearns &*

---

[6] Here, although Plaintiffs' Complaint is sparse of any such allegations, the uncontroverted evidence demonstrates the employees of Patriarch Partners could not be deemed agents of Patriarch Partners directing TransCare's affairs nor did Plaintiffs assert any such claims in their Complaint. *See* Mem. Decision Granting in Part and Denying in Part Mot. to Dismiss, *LaMonica v. Tilton, et al.*, Adv. Proc. No. 18-01021, at 21-22 (S.D.N.Y. Bankr. April 30, 2019), Dkt. No. 78 (this Court has found "Although an employee of a particular Entity Defendant may have been an agent of that entity and also directed TransCare's affairs, the Amended Complaint does not imply that he acted as an agent of the Entity Defendant, as opposed to Tilton, when he exercised control over TransCare.").

*Co., Inc.*, 499 F.3d at 150; *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 245 (3d Cir. 2008) (finding while "APA Truck Leasing may have made certain loans to APA Transport and shared certain administrative functions, it was not 'controlling' APA Transport and played no role in APA Transport's decision to close its facilities.").

Accordingly, Plaintiffs cannot satisfy the *de facto* control criterion with respect to any of the Non-Debtor Entity Defendants.

### 2.    None of the Non-Debtor Entity Defendants and TransCare Shared A Unity of Personnel Policies Emanating from a Common Source.

The next factor under the single-employer test is whether the employer and the related entity have a unity of personnel policies, emanating from a common source. The analysis of this factor looks to whether there was a centralized control of labor operations for the two companies at issue, considering such factors as "centralized hiring and firing, payment of wages, maintenance of personnel records, benefits and participation in collective bargaining." *Vogt*, 318 F. Supp. 2d at 143; 20 CFR §639.3(a)(2). The "limited monitoring of compensation expenditures as part of a general loan agreement requiring oversight of [] spending in a number of areas is" insufficient to demonstrate a unity of personnel policies emanating from a common source. *Pearson*, 247 F.3d at 499. Moreover, courts have held that mere allegations and/or proof that a secured lender controlled the hiring, monitoring and/or termination of c-suite executives and/or other high-level managers is not enough to satisfy this factor. *Id.* at 500. In sum, courts require that Plaintiffs demonstrate the two entities "actually functioned as a single entity with regard to its relationship with employees." *Id.* at 499.

Here, Patriarch Partners and TransCare did not function as a single entity with respect to employee matters such that a unity of personnel policies emanated from a common source. The undisputed facts demonstrate:

- Patriarch Partners did not share employees; payroll systems; employment policies and handbooks with TransCare. Patriarch Partners had its own personnel policies, payroll system and handbook. (Tilton Decl. ¶ 8, SOF ¶ 21.)

- Patriarch Partners was not a party to and did not negotiate any collective bargaining agreements that TransCare entered into with the union representing TransCare employees. (Tilton Decl. ¶ 8, SOF ¶ 21.)

- Patriarch Partners did not make hiring decisions related to TransCare rank and file employees, and only supplied support for Tilton in the hiring of high level c-suite executives, but had no individual decision-making authority to make such hires (only Tilton did). (Tilton Decl. ¶ 8; SOF ¶¶ 13, 19.)

The mere participation of the employees of the related entity in the hiring/firing of executive officers and other high-level managers of the company that is the direct employer of those employees is insufficient, as a matter of law, to create a factual issue as to the unity of personnel policies between two entities. *See Pearson*, 247 F.3d at 500 (finding that the fact that the secured lender "may have controlled the hiring and firing of the company's president and chief executive officer, and monitored the hiring of a few other high-level managers . . . simply is not enough to find a 'unity' of personnel 'policy.'"). Although certain Patriarch Partners' employees, such as Jones, advised Tilton (as TransCare's sole Director) regarding the hiring of high level TransCare executives such as the CEO and CFO, such activity is insufficient to raise a material factual issue as to the unity of personnel policies under the single employer analysis. (SOF ¶ 19.) This is because Patriarch Partners was not controlling the decision regarding the executives who would ultimately be hired/fired. *Pearson*, 247 F.3d at 500. Here, as the testimony and Authority Matrix makes plain, TransCare's sole Director, Tilton, made the ultimate hiring/firing decisions. (*Id.*; SOF ¶¶ 13, 19.)

20

Finally, given that Ark CLO never existed, it was also impossible for it to share personnel policies with TransCare. (SOF ¶¶ 33, 35.) As to AIP II and Patriarch III, it is undisputed that these two entities did not have employees; thus, it was impossible for those two entities to share personnel policies with TransCare. (SOF ¶¶ 25, 31.)

As a matter of law, Plaintiffs have not met and cannot meet their burden of proof as to the unity of personnel policies criterion with respect to any of the Non-Debtor Entity Defendants.

### 3. There Was No Dependency of Operations Among or Between the Non-Debtor Entity Defendants and TransCare.

The third factor, the "dependency of operations," is met where there is proof of "sharing of administrative or purchasing services, interchanges of employees or equipment, or commingled finances." *Vogt*, 318 F. Supp. 2d at 143; 20 CFR §639.3(a)(2). Courts have found that there is "strong evidence" that there is no dependency of operations if one company continues to operate "without incident after [the other entity] folded." *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d at 245; *see also Pearson*, 247 F.3d at 501 (finding in parent-subsidiary context, "the mere fact that the subsidiary's chain-of-command ultimately results in the top officers of the subsidiary reporting to the parent corporation does not establish the kind of day-to-day control necessary to establish an interrelation of operations.").

Here, neither Patriarch Partners nor AIP II had involvement in the day-to-day operations of TransCare, and both Patriarch Partners and AIP II continued their operations without interruption after TransCare filed for bankruptcy. (SOF ¶¶ 4, 13, 23-24, 40.) Thus, there is no factual dispute that neither Patriarch Partners nor AIP II was dependent on TransCare for their own continued operations.

In *In re Consol. Bedding, Inc.*, 432 B.R. 115, 124 (3d Cir. 2010), the Court found that plaintiffs could not show the "high degree of integration" necessary to sustain WARN Act claims

and no dependency of operations even when the private equity firm "[A]merican Capital supervised much of the Debtors' activities and American Capital employees occupied seats on the Debtors' boards of directors, the Debtors at all times remained separate business entities that did not rely on American Capital for day-to-day operations." Here, the fact that Tilton served as the TransCare's sole Director and was also the CEO of Patriarch Partners and the Manager of AIP II has no bearing on the questions of whether that the entities functioned separately. (SOF ¶¶ 14, 23.) Patriarch Partners, AIP II and TransCare each had separate bank accounts, separate tax returns and tax identification numbers. (SOF ¶ 21.) Patriarch Partners, AIP II and TransCare had different auditing and accounting processes. (*Id.*) Further, there is no dispute that TransCare employees controlled TransCare's day-to-day operations. (SOF ¶¶ 4, 6.)

In *In re Jevic Holding Corp.*, 492 B.R. 416, 432 (Bankr. D. Del. 2013), the Bankruptcy Court put special emphasis on the fact that the private equity firm's "focus [was] generally for troubled companies that they feel they can turn around" and that such a "'rescue' operation to return [the company] to profitability" was not a basis for finding dependency of operations. *Id.* at 433 & n.53. Similarly, Patriarch Partners is a private equity firm focused on rescuing companies in distress, and at all relevant times of this Complaint, Patriarch Partners' employees were advising Tilton in her capacity as TransCare's sole Director in an effort to turn around the TransCare operations or performing collateral manager duties to monitor loans made to TransCare by its lenders. (SOF ¶¶ 14, 15, 20, 53.) *See DHP Holdings II Corp.*, 447 B.R. at 425 (noting no dependency of operations where investment company's operations consisted of managing its investments). Evidence of such efforts to turnaround the business is insufficient to form the basis of a material issue of fact as to whether there was a dependency of operations between Patriarch Partners and TransCare.

22

As to AIP II, it solely served as an occasional lender to TransCare. (SOF ¶¶ 24, 27.) Both entities operated separately and had no shared services. (*Id.*) As discussed above, courts have placed special weight on finding no dependency of operations where a lender has provided capital to a troubled business. *Pearson* 247 F.3d at 495, 502 ("[t]he mere fact that a lender has loaned money to the borrower—thus making the borrower, in some sense, financially beholden to the lender—will not establish liability, or even 'dependency of operations'. . . even total control of a delinquent borrower's business might well be justified as an effort to protect collateral."); *In re Jevic*, 492 B.R. at 433.

With respect to Ark CLO and Patriarch III, given that neither of those entities had any involvement in TransCare's operations during the Statutory Class Periods (SOF ¶¶ 28, 30, 33, 34), there could be no dependency of operations between these entities and TransCare.

Accordingly, Plaintiffs have not presented any evidence to show that there was a dependency of operations among or between any of the Non-Debtor Entity Defendants and TransCare.

### 4.    Patriarch Partners and Ark CLO Could Not and Did Not Own TransCare, and AIP II and Patriarch III Have Only a De Minimis Interest in TransCare.

In analyzing the common ownership factor, courts have looked to whether the alleged related entity has an equity interest in the other entity. 20 CFR §639.3(a)(2); *Vogt*, 318 F. Supp. at 142 (citing *Pearson*, 247 F.3d at 498).

First, Ark CLO never existed; therefore, it could not have owned TransCare. (SOF ¶ 33.) Second, Patriarch Partners has no ownership interest in TransCare at all (SOF ¶ 16), and AIP II and Patriarch III have only a *de minimis* interest[7]. (SOF ¶¶ 26, 29; *see also* 20 CFR §639.3(a)(2).)

---

[7] AIP II owns approximately 5.6% of TransCare's stock; Patriarch III is a limited partner of AIP III. (SOF ¶¶ 26, 29.)

A *de minimis* ownership interest is not sufficient to demonstrate WARN liability. *In re DHP Holdings II Corp.*, 447 B.R. at 425 (finding that common ownership and common officers/directors did not establish a WARN violation).

### 5.    There is Only One Common Director and/or Officer Between and Among Patriarch Partners, AIP II, Patriarch III and TransCare.

The last and final factor, i.e., whether there are common directors and/or officers, considers whether the employer and the related entity: "(1) actually have the same people occupying officer or director positions with both companies, (2) repeatedly transfer management-level personnel between the companies; or (3) have officers and directors of one company occupying some sort of formal management position with respect to the second company." *Pearson*, 247 F.3d at 498; 20 CFR §639.3(a)(2). Courts have held that this factor is of "limited importance." *Vogt*, 318 F. Supp. 2d at 142 ("[T]he Supreme Court has noted [in the parent subsidiary context] 'it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary . . . . Since courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary, it cannot be enough to establish liability . . . that dual officers and directors made policy decisions and supervised activities at the [subsidiary].'"). More importantly, even if common ownership coupled with common management is established, this factor on its own is still insufficient to sustain claims of single employer liability at the summary judgment stage. *Pearson*, 247 F.3d at 494.

Here, there is only one common officer or director–Tilton. Tilton served as TransCare's sole Director and was also the Chief Executive Officer of Patriarch Partners and the Manager of AIP II and Patriarch III during the Statutory Class Periods. (SOF ¶¶ 12, 14, 23, 28.) However, Tilton's multiple positions alone is insufficient to create a material factual issue as to "single

employer" liability because "[e]ven ownership coupled with common management—is not a sufficient basis for liability." *Pearson*, 247 F.3d at 494.

As discussed above, Tilton served no role in Ark CLO as it has never existed (SOF ¶ 33); therefore, it is impossible for it to have any relationship with TransCare's operations.

In sum, there is no genuine issue of material fact that none of the Non-Debtor Entity Defendants exerted the necessary "pervasive control" over TransCare such that the entities could be deemed a "single employer" as a matter of law. *Pearson*, 247 F.3d at 505. Therefore, the federal and NY WARN Act claims should be dismissed as against the Non-Debtor Entity Defendants.

## III. THE FEDERAL AND NY WARN ACT CLAIMS ALSO SHOULD BE DISMISSED BECAUSE THE LAYOFFS AT ISSUE OCCURRED DUE TO UNFORESEEABLE BUSINESS CIRCUMSTANCES.

Even if this Court determines that a material factual dispute exists as to whether any of the Non-Debtor Entity Defendants can be a "single employer" (which they cannot), they are still entitled to summary judgment because the undisputed evidence shows that a "sudden, dramatic, and unexpected action or condition outside the employer's control" was the reason for the Plaintiffs' employment loss; therefore, the unforeseen business circumstances ("UBC") exception under both federal and New York WARN Acts precludes a finding of liability as to any of the Non-Debtor Entity Defendants. 29 U.S.C. § 2102(b)(2)(A); 20 C.F.R. § 639.9(b)(1); N.Y. LAB. L. § 860-c; 12 NYCRR § 921-6.3(a).

Under both the federal and state WARN Acts, the UBC exception applies when the event that triggers the lay-off at issue was "not reasonably foreseeable" at the time that the notice was required (60 or 90 days, respectively). 20 C.F.R. §639.9(b); 12 NYCRR § 921-6.3. As discussed below, none of the Non-Debtor Entity Defendants (especially Ark CLO because it did not exist) could have reasonably foreseen the business circumstances that led to the two layoffs and ultimate

25

closure of TransCare.  Therefore, summary judgment should be entered in Non-Debtor Entity

Defendants' favor, and those claims dismissed.

### A.    The Unforeseeable Business Circumstances Exception Under the WARN Acts

To invoke the UBC exception, the entity alleged to have WARN Act liability must show

that "1) the claimed circumstance was unforeseeable, and 2) the layoffs were caused by that

circumstance." *In re AE Liquidation, Inc.*, 522 B.R. 62, 68 (Bankr. D. Del. 2014).  In order for an

event to be foreseeable, it must be "probable."  The probability standard was first articulated by

the Fifth Circuit in *Halkias v. General Dynamics Corp.*, 137 F.3d 333 (5th Cir. 1998):

> [D]oes the WARN Act envision the probability of an unforeseen
> business circumstance (i.e. the contract cancellation) or instead the
> mere possibility of such a circumstance? We can only conclude that
> it is the probability of occurrence that makes a business
> circumstance "reasonably foreseeable" and thereby forecloses use
> of the § 2102(b)(2)(A) exception to the notice requirement. A lesser
> standard would be impracticable.

*Id.* at 336.

To date, all of the United States Courts of Appeals that have weighed in on the *Halkias*

opinion have adopted the Fifth Circuit's "probability" standard in analyzing whether the UBC

exception applies, including the Third, Sixth, Seventh, Eighth, and Tenth Circuits.  *In re AE*

*Liquidation, Inc.*, 866 F.3d 515, 530 (2017) ("In the nineteen years since *Halkias* was decided,

every Circuit to have considered this probability standard for WARN Act notice has adopted it . .

. the WARN Act is triggered when a mass layoff becomes probable—this is, when the objective

facts reflect that the layoff was more likely than not"); *Watson v. Mich. Indus. Holdings, Inc.*, 311

F.3d 760, 765 (6th Cir. 2002) (adopting the *Halkias* "probability" standard, and holding "a

reviewing court must be careful to avoid analysis by hindsight and remember that an employer's

commercially reasonable business judgment dictates the scope of this exception"); *Roquet v.*

*Arthur Andersen LLP*, 398 F.3d 585, 589 (7th Cir. 2005) (affirming the application of the unforeseeable business circumstances exception because the precipitating event was possible, but not probable, noting that "the WARN Act is not intended to deter companies from fighting to stay afloat"); *United Steel Workers of Am. Local 2660 v. U.S. Steel Corp.*, 683 F.3d 882, 887 (8th Cir. 2012) ("[I]t is the probability of occurrence [not the mere possibility] that makes a business circumstance 'reasonably foreseeable.'") (citation omitted); *Gross v. Hale-Halsell Co.*, 554 F.3d 870, 876 (10th Cir. 2009) ("we do not rely on the mere possibility that layoffs will occur, but rather look for their probability.").

Although the Second Circuit has not addressed the "probability standard," this Court should follow the other Circuit Courts and apply the *Halkias* "probability" standard to the instant matter.  As the court noted in *In re AE Liquidation,* "[t]his standard strikes an appropriate balance in ensuring employees receive the protections the WARN Act was intended to provide without imposing an 'impracticable' burden on employers that could put both them and their employees in harm's way."  866 F.3d at 530.

In evaluating the UBC exception, courts look to the history of the business and industry, and all surrounding facts and circumstances.  *In re AE Liquidation*, 522 B.R. at 68 (citing *Hotel Emps. & Rest. Emps. Int'l Union Local 54 v .Elsinore Shore Assocs*, 173 F.3d 175, 186 (3d Cir. 1999)).  An entity that is alleged to be liable for WARN Act claims must have had "such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market."  20 C.F.R. § 639.9(b)(2); 12 NYCRR § 921-6.3(b).  The court should objectively evaluate the decision based on information available when the decision was made—it is not necessary for the decision to have been *correct* in hindsight.  *In re Jevic Holding Corp.*, 496 B.R. 151, 161 (Bankr. D. Del. 2013).  Finally, the triggering event "does not

need to be an 'out-of-the-blue' event . . . for it to be considered 'sudden, dramatic, or unexpected.'" *Id.* (citing cases). The WARN Act allows some room for a company's exercise of reasonable business judgment, and the regulations "are intended to encourage employers to take all reasonable actions to preserve the company and the jobs." *In re Flexible Flyer Liquidating Trust*, 511 F. App'x 369, 374 (5th Cir. 2013).

Summary judgment dismissing Plaintiffs' WARN Act claims against the Non-Debtor Entity Defendants is warranted here because TransCare's Chapter 7 bankruptcy filing and the Trustee's shut down of operations that led to the layoff of TransCare employees were events that were not reasonably foreseeable.

### B.    TransCare's Chapter 7 Bankruptcy Filing Was Not Reasonably Foreseeable.

Here, the undisputed material facts demonstrate that the sudden decision of TransCare's senior lender, Wells Fargo, to continue funding only if the Company filed for Chapter 7 bankruptcy led to the unexpected Chapter 7 bankruptcy of certain subsidiaries of TransCare on February 24, 2016. (SOF ¶¶ 82, 83.) Wells Fargo's decision was not "reasonably foreseeable" at any time before February 24, 2016 based on the day-to-day events leading to the Chapter 7 petition. (*See generally* SOF ¶¶ 43-82.) On that same day, TransCare's Management Team distributed communications to employees regarding the Chapter 7 bankruptcy and related employment losses. (SOF ¶ 86.) The communications were sufficient for WARN Act purposes as the information in the communications clearly indicated why the Company filed for Chapter 7 bankruptcy and was "sufficient to 'assist' the employees in 'understand[ing] the employer's situation and its reasons for shortening the notice period.'" *In re AE Liquidation, Inc.*, 866 F.3d at 525 (quoting *Alarcon v. Keller Indus., Inc.*, 27 F.3d 386, 389 (9th Cir. 1994)); *see also Dewey & LeBoeuf LLP*, 507 B.R. 522 (Bankr. S.D.N.Y. 2014) (finding notices must include required brief statements regarding the basis for shortened notice).

28

In circumstances similar to the instant case, a federal court has held that a lender's sudden change of heart regarding funding extensions was sufficient to meet the UBC exception. For example, in *In re Jevic Holding Corp.*, defendant Sun Capital Partners acquired plaintiff Jevic, a trucking company, through a wholly-owned subsidiary in a leveraged buyout. 496 B.R. at 151. Jevic had a revolving credit facility with a bank group, CIT, which required it to maintain at least five million dollars in assets in order to access its line of credit. *Id.* When Jevic's assets fell below five million dollars in default of the financing agreement, CIT and Jevic entered into a forbearance agreement, which required Sun Capital to provide a two million dollar guarantee. *Id.* at 155. CIP agreed to extend the forbearance agreement on numerous occasions during a period when Jevic also retained a consulting firm Morris Anderson & Associates to advise with restructuring efforts, including retaining a CRO to assist with the reorganization plan. *Id.* Two months before the bankruptcy filing that led to the WARN action, Sun Capital decided not to invest more money in Jevic, and Jevic began an active sale process. *Id.* After several unsuccessful attempts to find buyers for the company, in May 2018, CIT refused to fund further borrowing unless Sun Capital invested additional money "to fund a bridge to complete the sale" to a potential buyer. *Id.* at 156. Sun Capital refused to do so since it would cost more to bridge the gap to fund the sale then the sale was expected to generate. Based on the fact that there was no prospective sale and that CIT's forbearance agreement was going to expire, Jevic's Board authorized a Chapter 11 bankruptcy filing. *Id.* Subsequently, employees received notice sufficient to satisfy the requirements of the WARN Act. *Id.*

Plaintiffs in *Jevic* argued that the debtors could not satisfy the unforeseen business circumstances exception because CIT's refusal to further extend the forbearance agreement was not unforeseeable and "[t]he problems that the Debtors faced did not arise suddenly. . . ." *Id.* at

162.    The court disagreed, holding that "[a]lthough CIT's refusal to extend forbearance was a

possibility, it cannot be said that it was the probable outcome when notice would have been

required . . . ."  *Id.*  The court noted the significance of the events leading to the bankruptcy filing

and issuance of notice, including the repeated extensions to the forbearance agreement,

implementation of a reorganization plan by the consulting firm, and attempts to sell the entities:

> These events are indicative of a company attempting to stave off
> layoffs, ***and attempting to save jobs and the company***.  The Court
> does not doubt that CIT refusing to extend forbearance was a
> possibility.  However, it was necessarily the probable outcome at the
> time WARN notice was required.  ***It would run counter to the***
> ***WARN Act's policy of encouraging employers to take all***
> ***reasonable actions to preserve the company and the jobs to impose***
> ***liability upon the Debtors for not giving notice sooner than they***
> ***did*** . . .

*Id.* at 163 (emphasis added).

The facts in *In re Jevic* are remarkably similar to the instant matter.  As in *Jevic,*

TransCare's sole Director took "all reasonable actions to preserve the company and jobs."  *Id.* at

163.  (*See also,* SOF ¶¶ 43-82.)  Like the trucking company in *Jevic,* TransCare hired restructuring

firm Carl Marks to assist in turning the company around shortly before the business closed.  *In re*

*Jevic*, 496 B.R. at 155.  (SOF ¶¶ 45-48.)  In fact, Carl Marks was retained on January 7, 2016, for

the purpose of developing a strategic operating plan for the business – only 48 days prior to the

February 24 lay-off.  (SOF ¶¶ 45-47); *see also In re Jevic*, 496 B.R. at 155 (consultant firm hired

at request of lender to assist in turnaround).  In the following weeks leading to the Chapter 7

bankruptcy filing, Carl Marks worked with Wells Fargo and TransCare's sole Director (assisted

by employees of Patriarch Partners) to develop numerous models attempting to save portions of

the Company and to wind down the remaining operations in an orderly Chapter 11 bankruptcy.

(SOF ¶¶ 62-76); *see also In re Jevic*, 496 B.R. at 155 (describing various restructuring plans to

save the company).  These models included wind-down periods accounting for 60- or 90-day

WARN notice for certain subsidiaries of TransCare, and a sale of other subsidiaries to entities prepared to operate them and salvage jobs.  (SOF ¶¶ 55-56, 72, 76.)  An orderly wind down was critical because public safety could be jeopardized if TransCare's business of providing emergency medical services abruptly shut down, and so all of the entities involved were working carefully and swiftly.  (SOF ¶ 58); *see In re AE Liquidation* 522 B.R. at 68 (noting that Courts look at the nature of the business in applying the UBC exception).

The undisputed material facts demonstrate that during this time, Wells Fargo and TransCare were engaged in discussions about entering into a new long-term borrowing agreement, and in the interim repeatedly agreed to extend the forbearance agreements, including *six* separate extensions on and between December 22, 2015 and February 24, 2016 when TransCare filed for bankruptcy – similar to the lender in *Jevic*.  (SOF ¶¶ 42, 43, 51, 52, 61, 65, 67); *In re Jevic*, 496 B.R. at 155.  Like the lender's decision in *Jevic,* Wells Fargo's decision to only fund a wind down in a Chapter 7 bankruptcy was a surprise to the Director of TransCare as well as to Carl Marks, and the undisputed evidence demonstrates that the Director of TransCare, advisors to the Director from Patriarch Partners, TransCare's Management Team, Carl Marks and Wells Fargo were planning an orderly, Chapter 11 wind down of TransCare's operations for weeks leading to the Chapter 7 filing.  (SOF ¶¶ 43-82); *In re Jevic*, 496 B.R. at 161.

The Chapter 7 bankruptcy filing was a "sudden, dramatic, and unexpected action or condition outside the employer's control," and, therefore, was unforeseeable under the UBC exception. 29 U.S.C. § 2102(b)(2)(A); 20 C.F.R. § 639.9(b)(1); N.Y. LAB. L. § 860-c; 12 NYCRR § 921-6.3(a).  None of the Non-Debtor Entity Defendants was aware of any impending Chapter 7 filing as early as November 26, 2015 (90 days in advance under NY WARN) or December 26, 2015 (60 days in advance under federal WARN).  The notion of a bankruptcy filing was not

"probable" in late 2015—it was not even remotely anticipated until February 2016, and even then it was only "possible" and not "probable" since a Chapter 11 filing incorporating a sufficient period of WARN notice was being planned. *Halkias*, 137 F.3d at 336; SOF ¶¶ 55, 72, 76.)  At no point until February 24, 2016 did "the objective facts reflect that the layoff was more likely than not," and therefore, WARN notice was not required before then. *In re AE Liquidation*, 866 F.3d at 530.

TransCare's sole Director, along with the employees of Patriarch Partners who were advising her, were clearly trying to prevent the shutdown of operations and "the WARN Act is not intended to deter companies from fighting to stay afloat." *Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 589 (7th Cir. 2005).  Further, there is no evidence that AIP II, Patriarch III or Ark CLO, which never existed, had any involvement in any of the events leading to TransCare's bankruptcy filing or the related employment losses.

Therefore, summary judgment is warranted, and the federal and NY WARN Act claims should be dismissed as to the Non-Debtor Entity Defendants.

### C.    The Chapter 7 Trustee's Unexpected Dispute Over Claims to Assets that Were Foreclosed Upon Caused TransCare's Management Team to Issue a February 26, 2016 Communication to Remaining Employees, Ending Their Employment.

The undisputed material facts also demonstrate that the February 26, 2016, layoff of the remaining TransCare employees was caused by the Trustee's refusal to turn over and recognize the foreclosure of certain assets and subsequent sale of those assets to Transcendence – both required steps for portions of TransCare's business to continue to operate in the form of a new entity.  (SOF ¶¶ 55, 97, 98.)  In fact, the February 24, 2016 communication to employees demonstrates that the turn of events on February 26, 2016, was not reasonably foreseeable since TransCare's Management Team had informed employees just two days prior that portions of

TransCare's business were intended to operate in the form of a new company and that certain employees would be offered employment to work for the new company.  (SOF ¶¶ 86-93.)

On February 26, 2016, employees received a communication from Tom Fuchs, Vice President of Transit Services, which indicated that the Hudson Valley, Pittsburgh and paratransit divisions of TransCare would have to cease operations as a result of the Trustee's dispute over assets that were foreclosed upon as part of the restructuring plan.  (SOF ¶ 98.)  That communication was also sufficient for WARN Act purposes because it explained the basis for the sudden employment losses and the proximate cause for those losses.   The events described in the communication caused the layoffs of the remaining TransCare employees (whose jobs were meant to be saved pursuant to the restructuring plan).  (SOF ¶¶ 95-98.)

The evidence clearly shows that none of the Non-Debtor Entity Defendants could "reasonably foresee" that TransCare's operations would completely shut down as a result of the Trustee's decisions, leading to the layoff of the remaining TransCare employees.[8]  Therefore, the unforeseen business circumstances exception should apply, and the federal and NY WARN Act claims should be dismissed as to the Non-Debtor Entity Defendants as a matter of law.

## IV.     AS A MATTER OF LAW, NON-DEBTOR DEFENDANTS ARE NEITHER JOINT NOR SINGLE EMPLOYERS FOR PURPOSES OF THE PA, NY AND MD WAGE STATUTES AND SHOULD BE DISMISSED.

Plaintiffs assert state law claims to recover unpaid wages under the Pennsylvania Wage Payment and Collection Law ("PWPCL"), 43 Pa. Stat. Ann. § 260.1, *et seq.*, the New York Labor Law Section 191 ("NYLL") and the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Lab. & Emp. § 3-501, *et seq.*, for "work performed after February 13, 2016 until on or

---

[8] For the reasons set forth in Section I, *supra*, Plaintiffs cannot offer any evidence to dispute this issue with respect to Ark CLO and Patriarch III, and as stated in Section I, all claims should be dismissed against Ark CLO and Patriarch III.

about February 24, 2016, for which they were not compensated." (Dkt. No. 1 at ¶ 4)  As a matter of law, Plaintiffs cannot show that any of the Non-Debtor Defendants constituted a joint employer with TransCare under the Pennsylvania, New York or Maryland wage payment statutes. Importantly, as discussed above in Argument Section I (*supra*), Plaintiffs cannot sustain wage claims under any state statute as against Ark CLO and Patriarch III because Ark CLO did not exist (Tilton Decl. ¶¶ 3, 5) and Patriarch III ceased to function as collateral manager long before the Statutory Class Periods.  (SOF ¶¶ 28-32).  In sum, for these reasons, and those discussed herein as to Tilton, Patriarch Partners and AIP II, Plaintiffs' wage claims against the Non-Debtor Defendants should be dismissed.

**A.    There is No Contractual Relationship for the Payment of Wages Between and/or Among the Non-Debtor Defendants and TransCare, and Plaintiffs' PWCPL Claims Should Be Dismissed.**

The PWPCL's definition of employer "includes every person, firm, partnership, association, corporation . . . and any agent or officer . . . employing any person in this Commonwealth."  43 Pa. Stat. Ann. § 260.2a.  To hold an "agent or officer" personally liable for unpaid wages, "evidence of an active role in decision making is required."  *Int'l Ass'n of Theatrical Stage Emps., Local Union No. 3 v. Mid-Atl. Promotions, Inc.*, 856 A.2d 102, 105 (2004) (citing *Mohney v. McClure*, 568 A.2d 682 (1990), *aff'd*, 604 A.2d 1021 (1992)).  To recover wages from an entity under the PWPCL, Plaintiffs must establish the formation of a written or oral contract to pay wages.  *Rosario v. First Student Mgmt. LLC*, No. CV 15-6478, 2016 WL 4367019, at *7-8 (E.D. Pa. Aug. 16, 2016) (granting a motion to dismiss on grounds that the plaintiffs had failed to alleged any contractual right to earned wages under the WPCL).  "The plaintiffs must set forth more than the mere existence of an employer relationship in order to establish a plausible claim for relief under the WPCL."  *Id.* at *8.

34

The evidence shows that Tilton had no role or involvement with respect to the wages set for the PWCL class members. (SOF ¶¶ 4, 6, 13.) Although Tilton may have had involvement with TransCare's Senior Management Team, including any members overseeing the PWCPL class members, that fact alone is insufficient to hold her individually liable under the PWCPL. *Int'l Ass'n of Theatrical Stage Employees, Local Union No. 3*, 856 A.2d at 105.

In addition, there is no evidence of a contract between the members of the PWPCL wage class and any of the Non-Debtor Entity Defendants for the payment of their wages. In the absence of such a contractual agreement, Plaintiffs' Pennsylvania wage claim fails, regardless of whether or not an employee-employer relationship existed. *Rosario*, 2016 WL 4367019, at *8.

Therefore, Plaintiffs' PWPCL wage claims should be dismissed as to all of the Non-Debtor Defendants.

### B.    Plaintiffs Cannot Demonstrate Joint Employer or Individual Liability as to the Non-Debtor Defendants Pursuant to the NYLL.

Under the NYLL, an "employer" is "any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service." N.Y. Lab. Law § 190(3). When analyzing employer liability under the NYLL, courts in New York have borrowed the "economic reality" test used under the federal wage statute, the Fair Labor Standards Act ("FLSA"). *Williams v. Epic Sec. Corp.*, 358 F. Supp. 3d 284, 305 (S.D.N.Y. 2019); *Thomas v. River Greene Constr. Group LLC*, 17 Civ. 6954 (PAE), 2018 WL 6528493, at *5 (S.D.N.Y. Dec. 11, 2018). Under the economic realities test, courts consider "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Salinas v. Starjem Rest. Corp.*, 123 F. Supp. 3d 442, 463 (S.D.N.Y. 2015) (citation omitted); *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 135 (2d Cir.

1999) (holding that the whether an entity is an "employer" is determined by if the entity "possessed the power to control the workers in question, with an eye to the economic reality presented by the facts of each case.") (internal quotation marks and citations omitted) ; *Irizarry v. Catsimatidis*, 722 F.3d 99, 109 (2d Cir. 2013) ("Evidence that an individual is an owner or officer of a company, or otherwise makes corporate decisions that have nothing to do with an employee's function, is insufficient to demonstrate 'employer' status.")

As to Tilton, the *Salinas* case is instructive.  In *Salinas*, a class of plaintiff restaurant workers sued their employer-restaurant, as well as its CEO/president/majority shareholder, for various claims under the FLSA and NYLL.  123 F. Supp. 3d at 448, 450.  The evidence showed that the individual defendant was at the restaurant every day it was open, performing greeting and hosting duties, and would sign employee's paychecks and sometimes tell bussers to reset a table, arrange tables, clean up spills, or bring bread to a table.  *Id.* at 450-51.  She was occasionally involved in hiring hosts and hostesses, but did not hire any other employees, discipline or fire any employees, create schedules or monitor attendance, or determine employee compensation. *Id.*  The Court applied the economic realities test and determined that the individual defendant was *not* an employer under the NYLL (or FLSA), holding that the evidence presented was not sufficient to meet any of the factors of the test, because the plaintiffs had not shown "control over Plaintiffs' employment." *Id.* at 464-5.  The court noted that the plaintiffs' belief that she was the boss "***does not make her an employer.***" *Id.* (emphasis added) (citing *to Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 314 (S.D.N.Y.2011)); *Chao v. Vidtape, Inc*., 196 F.Supp. 2d 281, 291 (E.D.N.Y. 2002), *aff'd as modified*, 66 F. App'x 261 (2d Cir.2003) (holding that testimony by class members who "thought [defendant] was a 'boss' when asked" failed to satisfy the economic realities test).

Similar to the CEO/president/majority shareholder in *Salinas*, Tilton does not trigger any of the factors of the economic realities test that New York courts use to determine NYLL liability. She did not hire or fire TransCare's non-executive employees and did not supervise or control those employees' work schedules or conditions of employment. (SOF ¶¶ 4, 6, 13.) Moreover, Tilton did not determine the rate and method of payment for those employees or maintain employment records for TransCare. (*Id.*) Although Tilton served as TransCare's sole Director, there is no genuine issue of material fact that Tilton did not exercise day-to-day operational control over Plaintiffs' employment, TransCare's Management Team did. (*Id.*) Accordingly, as a matter of law, Tilton is not a joint employer pursuant to the NYLL.

Similarly, neither Patriarch Partners nor AIP II are joint employers under the NYLL. As discussed above, there is absolutely no evidence that AIP II or Patriarch Partners controlled either TransCare's employees or day-to-day operations.

Further, Patriarch Partners is not a joint employer under the NYLL because, although the economic realities test differs from the single employer test used in assessing liability pursuant to the WARN Acts, many of the undisputed facts supporting dismissal of Patriarch Partners from the WARN Act claims also support dismissal of Patriarch Partners from Plaintiffs' NYLL wage claims. The undisputed facts with respect to Patriarch Partners' lack of control and authority to undertake any actions with respect to TransCare's day-to-day operations, including Ien's and the NYLL class members' hiring, firing, payroll and daily work schedules, make it clear that Patriarch Partners was not a joint employer with TransCare. (SOF ¶¶ 7-9.) In addition, Patriarch Partners did not control Plaintiffs' work schedules or other personnel decisions. (SOF ¶¶ 7-9.) *See Irizarry*, 722 F.3d at 113-15 (second factor was not satisfied even though defendant regularly visited stores and addressed problems occurring in them). Similarly, Patriarch Partners did not set and/or

determine the NYLL subclass' rates and methods of payment nor did Patriarch Partners sign those subclass members' checks. (SOF ¶¶ 7-9, 21-22.) Also, it is undisputed that TransCare, and TransCare's third-party vendor ADP, were responsible for and maintained all of TransCare's employee payroll records.[9] (Eichberger Decl., Ex. GGG.)

Moreover, Patriarch Partners employees' assistance to Tilton in her role as TransCare's sole Director with respect to the recruiting, vetting, and hiring of c-suite executives is insufficient to create a question of fact sufficient to survive summary judgment. *See In re Domino's Pizza*, No. 16-cv-2492, 2018 WL 4757944, at *5 (S.D.N.Y. Sept. 20, 2018) (citing *Godlewska v. HDA*, 916 F. Supp. 2d 246, 254 (E.D.N.Y. 2013) (holding that the power to hire rests with the entity that chooses who to hire, even if another entity "dictates the minimum criteria for persons who fill these positions and reviews applicants' resumes to ensure the applicants are adequately qualified"), *aff'd*, 561 F. App'x 108 (2d Cir. 2014)); *Jean-Louis v. Metro. Cable Commc'ns, Inc.*, 838 F. Supp. 2d 111, 123 (S.D.N.Y. 2011) (finding no power to hire even if direct employer is required to perform background checks).

Accordingly, Plaintiffs' NYLL wage claims should be dismissed as to the Non-Debtor Defendants.

### C.    Plaintiffs Cannot Demonstrate Employer or Individual Liability Pursuant to the MWPCL.

The MWPCL's definition of employer "includes any person who employs an individual in the State or a successor of the person." Md. Code Lab. & Emp. § 3-501. Maryland courts interpret the MWPCL's definition of employer "in light of common-law principles of employment" and

---

[9] Plaintiffs issued the subpoena to ADP in December 2016, seeking a "list of all employees employed by TransCare Corporation and any of its subsidiaries and affiliates . . . ." and to provide name, address, pay rate information, hourly rate, pay data, and benefits data. (Eichberger Decl., Ex. GGG.)

consider "'the right of the employer to control and direct the employee in the performance of the work and in the manner in which the work is to be done.'" *Hollensteiner v. Waterfield Grp.*, 793 F. Supp. 2d 730 (D. Md. 2010) (quoting *Mohiuddin v. Doctors Billing & Mgmt. Sols., Inc.*, 9 A.3d 859, 863-64 (Md. Ct. Spec. App. 2010)). Specifically, courts consider: "(1) the power to select and hire the employee, (2) the payment of wages, (3) the power to discharge, (4) the power to control the employee's conduct, and (5) whether the work is part of the regular business of the employer." *Id.* (quoting *Auto. Trade Ass'n v. Harold Folk Enters.*, 484 A.2d 612, 620 (1984)).

The MWPCL's definition of employer does not include supervisors, officers or other agents who act on behalf of a corporate employer, *Watkins v. Brown*, 173 F. Supp. 2d 409, 416 (D. Md. 2011), and "[a]n MWPCL claim cannot be sustained if the plaintiff fails to allege that the defendant was involved in payment of [his] wages." *Quickley v. Univ. of Md. Med. Sys. Corp.*, Civ. No. CCB-12-321, 2012 WL 4069757, at *6 (D. Md. Sept. 14, 2012) (citation omitted); s*ee also Alvarez-Soto v. B. Frank Joy, LLC*, 258 F. Supp. 3d 615, 631 (D. Md. 2017) (plaintiff-employees failed to allege that two corporate officers were employers under the MWPCL because there was no evidence that they had control over conditions of employment or authority to terminate).

Here, Tilton served as TransCare's sole Director, and her actions taken together with TransCare's Management Team were done on behalf of TransCare. In that role, it is undisputed that Tilton had no involvement with the payment of wages for the members of the MWPCL class. (SOF ¶¶ 12, 17, 21-22.) *See Watkins*, 173 F. Supp. 2d at 416. *Quickley*, 2012 WL 4069757, at *6 (an "MWPCL claim cannot be sustained if the plaintiff fails to allege that the defendant was involved in payment of [his] wages."). Therefore, as a matter of law, Tilton is not an employer under the MWPCL.

39

With respect to Patriarch Partners and AIP II, the MWPCL assesses factors similar to those set forth in the NYLL's economic realities test.  In particular, joint employer liability pursuant to the MWPCL hinges on the right of the putative employer to "control and direct" the employees at issue in the performance of their work and the manner in which it is done. *Hollensteiner*, 793 F. Supp. 2d at 737.  Neither Patriarch Partners nor AIP II exerted such control.  There is no dispute that AIP II did not possess ***any*** control over Plaintiffs, let alone the MWPCL class members, to satisfy any of the factors pursuant to the MWPCL's test.

Further, as discussed above, it is undisputed that Patriarch Partners did not control or direct the MWPCL subclass' work, including the manner in which the MWPCL subclass members performed their work.  (SOF ¶¶ 4, 6-10, 21, 22.)  Nor can the MWPCL subclass members offer any evidence to the contrary because the work performed by those TransCare employees, i.e., the provision of ambulance transportation and life support services, was not and is not Patriarch Partners' business. *See id.* (lack of joint employer relationship found where "the work is [not] part of the regular business" of the entity at issue).

Therefore, Plaintiffs' MWPCL wage claims should be dismissed as to the Non-Debtor Defendants.

## **CONCLUSION**

For the reasons stated herein and in the Non-Debtor Defendants' Bankruptcy Rule 7056-1 Statement of Undisputed Material Facts, and accompanying Declarations and exhibits, Non-Debtor Defendants respectfully request that the Court enter an order granting summary judgment in favor of Non-Debtor Defendants, dismissing the Complaint in its entirety.

DATED:        May 21, 2019
New York, New York

40

PROSKAUER ROSE LLP

By: _/s/ Nicole A. Eichberger_
Nicole A. Eichberger*
Gillian G. Egan*
650 Poydras Street, Suite 1800
Poydras Center
New Orleans, LA 70130
Tel.: (504) 310-2024
Fax : (504) 310-2022
Email: neichberger@proskauer.com
gegan@proskauer.com

Kathleen M. McKenna
Eleven Times Square
New York, New York 10036
Tel.: (212) 969-3000
Fax: (212) 929-2900
Email: kmckenna@proskauer.com

*Attorneys for Non-Debtor Defendants Lynn Tilton,
Patriarch Partners, LLC, Patriarch Partners III,
LLC, Ark CLO 2001-1 Limited, and Ark Investment
Partners II, L.P.*

*\*Admitted pro hac vice*

41