## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re* <br><br>TRANSCARE CORPORATION, *et al.*,[1] <br><br>                Debtors. | Chapter 7 <br> Case No. 16−10407 (SMB) <br> (Jointly Administered) |
| SHAMEEKA IEN on behalf of herself and all others similarly situated, <br><br>          Plaintiff, <br><br>          v. <br><br>TRANSCARE CORPORATION, TRANSCARE NEW YORK, INC., TRANSCARE ML, INC., TC AMBULANCE GROUP, INC., TRANSCARE MANAGEMENT SERVICES, INC., TCBA AMBULANCE, INC., TC BILLING AND SERVICES CORPORATION, TRANSCARE WESTCHESTER, INC., TRANSCARE MARYLAND, INC., TC AMBULANCE NORTH, INC. AND TRANSCARE HARFORD COUNTY, INC., LYNN TILTON, ARK CLO 2001-1 LIMITED, ARK INVESTMENT PARTNERS II, L.P., PATRIARCH PARTNERS, LLC, and PATRIARCH PARTNERS III, LLC, <br><br>          Defendants. | Adv. Proc. No. 16−01033-smb |

## PLAINTIFF'S OPPOSITION TO NON-DEBTOR DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

---

[1] The Debtor Defendants are TransCare Corporation, TransCare New York, Inc., TransCare ML, Inc., TC Ambulance Group, Inc., TransCare Management Services, Inc., TCBA Ambulance, Inc., TC Billing and Services Corporation, TransCare Westchester, Inc., TransCare Maryland, Inc., TC Ambulance North, Inc., TransCare Harford County, Inc., TransCare Pennsylvania, Inc., TC Ambulance Corporation and TC Hudson Valley Ambulance Corporation (collectively, the "Debtors," "Debtor Defendants," or "TransCare").

# TABLE OF CONTENTS

I.   Standard for Summary Judgment in Single/Joint Employer Cases .................................... 2

II.  Summary Judgment is Inappropriate on the Single Employer Issue ...................... 4

   A.   The Purpose of the WARN Act and Its Single Employer Doctrine .................... 4

   B.   How The Single Employer Factors Are Applied ................................................. 6

   C.   Single Employer Liability Exists When Parents Exercise Top Down Control
        to  Cause a Violation the WARN Act ................................................................. 9

   D.   All Patriarch Entities Were A Single Business Enterprise. ............................... 12

   E.   All of the Single Employer Factors are Undisputedly in Plaintiff's Favor
        or Subject to Disputes of Fact .......................................................................... 14

        1.   Common Ownership ................................................................................. 14

        2.   Common Officers and Directors .............................................................. 15

        3.   De Facto Control ...................................................................................... 16

        4.   Unity of Personnel Policies Emanating From a Common Source ............... 20

        5.   Dependency of Operations ....................................................................... 21

III. Patriarch's Unforeseeable Business Circumstances Defense Fails .................... 22

   A.   Patriarch Did Not Issue Notice ........................................................................ 22

   B.   The *Halkias* Probability Standard is Wrong ................................................... 23

   C.   It Is Disputed as to Whether the Layoffs Were Unforeseeable and Caused
        By An Outside Force That Caused the Mass Layoffs or Plant Closing............ 24

        1.   It Was Probable That There Would be Job Losses 60 and 90 Days in Advance ........... 24

        2.   Evidence Shows the February 24, 2016 Terminations Were Caused By
             Lynn Tilton's Decision to File Chapter 7 and Refuse to Fund Continued Payroll ........ 27

        3.   Lynn Tilton's Decision to Strip TransCare of Assets and Launch an Entity
             that Was Incapable of Paying its Own Employees Caused the Later Layoffs .............. 31

IV.  There Are Disputes Precluding Determination of Whether Patriarch and Lynn Tilton are
     Joint/Single Employers Under State Wage Laws .......................................... 32

   A.   Tilton and Patriarch are Responsible for Unpaid Wages Under New York Law .............. 32

   B.   Tilton and Patriarch are Responsible for Unpaid Wages Under Maryland Law ............... 36

   C.   Tilton and Patriarch are Responsible for Unpaid Wages Under Pennsylvania Law ......... 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re APA Transp. Corp. Consol. Litig.*,
    541 F.3d 233 (3d Cir. 2008)........................................................................5, 19

*Austen v. Catterton Partners V, LP*,
    709 F. Supp. 2d 168 (D. Conn. 2010)..................................................................12

*Avila v. Caring Hearts & Hands Assisted Living & Elder Care, LLC*,
    No. CV TDC-15-3943, 2016 WL 4083365 (D. Md. Aug. 1, 2016) ......................36

*Barfield v. N.Y. City Health & Hosps. Corp.*,
    537 F.3d 132 (2d Cir. 2008)...................................................................2, 32, 33, 36

*Baystate Alternative Staffing v. Herman*,
    163 F.3d 668 (1st Cir.1998)...........................................................................36, 37

*Blough v. Voisard Mfg., Inc.*,
    No. 1:14 CV 263, 2015 WL 366934 (N.D. Ohio Jan. 27, 2015) .................... *passim*

*Bowers v. NETI Technologies, Inc.*,
    690 F.Supp. 349 (1988) ......................................................................................38

*Brown v. Daikin Am. Inc.*,
    756 F.3d 219 (2d Cir. 2014)...................................................................................3

*Calloway v. Caraco Pharm. Labs., Ltd.*,
    800 F.3d 244 (6th Cir. 2015) ...................................................................23, 24, 26

*Campusano v. Lusitano Const. LLC*,
    208 Md. App. 29, 56 A.3d 303 (2012)..................................................................36

*Carroll v. Local 144 Pension Fund*,
    100 F.3d 943 (2d Cir. 1996).................................................................................13

*Central Pennsylvania Teamsters Pension Fund v. Burten*,
    634 F.Supp. 128 (E.D. Pa. 1986) .........................................................................38

*Childress v. Darby Lumber Inc.*,
    126 F. Supp. 2d 1310 (D. Mont. 2001), *aff'd*, 357 F.3d 1000 (9th Cir. 2004) .......................30

*Childress v. Darby Lumber, Inc.*,
    357 F.3d 1000 (9th Cir. 2004) ...............................................................9, 10, 15, 16

*In re Consol. Bedding, Inc.*,
  432 B.R. 115 (3d Cir. 2010) ..............................................................................22

*CSX Transp., Inc. v. McBride*,
  564 U.S. 685 (2011)...........................................................................................23

*Day v. Celadon Trucking Servs., Inc.*,
  827 F.3d 817 (8th Cir. 2016) .............................................................................4

*In re DHP Holdings II Corp.*,
  447 B.R. 418 (Bankr. D. Del. 2010) .............................................................19, 22

*Esmark, Inc. v. N.L.R.B.*,
  887 F.2d 739 (7th Cir. 1989) ..............................................................................8

*Frankel v. Bally, Inc.*,
  987 F.2d 86 (2d Cir. 1993)................................................................................32

*Garner v. Behrman Bros. IV, LLC*,
  260 F. Supp. 3d 369 (S.D.N.Y. 2017)..........................................................11, 12

*Greenawalt v. AT & T Mobility LLC*,
  642 F. App'x 36 (2d Cir. 2016) ..........................................................................3

*Guippone v. BH S & B Holdings LLC*,
  737 F.3d 221 (2d Cir. 2013)................................................................... *passim*

*Halkias v. Gen. Dynamics Corp.*,
  137 F.3d 333 (5th Cir. 1998) ............................................................................23

*Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132 (2d Cir. 1999), *holding modified by*
  *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61 (2d Cir. 2003)..................33, 34, 39

*Hotel Employees & Rest. Employees Int'l Union Local 54 v.*
*Elsinore Shore Associates*,
  173 F.3d 175 (3d Cir. 1999)..........................................................................4, 24

*Irizarry v. Catsimatidis*,
  722 F.3d 99 (2d Cir. 2013)...................................................................33, 34, 35

*In Jones v. Hoffberger Moving Servs*,
  92 F. Supp. 3d 405 (D. Md. 2015) ....................................................................37

*Inclan v. New York Hosp. Grp., Inc.*,
  95 F. Supp. 3d 490 (S.D.N.Y. 2015)..............................................................32, 34

*Indian Brand Farms, Inc. v. Novartis Crop Prot. Inc.*,
  617 F.3d 207 (3d Cir. 2010)..............................................................................23

iii

*Int'l Ass'n of Theatrical Stage Emps., Local Union No. 3 v. Mid-Atl. Promotions, Inc.*, 856 A.2d 102 (2004) ................................................................................38

*Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers, Gen. Truck Drivers, Office Food & Warehouse Local 952 v. Am. Delivery Serv. Co.*, 50 F.3d 770 (9th Cir. 1995) ................................................................................10

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. MRC*, 541 F.Supp.2d 902 ................................................................................26

*In re Jevic Holding Corp.*, 492 B.R. 416 (Bankr. D. Del. 2013), *aff'd*, 526 B.R. 547 (D. Del. 2014), aff'd, 656 F. App'x 617 (3d Cir. 2016) ................................15, 19, 21, 29

*In re Jevic Holding Corp.*, 496 B.R. 151 (Bankr. D. Del. 2013) ................................29

*Local 397, International Union of Electronic, Electrical Salaried Machine & Furniture Workers v. Midwest Fasteners, Inc.*, 779 F. Supp. 788 (D.N.J. 1992) ................................................................................6

*Mohney v. McClure*, 390 Pa.Super. 338, 568 A.2d 682 (1990) ................................................................................38

*Local 2-1971 of Pace Int'l Union v. Cooper*, 364 F. Supp. 2d 546 (W.D.N.C. 2005) ........................................................... *passim*

*Open Hous. Ctr., Inc. v. Kessler Realty, Inc.*, No. 96-CV-6234(ILG), 2001 WL 1776164 (E.D.N.Y. Dec. 4, 2001) ................................13

*Pearson v. Component Tech. Corp.*, 247 F.3d 471 (3d Cir. 2001) ........................................................................... *passim*

*Rangel v. Cardell Cabinetry, LLC*, No. SA-13-CA-843, 2014 WL 12540718 (W.D. Tex. Jan. 17, 2014) ................................12

*Rivera v. Mo's Fisherman Exch., Inc.*, No. CV ELH-15-1427, 2018 WL 2020423 (D. Md. May 1, 2018) ................................37

*Salemi v. Boccador, Inc.*, No. 02 CIV. 06648, 2004 WL 943869 (S.D.N.Y. Apr. 29, 2004) ................................2, 3

*Schwartz v. U.S. Dep't of Justice*, No. 94 CIV. 7476(AGS), 1995 WL 675462 (S.D.N.Y. Nov. 14, 1995), *aff'd*, 101 F.3d 686 (2d Cir. 1996) ................................................................................14

*Snider v. Commercial Fin. Servs., Inc.*, 288 B.R. 890-97 (N.D. Okla. 2002) ................................................................................23

*Stearns & Co.*,
499 F.3d 144 (2d Cir.2007)........................................................................19

*Trustees of Elevator Constructors Union Local No. 1 Annuity & 401(K)
Fund v. K.A.N. Elevator Inc.*,
No. 16 CIV. 7408 (PAE), 2018 WL 2727884 (S.D.N.Y. June 5, 2018) ...........................3, 4

*In Re Tweeter OPCO*,
453 B.R. 534 (Bankr. D. Del. 2011) ..................................................10, 15, 20

*United Paperworkers Int'l Union, AFL-CIO, CLC v. Alden
Corrugated Container Corp.*,
901 F. Supp. 426 (D. Mass. 1995) ...................................................11, 29

*Van Hoven v. 1199 SEIU Pension & Benefit Funds*,
No. 11 CV 3197 HB, 2012 WL 488704 (S.D.N.Y. Feb. 15, 2012).......................13

*Vogt v. Greenmarine Holding, LLC*,
318 F. Supp. 2d 136 (S.D.N.Y. 2004).................................................12, 20

*Zheng v. Liberty Apparel Co. Inc.*,
355 F.3d 61 (2d Cir., 2003)........................................................3, 33, 39

*Zheng v. Liberty Apparel Co., Inc.*,
617 F.3d 182 (2d Cir.2010)...............................................................3

**Statutes**

Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq* .................. *passim*

New York WARN Act, New York Labor Law § 860 *et seq* ..................................32, 35

29 U.S.C. § 203(d) ....................................................................39

29 U.S.C. § 2101(a)(1)..................................................................5

29 U.S.C. § 2102(b)(2)(A)..............................................................24

**Other Authorities**

20 C.F.R. § 639.3(a)(1)................................................................12

20 C.F.R. § 639.3(a)(2)...............................................................5, 7

20 C.F.R § 639.7(a)(3)................................................................26

20 C.F.R. § 639.9 ...................................................................24, 25

20 C.F.R. § 639.9(b)(1)..............................................................24, 31

54 FR 16042-01 ............................................................................................................2, 26

Plaintiff claims that Patriarch and Lynn Tilton ("Non-Debtor Defendants") bear employer liability largely because she made the ultimate decisions that gave rise to this lawsuit – forcing an immediate shutdown of her company without paying wages or giving notice. Non-Debtor Defendants nevertheless move for summary judgment claiming they are insulated because she made these decisions as TransCare's Board. Mov. Br. at 17-18 "(There is also no doubt that Tilton was the ultimate decision maker, with respect to TransCare's decision to file for Chapter 7 bankruptcy"). Their argument fails. Employee-protection laws do not require plaintiffs to pierce the veil of all-controlling persons who cause a violation. They protect employees by denying ultimate decision-makers sanctuary.

To be sure, labor laws do not impose vicarious liability on passive owners or those acting within the normal incidents of ownership. They impose liability, however, on owners who interfere with their portfolio companies by arrogating all authority to themselves and then cause the violation of these laws when exercising it. That is what the facts show here.

For the Non-Debtor Defendants to be granted summary judgment they had to show TransCare acted independently of sole Board member Lynn Tilton. They offer no evidence that Transcare ever acted on its own during the relevant period, accordingly, they are not entitled to summary judgment.

Summary judgment must also be denied with respect to the WARN Act's unforeseeable business circumstances defense. The Non-Debtor Defendants concede that before the shutdown, TransCare was unsalvageable except for a part Tilton had to work "tirelessly" to salvage." Mov. Br. at 4. The shutdown of all or part of TransCare, accordingly, was not only foreseeable – it was contemplated. For Non-Debtor Defendants to claim no one could reasonably foresee it, is both specious and academic. As Plaintiff explained in her motion for summary judgment, the

Non-Debtor Defendants cannot avail themselves of this defense because its requires the delivery of a valid written WARN Act notice to the employees, and such a notice was never sent here.

This Court explicitly stated that it did not believe that summary judgment would be possible on the issue of Patriarch's single employer liability and the underlying merits of the WARN Act's unforeseeable business circumstances defense. The Court's inclination was correct. The determination of a single employer is a mixed issue of law and fact that cannot be decided on summary judgment when there are factual disputes as to the underlying factors that preclude weighing them as a matter of law.[2]

## I.       Standard for Summary Judgment in Single/Joint Employer Cases

> [S]ummary judgment is appropriate only when there are no genuine issues of material fact in dispute and when, viewing the evidence in a light most favorable to the nonmoving party, no reasonable trier of fact could disagree as to the outcome of the case. The court is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments. Summary judgment is then appropriate if the evidence in the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Salemi v. Boccador, Inc.*, No. 02 CIV. 06648, 2004 WL 943869, at *4 (S.D.N.Y. Apr. 29, 2004) (internal citations omitted).

In the context of joint and single employer decisions under the Fair Labor Standards Act and other employment laws, the Second Circuit has indicated that the fact intensive nature of the inquiry makes it difficult to determine on summary judgment.[3] *See Barfield v. N.Y. City Health*

---

[2] The relevant facts are included in Plaintiff's submission pursuant to Local Rule 7056-1 and incorporated herein to the extent necessary.

[3] The DOL has indicated that the WARN Act single employer doctrine is meant to summarize existing law and, therefore, decisions regarding the appropriateness of summary judgment in the context of other employment laws is relevant here. See Worker Adjustment and Retraining Notification, 54 FR 16042-01 ("The intent of the regulatory provision relating to independent contractors and subsidiaries is not to create a special definition of these terms for WARN

*& Hosps. Corp.,* 537 F.3d 132, 143-44 (2d Cir. 2008) ("Because of the fact-intensive character of a determination of joint employment, we rarely have occasion to review determinations made as a matter of law on an award of summary judgment."). *See also Greenawalt v. AT & T Mobility LLC*, 642 F. App'x 36, 37 (2d Cir. 2016) (reversing district court's summary judgment finding that AT&T was not a joint employer of security guards hired by an intermediary contractor"); *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 226 (2d Cir. 2014) ("Whether two related entities are sufficiently integrated to be treated as a single employer is generally a question of fact. . ."); *Salemi v. Boccador, Inc.*, 2004 WL 943869, at *4 ("Whether a parent and subsidiary meet the standard for integration under Title VII is ultimately an issue of fact for the jury." (citing *Knowlton v. Teltrust Phones, Inc.,* 189 F.3d 1177 (10th Cir. 1999)).

In this regard, the Second Circuit has noted that determining this issue presents "[m]ixed questions of law and fact" which are "especially well-suited for jury determination." *Zheng v. Liberty Apparel Co., Inc.,* 617 F.3d 182, 185 (2d Cir.2010). The "jury's role [i]s to apply the facts bearing on the multi-factor joint employment inquiry to the legal definition of joint employer." *Id*. at 186. "Where there are genuine issues of material fact as to whether entities constitute a single employer, summary judgment is improper." *Trustees of Elevator Constructors Union Local No. 1 Annuity & 401(K) Fund v. K.A.N. Elevator Inc*., No. 16 CIV. 7408 (PAE), 2018 WL 2727884, at *7 (S.D.N.Y. June 5, 2018) (collecting cases).

That is, when there are material factual disputes as to the factors underlying the integration test, these disputes have to be submitted to the jury so the factors can be evaluated and properly weighed. *See Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 76 (2d Cir., 2003).

---

purposes; the definition is intended only to summarize existing law that has developed under State Corporations laws and such statutes as the NLRA, the Fair Labor Standards Act (FLSA) and the Employee Retirement Income Security Act (ERISA).").

(holding that the "historical findings of fact that underlie each of the relevant factors" and the "findings as to the existence and degree of each factor" are factual questions). *See also Trustees of Elevator Constructors Union Local No. 1 Annuity & 401(K) Fund*, 2018 WL 2727884, at *7 ("outstanding factual disputes prevent the Court from determining which outcome the third and fourth factors (common management and ownership) favor. . . . a reasonable jury could find either that North American and K.A.N. are a single employer or that they are not.").

Here, where as explained below, there are factual disputes as to whether any of the single employer factors can be weighed in favor of the Non-Debtor Defendants, determination of these issues is the province of a jury and summary judgment in their favor is impossible.

## II. Summary Judgment is Inappropriate on the Single Employer Issue

### A. The Purpose of the WARN Act and Its Single Employer Doctrine

"The WARN Act is a remedial statute stating the public policy of the United States to protect employees against certain employment losses." *Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 835 (8th Cir. 2016). It was enacted in response to "extensive worker dislocation that occurred in the 1970s and 1980s. As companies were merged, acquired, or closed, many employees lost their jobs, often without notice. In some circumstances, the projected closing was concealed from the employees." *Hotel Employees & Rest. Employees Int'l Union Local 54 v. Elsinore Shore Associates*, 173 F.3d 175, 182 (3d Cir. 1999) (internal citations omitted).

"By requiring advance notice, the WARN Act aims to 'provide[ ] workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market,' and allows the state to provide prompt assistance to displaced workers." *Guippone v. BH S & B Holdings LLC*, 737 F.3d 221, 225 (2d Cir. 2013)

(quoting 20 C.F.R. § 639.1(a)). Further background on the WARN Act is given in Plaintiff's brief in support of partial summary judgment and is incorporated by reference, but omitted here for brevity purposes. *See* Doc. No. 100.

The Single Employer doctrine provides employees further protection. Terminated employees of distressed companies often sue the corporate parents because "a plant closure often presages a corporation's demise leaving workers without a source of satisfaction from their employer." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 476-77 (3d Cir. 2001). The WARN Act's path for redress against a parent company "is demonstrably easier on plaintiffs than traditional veil piercing." *Id*. at 486.

In this regard, the WARN Act defines an employer as "any business enterprise" [that employs one hundred or more employees], 29 U.S.C. § 2101(a)(1), and the WARN Act's Regulations make clear that "employer" includes certain parents. 20 C.F.R. § 639.3(a)(2). The WARN Regulations provide that whether a subsidiary is treated as a separate employer or as a part of the parent depends "upon the degree of their independence from the parent." 20 C.F.R. § 639.3(a)(2). Whether the two are jointly liable for the closing and lack of notice is an "assessment of the amount of control" exercised by one entity over another" *In re APA Transp. Corp. Consol. Litig.,* 541 F.3d 233, 244 (3d Cir. 2008), as amended (Oct. 27, 2008) (citing *Pearson*, 247 F.3d at 495-96). "'[I]if the parent corporation has "disregard[ed] the separate legal personality of its subsidiary' in directing the subsidiary to act —such evidence alone might be strong enough to warrant liability." *Pearson*, at 496. A parent exerts de facto control when it is the decision maker responsible for the WARN violation. *Id. at* 245 cited in *Guippone v. BH S & B Holdings LLC*, 737 F.3d 221, 227 (2d Cir. 2013).

Non-Debtor Defendants contend they are due blanket parental immunity for throwing their captive entity into liquidation while plucking out the jewel asset, simply because Ms. Tilton donned herself with the self-appointed title of Director when carrying it out for them. Such a notion would overrule 80 years of single-employer law, including *Guippone*, the controlling precedent which leaves no doubt that parents who are directors are subject to parent liability simply for approving a shutdown without notice, no less masterminding it. In *Guippone*, the operating company had as its board, its parent, which chose its management and negotiated its financing. "Most critically," the *Guippone* Court found, "th[is] evidence, at a minimum, raise[d] a question of fact as to whether [the parent] made the decisions leading to the alleged illegal employment practice." 737 F.3d at 227. Here, the Non-Debtor Defendants do not dispute that Tilton made all significant decisions for TransCare, including the chapter 7 filing of a cashless estate that required immediate shutdown. In *Guippone*, the parent's decision-making in the guise of a "board" did not absolve the parent, it directly inculpated it, as explained below. The "board" veneer, on which Non-Debtor Defendants rely, does not insulate them in this Circuit.

### B. How The Single Employer Factors Are Applied

Given the WARN Act's goal of protecting workers, it has been noted that the "wrongdoer should not escape liability merely because corporate formalities are observed." *Blough v. Voisard Mfg., Inc.*, No. 1:14 CV 263, 2015 WL 366934 at *9 (N.D. Ohio Jan. 27, 2015). *See also Local 397, International Union of Electronic, Electrical Salaried Machine & Furniture Workers v. Midwest Fasteners, Inc.*, 779 F. Supp. 788, 800 (D.N.J. 1992) (indicating same) (cited in *Pearson*, at 488). Single employer status, therefore, turns on a "functional" assessment of control, not on corporate formalities. *Pearson* at 495-96.

The five non-exclusive factors that the regulations proscribe for determining if entities are a single employer are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations. 20 C.F.R. § 639.3(a)(2).

The Second Circuit noted that, "[a]s in any balancing test, application of these factors requires a fact-specific inquiry, no one factor set out by the DOL is controlling, and all factors need not be present for liability to attach." *Guippone v. BH S & B Holdings LLC*, 737 F.3d 221, 226 (2d Cir. 2013). Rather, "[t]hese factors are useful for courts in determining 'whether the nominally separate corporations actually functioned as a single entity with respect to [policy].'" *Id*. (quoting *Pearson*, 247 F.3d 471 at 503–04). The Court explained that "[i]n a WARN case like this one, that policy is the decision to terminate the employment of a significant part of a company's work force" and that "[t]hese factors are also sensibly applied to determine whether WARN liability is to **be imposed on an equity investor**, **who may similarly exercise control over the termination decision**." *Id*. (emphasis added).

The *Pearson* Court explained that there is a fundamental difference between a parent's decision to shut down a subsidiary and other "aspects of integration." *Id.* at 487. Two fact patterns tend to predominate: top-down decision making by a parent which implicates direct liability based on control, and integration based on entanglement between affiliates implicating derivative liability. An example of the latter is a subsidiary's discriminatory firing of an employee which is likely controlled at the "'local' level." *Pearson*, 247 F.3d at 504 at fn. 9.

Generally, however, a subsidiary does not "independently" decide to consolidate, merge, go public or private. These are decisions made from "outside" the affected corporation. Only the owner of a corporation decides which corporate transformations are in the owner's (not

necessarily the corporation's) best interests. *Esmark, Inc. v. N.L.R.B.*, 887 F.2d 739, 759 (7th Cir. 1989) (applying NLRB single employer doctrine).

That is, the "very nature of the acts that give rise to WARN Act liability (a plant closure) are likely to result from decisions made from the highest levels within the corporate structure, rendering an examination of a parent corporation's role in the decision more important." *Pearson* at 504 n. 9. When the subsidiary's "wrong" can be "traced to parent through the conduit of its own personnel and management," when the parent is "directly a participant in the wrong complained of" or when it "interferes with the subsidiary's operations in a way that surpasses the control exercised by a parent as an incident of ownership," *id. at* 486-87 (citing *United States v. Bestfoods*, 524 U.S. 51, 64 (1998)), WARN liability can be extended to the parent as a single employer. This behavior implicates the most critical factor, de facto control.

In determining de facto control, the foremost question is whether the parent corporation was the final decision-maker for the challenged practice, *i.e.*, "the decision-maker responsible for the employment practice giving rise to the litigation." *Guippone v. BH S & B Holdings LLC*, 737 F.3d 221, 227 (2d Cir. 2013) (quoting *In re APA Transport,* at 245). The *Pearson* Court placed the parent's involvement in the shutdown decision on "a sliding scale." *Pearson at* 487. If the "parent has sufficiently overwhelmed its subsidiary in taking the challenged action, such a showing is sufficient to create liability; if the parent was involved to a lesser degree, there must be some demonstration of the presence of the other aspects of the integrated enterprise test." *Id*. *See also Guippone*, 737 F.3d at 228.

In other words, there are effectively two separate strains of single employer doctrine – those in which entities are completely integrated, and those in which one entity dominates another, particularly with respect to making the decisions that give rise to WARN liability. As

the Second Circuit explained, "because the balancing of the factors is not a mechanical exercise, if the de facto exercise of control was particularly striking—for instance, were it effectuated by 'disregard[ing] the separate legal personality of its subsidiary' then liability might be warranted even in the absence of the other factors." *Guippone v. BH S & B Holdings LLC*, 737 F.3d 221, 228 (2d Cir. 2013) (quoting *Pearson,* 247 F.3d at 504 (internal citation omitted)).

### C. Single Employer Liability Exists When Parents Exercise Top Down Control to Cause a Violation the WARN Act

In *Guippone*, the Second Circuit reversed summary judgment granted to a parent. It noted that the record evidence was sufficient for a reasonable jury to conclude that "Holdings was so controlled by HoldCo that it lacked the ability to make any decisions independently, and that the resolution passed by HoldCo's board 'authoriz[ing] Holdings to effectuate the Reduction in Force' was, in fact, direction from HoldCo to Holdings to undertake the layoffs." *Guippone v. BH S & B Holdings LLC*, 737 F.3d at 227. In particular, the Court focused on the fact that, "[t]here is sufficient evidence . . . to allow a jury to conclude that Holdings was not free to implement its own decisions, and that the layoffs were . . . directed by HoldCo." *Id*. at 227-28.

Critically, the Court explained the following: "Authorizing layoffs is not just a prerogative of ownership—it's a function of being an employer . . ." *Id.*

The Ninth Circuit concluded similarly in *Childress v. Darby Lumber, Inc.*, 357 F.3d 1000, 1006 (9th Cir. 2004). There, the Appellants "assert[ed] that the companies maintained separate employment policies, had separate managers, and had separate workforces with separate pay scales, payrolls, workers compensation, employee health benefits, and separate middle management." However, Darby Lumber's "manager made the decision to move employees from the payroll of DLI to that of BRC, and to have employees on the BRC payroll work in the DLI log yard" and "Russell [the owner of BRC and DLI] admitted . . . that he directed both the DLI

manager and the BRC manager to shut down the respective companies when the time came and Darby Lumber acknowledged that BRC "would ultimately answer to higher management at Darby Lumber, Inc. [DLI]." The Court found that the evidence, "on balance, demonstrated de facto exercise of control by DLI over BRC." *Id*.

Likewise, in *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers, Gen. Truck Drivers, Office Food & Warehouse Local 952 v. Am. Delivery Serv. Co.*, 50 F.3d 770 (9th Cir. 1995) the Ninth Circuit found that summary judgment was inappropriate to the defendant on single employer because plaintiff presented evidence that, "ADS did not adhere to corporate formalities, did not act independently through its Board of Directors, and did not make policy labor decisions without Ward's influence." *Id*. at 776.

*In re Tweeter OPCO, LLC*, further illustrates how evidence of de facto control can overwhelm the other factors. 453 B.R. 534 (Bankr. D. Del. 2011). The *Tweeter* Court found no integration given that two DOL factors: dependency of operations and unified personnel policies, tipped in favor of independence. *Id*. at 542-546. Nevertheless, it granted summary judgment to the employees, finding the upstream parent owner exercised de facto control. *Id*. at 545. Although the parent was only an "indirect owner" and the two entities shared only one common director, the court found the parent's owner's conduct was "egregious." He had requested that the subsidiary reduce headcount and was "onboard" with the cuts. He had also taken an interest in other reductions in force. This was sufficient to warrant summary judgment. *Id*. at 545

Likewise, in *Blough v. Voisard Mfg., Inc.*, No. 1:14 CV 263, 2015 WL 366934 (N.D. Ohio Jan. 27, 2015) the court found three entities were a single employer. There, there was common ownership and management between the direct employer Voisard and LGP and LGI. LGP owned Voisard, and LGI which was the managing partner of LGP (but not the owner). *Id.*

at *1.  Walker and Constein, were the limited partners of LGI and also served as the officers and directors for all three companies.  *Id*.  The court found that LGP and LGI exercised de facto control over Voisard because the ultimate authority lay in Walker and Constein who "were the only two officers and directors of [Voisard]."  *Id*. at *9.  "They made the employment and financial decisions at Voisard since it was purchased in 2003, for which LGP was paid management fees."  *Id*.  "And importantly, Walker and Constein were responsible for the mass layoff on January 31, 2014."  *Id*.

Additionally, in *United Paperworkers Int'l Union, AFL-CIO, CLC v. Alden Corrugated Container Corp.*, 901 F. Supp. 426 (D. Mass. 1995), the Court granted summary judgment to plaintiffs indicating that because

> The primary stockholders of Alden Holdings, Walter Zuckerman, Benjamin Gottlieb and Frederic M. Gottlieb, with one exception, were each officers and directors of Alden Holdings, Alden and Bates. Three of the four directors of Alden Holdings supervised the labor negotiations of Alden and Bates. Alden Holdings secured financing for Alden and Bates. Two of the officers/directors of Alden Holdings determined the allocation of Stanley Jacobson's salary between Alden and Bates. Representatives of Alden Holdings attended the meeting of Alden's and Bates' paper suppliers. De facto control of Alden and Bates by Alden Holdings is amply supported by the record.

901 F. Supp. at 439.

So too, in *Local 2-1971 of Pace Int'l Union v. Cooper*, 364 F. Supp. 2d 546 (W.D.N.C. 2005), the Court concluded that summary judgment was inappropriate for the defendants because a single individual was the ultimate owner and controller of all companies and "[a]s the ship was going down," they went to him to him for an infusion of money.  364 F. Supp. 2d at 564-65.

Further, in the context of motions to dismiss, Courts routinely deny such motions when de facto control and control over day-to-day operations is alleged.  In *Garner v. Behrman Bros. IV, LLC*, 260 F. Supp. 3d 369 (S.D.N.Y. 2017) the Court concluded that allegations that

Behrman made the ultimate decision to shut down the direct employer through its officers, gave the direct employer instructions on a daily or near daily basis, a Behrman partner, despite a formal board membership role at the direct employer, acted on behalf of Behrman in undertaking that role were sufficient to warrant discovery to prove their veracity. *Id*. at 378. Likewise, in *Vogt v. Greenmarine Holding, LLC*, 318 F. Supp. 2d 136 (S.D.N.Y. 2004), the court concluded that the "the allegation that [defendants] directed [plaintiffs' direct] employer to enter bankruptcy and shut its facilities, is sufficient to warrant discovery into plaintiffs' claims" despite the fact that plaintiffs alleged that the owner "left the day-to-day functioning of OMC's outboard motor production to other managers." The Court found that, "the de facto control element tips the balance towards plaintiffs." *Id*. at 144-46. *See also Austen v. Catterton Partners V, LP*, 709 F. Supp. 2d 168, 175-77 (D. Conn. 2010) (denying a motion to dismiss where, "Plaintiffs ha[d] alleged that the boards of directors . . . were composed entirely of individuals from [the parents]"); *Rangel v. Cardell Cabinetry, LLC*, No. SA-13-CA-843, 2014 WL 12540718, at *3–4 (W.D. Tex. Jan. 17, 2014) (denying motion to dismiss where "the Plaintiffs allege[d] that the H.I.G. Defendants hand-picked Cardell's CEO, who engaged in weekly calls and quarterly meetings with H.I.G. account managers and executives" and could "establish that the H.I.G. Defendants ultimately doomed the plant when they cut off financial support").

### D. All Patriarch Entities Were A Single Business Enterprise.

Patriarch attempts to misdirect the single employer analysis by focusing on the relationship between each individual Patriarch entity and TransCare. But, the Court must consider whether the Patriarch entities were a single business enterprise with TransCare as whole. *See* 20 C.F.R. § 639.3(a)(1) (describing employer as a "business enterprise"); *Local 2-*

*1971 of Pace Int'l Union v. Cooper*, 364 F. Supp. 2d 546 (W.D.N.C. 2005) (finding web of companies was single employer where "Puri owned and controlled every single Purico entity").

It is obvious that the Patriarch entities were a single business enterprise together. The entities all served to managing Lynn Tilton's investments and portfolio companies. The entities each served roles in furtherance of that same goal. There is no evidence that any Patriarch entity other than Patriarch Partners Management Group and Patriarch Partners, LLC had any employees of their own and the entities shared office space. There is no evidence that any Patriarch entity had its own employment policies. *See* ¶¶ 15; 20; 23; 24; 25; 26; 28; 29; 31; 110; 113. It is undisputed that Lynn Tilton had control over all of the Patriarch entities, ¶ 110, and owned all or a majority of each entity whether directly or indirectly. ¶¶ 100-109. Accordingly, it is clear that these entities were a single business enterprise.

Further, though Ms. Tilton contends that Patriarch Partners III, LLC was not active during the relevant time period, she presents no evidence that it is not part of the Patriarch business enterprise. *See* ¶¶ 30-31. Additionally, though Patriarch contends that Ark CLO 2001-1, Limited does not exist, a misnomer of defendants is not an independent basis for their dismissal from the case. Rather, even where plaintiffs have been advised of this misnomer, it is appropriate to allow them an opportunity to amend the complaint. *See Open Hous. Ctr., Inc. v. Kessler Realty, Inc.*, No. 96-CV-6234(ILG), 2001 WL 1776164, at *10 (E.D.N.Y. Dec. 4, 2001) (granting plaintiffs' request in opposition to summary judgment for leave to amend to substitute misnamed defendants.) Other courts have simply noted the misnomer and proceeded to decide summary judgment on the merits. *See Carroll v. Local 144 Pension Fund*, 100 F.3d 943 (2d Cir. 1996); *Van Hoven v. 1199 SEIU Pension & Benefit Funds*, No. 11 CV 3197 HB, 2012 WL

488704 (S.D.N.Y. Feb. 15, 2012); *Schwartz v. U.S. Dep't of Justice*, No. 94 CIV. 7476(AGS),

1995 WL 675462 (S.D.N.Y. Nov. 14, 1995), *aff'd*, 101 F.3d 686 (2d Cir. 1996).

In all events, given that the Patriarch entities are a single employer, the remaining

question is whether the Patriarch enterprises' relationship with TransCare and actions in closing

TransCare without WARN notice render that enterprise a single employer with TransCare for

WARN Act purposes.

### E. All of the Single Employer Factors are Undisputedly in Plaintiffs' Favor or Subject to Disputes of Fact

The Court cannot decide the single employer inquiry in Patriarch's favor because the

evidence demonstrates that there is common ownership and common directors and there are

disputes as to de facto control, unity of personnel policies, and dependency of operations.

#### 1. Common Ownership

Patriarch contends that the common ownership factor is not met because Patriarch is not

the owner of TransCare. Mov. Br. at 23. However, common ownership, as the name implies, is

not met only when one entity owns another. Rather, where two entities are owned by a common

owner, this factor is met. This is logical because in some instances, a single corporate parent

may own multiple horizontally integrated entities which are deemed a single employer under the

WARN Act despite the fact that no one of these entities owns another. Here, it is not disputed

that Lynn Tilton is the ultimate majority or sole owner of both Patriarch (all Patriarch entities)

and TransCare despite the web of ownership relationships and multiple entities. ¶ 16.

*Local 2-1971 of Pace Int'l Union v. Cooper*, 364 F. Supp. 2d 546 (W.D.N.C. 2005) is on

point. There, the court noted the extenuated ownership chain and the fact that "Puri took great

care to disassociate himself technically from any or all of the so-called 'Purico Group." *Id*. at

565. Nonetheless, the Court noted that "[t]he corporate family tree . . . once the branches are

untangled, reveals that only [one] defendant[ ]" actually owns the various corporate entities, Nathu Puri." *Id*. at 565. (alterations in original). *See also Childress v. Darby Lumber, Inc.*, 357 F.3d 1000, 1006 (9th Cir. 2004) ("technical common ownership is avoided by corporate formalities" but "actual commonality of ownership satisfies this . . . factor.") (citation omitted).

Moreover, "[f]inancial control itself is sufficient to satisfy the common ownership factor." *In Re Tweeter OPCO*, 453 B.R. at 542 (citing Pearson, 247 F.3d at 494 ("'financial control' will suffice to satisfy the 'common ownership' prong of the integrated enterprise test, and it is likely that the DOL factors should be interpreted similarly...."). Here, it is not disputed that Patriarch had financial control over TransCare as, for example, Patriarch entities were its lenders and TransCare did not have any excess funds with which to operate. *See* ¶¶ 131-32.

Accordingly, this factor clearly falls in Plaintiff's favor.

### 2. Common Officers and Directors

Patriarch does not dispute that there was a common officer/director, Lynn Tilton. Mov. Br. at . While Patriarch notes that there is only one common officer/director, it neglects to mention that Ms. Tilton was the sole director of TransCare. In *Jevic*, the Court held that this factor was satisfied even though there was not a common officer because two out of three board members of Jevic were from the parent entity. *In re Jevic Holding Corp.*, 492 B.R. 416, 426 (Bankr. D. Del. 2013), *aff'd*, 526 B.R. 547 (D. Del. 2014), aff'd, 656 F. App'x 617 (3d Cir. 2016). Accordingly, this factor also plainly falls in favor of Plaintiff.

As discussed below, Tilton's dominance of TransCare as its sole director and her Patriarch umbrella as the sole control person in each entity is unique and weighs heavily toward a finding of single employer liability. The absence of independent directors is a factor that has been considered by Courts before. *See, e.g., Blough v. Voisard*, at *9.

### 3. De Facto Control

Patriarch contends that it did not exercise control over TransCare because, "[t]here is no dispute Patriarch Partners' employees' involvement in any TransCare matters were solely in connection with the performance of collateral manager duties or in their capacity as advisors to Tilton in her role as TransCare's sole Director." Mov. Br. at 17. This point is disputed.

For example, Leland, TransCare's CEO testified that Jean Luc Pelissier, a PPMG employee, and Michael Greenberg, a Patriarch Partners employee directed him as to how to make payment on all accounts receivable. ¶ 4. They made him withhold payment from creditors until TransCare could not receive necessary medical items or even use E-Z Pass for its ambulances. ¶ 113. Pelissier sat in Leland's office on a daily basis and Greenberg was a constant presence at TransCare's offices as well. ¶ 4. Leland was required to answer to Patriarch employees as if they were Lynn Tilton. ¶ 13. This despite the fact that Patriarch employees would often hide from him whether their instructions actually came from Lynn Tilton. *Id*. That is, TransCare's highest level officers effectively "ultimately answer[ed] to higher management at [Patriarch]." *Childress v. Darby Lumber, Inc.*, 357 F.3d 1000, 1006 (9th Cir. 2004).

Moreover, Tilton did not distinguish when she was dealing with Patriarch employees as TransCare's director or in any other capacity, such as in her capacity in a control position of Patriarch entities and her personal funds. ¶ 13. She did not have regular TransCare board meetings. *Id*. Thus, when Tilton directed Patriarch's employees to act in her interests and outside of the interests of TransCare, she was clearly directing them not to act as her agent as director of TransCare, but rather in their capacity as Patriarch employees managing her investments. Indeed, the end of TransCare was specifically an action by Tilton to use her patriarch entities to foreclose on TransCare's assets and transfer them to another corporate entity

that she controlled. *See* ¶ 54. This could not have been her acting as director of TransCare and using Patriarch employees to effectuate TransCare goals.

Even if Patriarch employees were acting as agents of TransCare director Lynn Tilton, the mere fact that they were employees of Patriarch who were de facto exerting upper management level control over TransCare, even if they were not formally named executives, established Patriarch's de facto control over TransCare. *See, e.g.*, *Blough v. Voisard*, at *9.

Tilton also put in place an authority matrix that severely constrained the ability of TransCare's officers to act in the company's interest. ¶¶ 13; 134. While Patriarch points to the authority matrix and Tilton's control as director as evidence that Patriarch was not a single employer, Tilton's de jure control does not insulate Patriarch from liability. Rather her dual roles with Patriarch and TransCare are precisely what help establish single employer liability. Tilton owned a majority in TransCare largely through Ark II CLO 2001-1, Limited. ¶¶ 49, 103 Her Patriarch enterprise placed her in control of TransCare. Thus, Patriarch's indication that, "Tilton (and not Patriarch Partners or its employees) was the ultimate decision maker, with respect to TransCare's decision to file for Chapter 7 bankruptcy on February 24, 2016," Mov. Br. at 18, does not insulate Patriarch from liability, it establishes it. Moreover, although it is not necessary for Plainitff to establish this, it is obvious that Ms. Tilton was not acting in TransCare's interest when she plunged TransCare into Chapter 7 and attempted to use its assets to launch another business enterprise that she owned, Transcendence. *See Guippone*, 737 F.3d at 227-28 (noting that authorizing layoffs is a function of being an employer under the WARN Act and that de facto control occurs when the subsidiary is ignored as a separate legal entity).

Indeed, it would be backwards and anathema to single employer doctrine if employers could shield themselves from liability by giving themselves total legal control over a subservient

entity and then wielding that legal control to effectuate WARN violating layoffs without recourse. Even direct employers could evade liability that way simply by creating corporate walls between the entity that employed the management team and the rank and file employees.

*Local 2-1971 of Pace Int'l Union v. Cooper* is highly instructive here. There, the Court noted that, "there is no doubt that Puri owned and controlled each of these organizations regardless of the other corporate formalities observed." The Court noted that "Puri was the driving force behind each of the[] organizations and, when it was to his advantage, financial interchanges among the organizations occurred with frequency and complexity." *Id*. at 564. Based on that record, the Court rejected the defendants' summary judgment motion.

Finally, with respect to the most important transactions, those that *Pearson* and *Guippone* court noted could create single employer liability on their own, Tilton and Patriarch assumed total control. Tilton and Patriarch made every decision that led to the termination of TransCare's employees without notice while trying to launch Transcendence on Tilton's behalf.

When Leland anticipated terminations going into 2016, he wanted to communicate openly with employees but was overruled by Patriarch. ¶ 84. As of eight days into January 2016 there was no TransCare upper level management. Leland and Bonilla were out of their roles. ¶ 3; 13; 39. Patriarch was directing TransCare's remaining management on what to tell employees and what to do with TransCare assets. ¶¶ 84; 85; 156; 208; 209; 231; 247; 259. TransCare did not have counsel and Patriarch drafted all documents, including WARN notices, which they controlled the shots on distributing and ultimately decided to withhold. ¶ 84. Jones drafted that communications that were sent to employees. ¶ 85. Tilton and Patriarch planned to launch Transcendence, a new company owned by Lynn Tilton with some of TransCare's employees to be transferred at Ms. Tilton's will. ¶ 54; 206.

Patriarch seeks to analogize this case to *In re DHP Holdings II Corp.*, 447 B.R. 418 (Bankr. D. Del. 2010). Mov. Br. at 15-16. There however, the CRO "made the decision to close the facilities and terminate the employees." *Id*. at 424. "There [was] no evidence that [the parent company] controlled that decision" or that the CRO "sought any prior authority" from the parent. *Id*. Thus, even though there were numerous parent company representatives on the Debtors' board of directors, they were not implicated by the evidence. *Cf. Jevic* (Jevic "had senior management discussions about whether to issue WARN Act notices where no Sun Cap employees were present, and Jevic management relied on its consultant from Morris Anderson for legal and bankruptcy advice." 492 B.R. at 428. Here, Tilton, not Carl Marks (which was CFO not CRO) made the decision to conduct the layoffs which were effectuated through Patriarch employees' instructions. TransCare had no independent discussions with counsel.

Likewise, while Patriarch contends that the higher standard for imposing WARN Act liability on a lender should be applied, *see* Mov. Br. at 18-19 (citing *Coppola v. Bear Stearns & Co.*, 499 F.3d 144 (2d Cir.2007) and *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 245 (3d Cir. 2008)), that is not the case. Rather, as indicated in *Guippone*, "this test is applicable only to lenders, and we decline to extend it to defendants in this case who are not lenders but related or parent entities." *Id*. at 226. Here, the mere fact that Lynn Tilton extended money in the form of loans does not extinguish her equity relationship and common ownership. The high standard of Coppola is designed to protect true lenders like Wells Fargo who seek to protect their collateral, not owners who make capital contributions in the form of loans.

Ultimately, Plaintiff disputes or disputes in part all material evidence that Patriarch points to in favor of a finding of no de facto control. Mov. Br. at 17-18. Tilton and Patriarch determined to eliminate 1100 jobs at TransCare and ultimately all 1800, and made the decision

not to deliver WARN Act notice.  ¶¶ 54-55; 84.  The evidence demonstrates that there is at a minimum an issue of fact as to whether Patriarch so dominated TransCare that TransCare could not control its own destiny with respect to laying off its employees and issuing notice.  Rather, it was "powerless when it [came] to the decision to effect" its own shut down.  *See Vogt v. Greenmarine Holding, LLC*, 318 F. Supp. 2d 136, 143 (S.D.N.Y. 2004); *Guippone* at 227-28; *Pearson* at 490.  Accordingly, there are genuine, material disputes that preclude a finding in Patriarch's favor on de facto control.  Given the outsized importance of this factor, where a finding of de facto control alone can yield a single employer determination, *see Guippone*, at 228, these factual disputes alone are enough to preclude summary judgment in Patriarch's favor.

### 4.  Unity of Personnel Policies Emanating From a Common Source

The unity of personnel policies factor looks to whether the parent and subsidiary "functioned as a single entity with respect to [personnel] policies on a regular, day-to-day basis." *In re Tweeter OPCO*, 453 B.R. at 534.  As discussed above, where de facto control is pronounced, the unity of personnel policies carries comparatively little.  *See id*. at 545.

Regardless, here it is disputed whether there was a unity of personnel policies.  Patriarch acknowledges that it was involved in the hiring and firing of executive officers.  *See* Mov. Br. at at 20.  The evidence shows that it also, however, was involved in hiring and firing decisions beyond executives.  In particular, in determining who would be kept for Transcendence and who would be fired, Patriarch exerted complete control over the employment of each TransCare employee.  *See* ¶¶ 54; 61; 201.  Moreover, Leland testified that a Patriarch employee, John Pothin drafted TransCare employment policies and was involved in day-to-day communications and guidance of TransCare's HR functionality after TransCare's head of HR resigned.  ¶ 4.

These disputed facts render it impossible for the Court to make a determination as to this factor as a matter of law.  A jury must weigh the evidence and credibility of the witnesses.

### 5. Dependency of Operations

Patriarch focuses only on whether Patriarch was dependent on TransCare, see Mov. Br. at 21. This analysis is missing half the picture. The evidence shows that TransCare was dependent on Patriarch. The *Pearson* Court recognized that undercapitalization and siphoning, standard veil-piercing elements, may support a finding of "dependency of operations" leading to single-employer liability. 247 F.3d at 503. The Court in *Blough v. Voisard Mfg., Inc*., granted summary judgment against a parent who had received about $2.7mm in management fees. *Id*. at *1. *See also Local 2-1971*, 364 F. Supp. 2d 546 at 565 ("While there may not have been a dependency of personnel policies or operations, there was certainly a financial dependency").

Here, the evidence demonstrates that the undercapitalization of TransCare was a significant factor in its failure and demise. *See, e.g.,* ¶ 164. TransCare paid substantial interest and management fees to Tilton through Patriarch entities. ¶¶ 118; 154. Lynn Tilton was expending her personal funds through Patriarch and funds she owned to keep TransCare running on a day-to-day basis. ¶ 237. TransCare's ultimate demise occurred when she elected to fund a different operation, Transcendence. ¶¶ 203-06.

While Patriarch contends that there is no dispute that TransCare's employees were in charge of TransCare's day-to-day operations, Mov. Br. at 22, that is contested. *See* ¶¶ 4, 13.

Patriarch cites to *Jevic* as an example of courts refusing to find a company that engages in a rescue operation as creating financial dependency, Mov. Br. at 22, *Jevic* is inapposite. There, "[t]he record reflect[ed] that the Debtors sought additional financing from the NJEDA and also sought out buyers, with one company submitting a bid letter." *Jevic*, 492 B.R. at 432. Here, Patriarch expressly forbade TransCare's CEO from attempting to sell any assets or seek independent financing. ¶¶ 39; 183.

*DHP Holdings II Corp.*, is also inapposite. There the Plaintiff did not dispute that this factor was not met and there is no discussion of the subsidiary being financially dependent or lacking financial independence from the parent. 447 B.R. at 425. Likewise, in *In re Consol. Bedding, Inc.*, 432 B.R. 115, 124 (3d Cir. 2010), there was no evidence that the parent was involved in day-to-day operations. Here there is substantial evidence. See, e.g., ¶¶ 4, 13.

In sum, there is not a single factor that can be weighed in Patriarch's favor at summary judgment. Plaintiff's evidence, if credited by a jury, would be sufficient to establish all five single employer factors. In particular, the evidence shows Patriarch exerted de facto control over TransCare in determining to terminate TransCare's employees and withhold WARN notice.

## III. Patriarch's Unforeseeable Business Circumstances Defense Fails

Patriarch cannot establish the unforeseeable business circumstances defense because it did not issue valid notice to the affected employees, the terminations were not objectively unforeseeable, and there is significant evidence that the terminations were caused by the actions of Patriarch and Lynn Tilton, not Wells Fargo.

### A. Patriarch Did Not Issue Notice

As discussed at length in Plaintiff's brief in support of partial summary judgment on the WARN Act's defenses, an employer cannot rely on the WARN Act's unforeseeable business circumstances defense when it does not deliver written notice as soon as practicable explaining why earlier notice was not provided. *See* Doc. No. 100, incorporated herein by reference.

Patriarch contends that it did "enough" to notify employees but it plainly did not issue to the class a written notice, issued as soon as practicable, indicating that the class members were being terminated as part of a mass layoff and plant closing. Accordingly, the question of whether there are undisputed fact sufficient to conclude that the unforeseeable business

circumstances defense could be applied is rendered academic. Nonetheless, there are genuine disputes of material fact that would preclude the application of the defense.

## B. The *Halkias* Probability Standard is Wrong

Patriarch indicates that the Court should apply a standard for foreseeability that establishes that a layoff causing event is unforeseeable unless it was probable. Mov. Br. at 26 (citing *Halkias v. Gen. Dynamics Corp.*, 137 F.3d 333, 336 (5th Cir. 1998). However, the term foreseeable plainly does not mean probable to occur.[4] While Patriarch suggests that this standard is appropriate because it gives employers flexibility to preserve jobs, Mov. Br. at 28, the WARN Act "requires notice, not terminations." *Calloway v. Caraco Pharm. Labs., Ltd.*, 800 F.3d 244, 251 (6th Cir. 2015). The exceptions to the WARN Act permit an employer that flexibility only in certain cases. WARN Act notice is excused to allow an employer to seek financing or new business (if certain other criteria are met) in the Faltering Company exception, but not the Unforseeable Business Circumstances Defense. *See Snider v. Commercial Fin. Servs., Inc.*, 288 B.R. 890-97 (N.D. Okla. 2002). Whether notice is not in the absolute best interest of the company has nothing to do with whether a layoff is foreseeable. The standard of unforeseeability should not be twisted to permit the exception to swallow the rule. As Patriarch notes, the *Halkias* rule has not been adopted by the Second Circuit. It should not be applied.

---

[4] The ordinary usage of the term "reasonably foreseeable" cuts off liability only when events are too speculative to account for in planning. *See, e.g.*, *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 703 (2011) (Under FELA event is not reasonably foreseeable "'[i]f a person has no reasonable ground to anticipate that a particular condition ... would or might result in a mishap and injury'"); *Indian Brand Farms, Inc. v. Novartis Crop Prot. Inc.*, 617 F.3d 207, 226 (3d Cir. 2010)(reasonable foreseeability standard in products liability law "does not affix responsibility for future events that are only theoretically, remotely, or just possibly foreseeable..." because "[v]irtually all misuses are foreseeable as *possibilities*.") (emphasis in original).

### C. It Is Disputed as to Whether the Layoffs Were Unforeseeable and Caused by an Outside Force That Caused the Mass Layoffs or Plant Closing

Patriarch seeks to rely on the "unforeseeable business circumstances" exception. 29 U.S.C. § 2102(b)(2)(A). It allows for a reduction in the notice period when a "closing or mass layoff is caused by business circumstances that were not reasonably foreseeable" at the 60-day mark. 29 U.S.C. § 2102(b)(2)(A). Circumstances "not reasonably foreseeable" include "some sudden, dramatic, and unexpected action or condition **outside the employer's control**." *In re APA Transp.,* 541 F.3d at 248-49 (citing 20 C.F.R. § 639.9(b)(1)) (emphasis added).

Examples of such actions or conditions are: "[a] principle client's sudden and unexpected termination of a major contract with the employer, a strike at a major supplier of the employer, and an unanticipated and dramatic major economic downturn…." 20 C.F.R. § 639.9(b)(1).

In order to qualify for the exception, the employer "must prove two elements: (A) that the circumstances complained of were unforeseeable; and (B) that the circumstances complained of actually caused the mass layoff or plant shutdown." *Calloway*, 800 F.3d at 251. In "determining whether a closing was caused by unforeseeable business circumstances, we evaluate whether a 'similarly situated employer' in the exercise of commercially reasonable business judgment would have foreseen closing.") *Elsinore*, 173 F.3d at 186 (citing 20 C.F.R. § 639.9(b)(2)). Employers bear the burden of proof on the WARN Act's defenses. *See* 20 C.F.R. § 639.9 ("The employer bears the burden of proof that conditions for the exceptions have been met").

As explained below, even if the Court does apply the "probable" standard for foreseeability, summary judgment is nonetheless inappropriate.

### 1. It Was Probable That There Would be Job Losses 60 and 90 Days in Advance

TransCare was always close to death. Throughout 2015 it struggled to operate and Tilton had to pump money in as short term fixes to make payroll and plug operating losses. ¶¶ 111;

117.  EZ-pass accounts were shut off.  ¶ 113.  Ambulances were inoperable and supplies could not be obtained.  ¶ 114.  Over time, under the direction of Patriarch, substantial threats to TransCare's operations past January 1, 2016 had built up.  ¶ 148.  Leland and Bonilla both were concerned that operations would cease imminently at the beginning of 2016.  ¶¶ 150; 157.  Patriarch funding had never fixed the underlying problems only met emergencies.  ¶ 147.

On October 2, 2015, Wells Fargo had canceled the automatic renewal of the ABL relationship.  ¶ 42.  On December 10, 2015, payroll was missed again.  ¶ 141.  Wells Fargo believed that $6 million had to be infused.  ¶ 125; 166.  When Leland was removed, Carl Marks indicated that there was an immediate need to fund critical payments to prevent disruption.  ¶ 191.  The MTA expressed concerns with TransCare's relationship with Patriarch.  ¶¶ 145; 158.  It reduced its reliance on TransCare for access-a-ride.  *Id*.

Not only was the probability of layoffs foreseeable, it was in fact foreseen by TransCare's CEO, Glenn Leland.  Leland asked that he be permitted to open the lines of communication with his employees, but was forbidden.  ¶¶ 151; 156.  Leland indicated that others in the industry called TransCare "dead men walking." ¶ 146.

Lynn Tilton and Patriarch also clearly foresaw layoffs.  Tilton routinely stated that she was attempting to save as many jobs as possible.  ¶ 52.  The counterpart of this is obviously that a substantial number of jobs would be lost.  In other words, well before the layoffs, Tilton understood that she was not going to continue TransCare as a going concern.  She wanted to, and did, spin off the most valuable assets.  ¶¶ 59; 78-80.  Indeed there was a plan for a liquidating 11 that had been prepared by Carl Marks and even in that plan it was understood that there would be WARN claims which would potentially be entitled to administrative treatment.  ¶ 219.  As time

wound down, Ms. Tilton routinely threatened Wells Fargo that a chapter 7 liquidation would ensue, if they wanted to "take the keys." ¶¶ 56; 81.

As noted in Plaintiff's brief in support of her motion, the reason that Tilton and Patriarch did not disclose to those individuals who were planned to be terminated that they would be terminated is because they thought it would interfere with their business plan to spin off a new company with some of TransCare's assets and employees.  ¶ 223.

The WARN Act's unforeseeable business circumstances defense does not protect an employer under those circumstances.  *Calloway* is instructive.  There "Caraco argue[d] that premature WARN notices would force employers to lay off employees prematurely and thus hurt the intended beneficiaries of the Act."  But "the Act mandates notice, not layoffs." "Caraco could have issued notice to its employees of . . . without actually conducting the layoffs."  *Id*. at 255. As the *Calloway* Court recognized, an employer can "issue[] . . . conditional notice of probable layoffs caused by[] an imminent … action without actually conducting the layoffs if the action never occur[s]."  *Id*.   Here, Patriarch could have followed this routine practice and told employees it was attempting to spin off TransCare divisions into a new operation and that any employees who were not part of that operation were subject to termination.  20 C.F.R § 639.7(a)(3) ("Notice may be given conditional upon the occurrence or nonoccurrence of an event").  *Accord* 54 FR 16042-01, at *16059.

"[T]he purpose of the WARN Act [is] to give employees a chance to leave on their own terms."  *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. MRC*, 541 F.Supp.2d 902, 910-12.  Everyone involved from Leland to Patriarch to Carl Marks foresaw layoffs well in advance of February 24, 2016.  By withholding notice for their own purposes

despite knowledge that many employees would be out of work in short order, Patriarch robbed the employees of their opportunity to leave on favorable terms.

## 2. Evidence Shows the February 24, 2016 Terminations Were Caused By Lynn Tilton's Decision to File Chapter 7 and Refuse to Fund Continued Payroll

The central point on which Patriarch's unforeseeable business circumstances defense stands with respect to the February 24, 2016 terminations is disputed. Citing only deposition testimony from Lynn Tilton, Patriarch contends that "the undisputed material facts demonstrate that the sudden decision of TransCare's senior lender, Wells Fargo, to continue funding only if the Company filed for Chapter 7 bankruptcy led to the unexpected Chapter 7 bankruptcy of certain subsidiaries of TransCare on February 24, 2016." Mov. Br. at 28 (citing SOF ¶¶ 82, 83).

In the first instance, this defense is illogical. Patriarch contends that it was forced into Chapter 7 by Wells Fargo, who told them they would fund in Chapter 7, and that this somehow caused layoffs. If Wells Fargo had wanted to fund in Chapter 7, why did it not do so?

In all events, this is *not* what TransCare's employees were advised in communications to them. They were told that the filing of Chapter 7 was necessitated by the decision of the lender to "cease providing additional funding" which meant they were "being forced into a liquidation under Chapter 7 of the Bankruptcy Code." ¶ 88. This alone is reason for the unforeseeable business circumstances defense to fail. *See* Doc. No. 100 pp. 15-16.

Moreover, the evidence contradicts Ms. Tilton's testimony. Wells Fargo was an asset based lender, and therefore never was responsible for funding out of formula. ¶ 38. The bank understood a Chapter 7 filing to mean a liquidation (as of course is the ordinary reason for a Chapter 7 filing.). Wells Fargo made no promise to fund payroll in a Chapter 7. ¶ 81; 84. Rather, on February 19, Wells Fargo sent Ms. Tilton a proposal for continued funding that also required her to issue immediate WARN Notice as a condition of funding. ¶ 224. There is no

evidence that Ms. Tilton ever met those terms. Lynn Tilton told Wells Fargo that she would no longer work with them. ¶ 81. TransCare's employees were pulled off the job when Tilton and Wells Fargo could not agree on paying payroll and funding after she had already filed. *Id.* Lynn Tilton had been the funder of last resort for payroll for TransCare. ¶ 160.

Indeed, Ms. Tilton's decision to strictly foreclose on TransCare assets and file a chapter 7 bankruptcy came as a surprise to the lender. ¶ 81. In fact, Wells Fargo was concerned that by plunging TransCare into a Chapter 7, Ms. Tilton would use the opportunity to "grab some of the assets and use [them] in a spin off concept she has been planning." ¶ 236.

Patriarch is seeking to be rewarded for haphazard way in which it managed its subsidiary and for its own decision to suddenly plunge it into a Chapter 7 and use that as a pretext to withdraw funding.

Of course, it makes little sense that Wells Fargo would have advised Lynn Tilton that they would fund a wind down (with sufficient funding for a WARN notice period) in a Chapter 7 and then act with surprise when a Chapter 7 was filed and scramble to ensure that Ms. Tilton did not use the opportunity to seize assets – which in fact had already happened. Moreover, if Wells Fargo had committed to fund in a Chapter 7, why would that decision have led to employee layoffs without notice when Wells Fargo had made notice a condition of funding.

Plainly, there is at a minimum a dispute as to the stated unforeseeable business circumstance that caused the layoffs without notice. Patriarch contends (nonsensically and inconsistently with the written communications that it issued) that it was "the sudden decision of TransCare's senior lender, Wells Fargo, to continue funding only if the Company filed for Chapter 7 bankruptcy" that led to the layoffs without advance notice after TransCare filed for Chapter 7. Other record evidence shows that Lynn Tilton made the decision to foreclose on

TransCare assets, file Chapter 7, and refuse to fund payroll that was already due, let alone commit to 60/90 days additional funding.

Patriarch cites to *In re Jevic Holding Corp.*, 496 B.R. 151, 164 (Bankr. D. Del. 2013), where the Court held that the banks refusal to continue funding was unforeseeable. But Jevic is inapposite. There, the lender "CIT terminated the credit facility when [equity owner] Sun Cap refused to invest additional funds" and "refused to fund a proposed sale to Pitt–Ohio. Jevic's board formally authorized a bankruptcy filing and WARN notice was sent that day." *In re Jevic Holding Corp.*, 496 B.R. 151, 163 (Bankr. D. Del. 2013).

Critically, however, the Court noted that it "will not impute Sun Cap's refusal to invest additional money to the Debtors" and therefore "CIT's ultimate decision not to extend the forbearance was out of the Debtors' control." *In re Jevic Holding Corp.*, 496 B.R. 151, 164 (Bankr. D. Del. 2013). In *Jevic*, the Court had simultaneously rejected plaintiffs' single employer arguments and granted summary judgment to Sun Capital on that issue. *See In re Jevic Holding Corp.*, 492 B.R. 416, 433 (Bankr. D. Del. 2013), *aff'd*, 526 B.R. 547 (D. Del. 2014), *aff'd*, 656 F. App'x 617 (3d Cir. 2016). Here, a single individual helmed Patriarch and TransCare and decided when the TransCare entities would file and how much they would be funded. It is impossible to split the atom of the single employer and conclude that TransCare was surprised by Patriarch's decision to stop funding payroll and therefore had to file for Chapter 7 and terminated employees.

Moreover, whether Wells Fargo made any negative decision that caused layoffs is disputed. But, even if it were undisputed, other courts have concluded that a bank's decision to call loans during a "deepening downward fiscal spiral," while "dramatic" is not unforeseeable. *United Paperworkers Int'l Union, AFL-CIO, CLC v. Alden Corrugated Container Corp.*, 901 F.

Supp. 426, 443 (D. Mass. 1995).  In *Blough v. Voisard*, the Court similarly rejected the argument that "TD Bank's freezing its line of credit caught Voisard by surprise" even though "TD Bank had always worked with Voisard to modify its loan agreement."  2015 WL 366934, at *6 (N.D. Ohio Jan. 27, 2015).  The Court concluded that the record lent itself to the conclusion that it was not unforeseeable that TD Bank would refuse to cover an "overdraft [that] was larger than that allowed under the terms of [Voisard's] agreement with TD Bank."  *Id*.

Likewise in *Childress v. Darby Lumber Inc.*, 126 F. Supp. 2d 1310, 1316–17 (D. Mont. 2001), *aff'd*, 357 F.3d 1000 (9th Cir. 2004), the Court concluded that  lender notified the company on multiple occasions throughout 1998 that the company was in violations of its covenants, and that the company needed to come into compliance or risk losing credit with the bank.  But the Court rejected the argument that the bank caused the layoff because, there was no "sudden onset" of the "company's financial crisis" and "[t]he loss of credit did not happen until November 1998, more than a month after the layoff event."  *Id*. at 1316-17.

Here, Patriarch defaulted with Wells Fargo by executing the Article 9 foreclosure (see ¶ 81) and plunged TransCare into Chapter 7 where Patriarch and Lynn Tilton refused to fund payroll.  While it purports to have done so at the hands of Wells Fargo, that is a disputed fact and Patriarch's only support for it is the testimony of Lynn Tilton.  While Patriarch had been in constant discussions with Wells Fargo and had executed numerous forbearance agreements, the record lends itself to the interpretation that Patriarch's refusal to meet Wells Fargo's terms and to send TransCare into Chapter 7 is what ultimately ended the relationship.  Thus, if the Court even considers the underlying merits of Patriarch's defense, which it should not because of the lack of sufficient notice, it should reject it because Patriarch's cited unforeseeable circumstance – the purportedly forced filing of Chapter 7 – was not undisputedly caused by an outside actor.

### 3. Lynn Tilton's Decision to Strip TransCare of Assets and Launch an Entity that Was Incapable of Paying its Own Employees Caused the Later Layoffs

Patriarch argues that the termination of employees on February 26, 2016 and the next days was unforeseeable because they could not have anticipated that the Chapter 7 Trustee would dispute their seizure of TransCare assets to launch TransCendence.

However, this also is disputed. Not only was it foreseeable, it was foreseen that seizing assets outside of a bankruptcy process was a highly risky maneuver.

Husson testified that he understood the plan was for Patriarch to split TransCare's assets in a bankruptcy under court supervision. ¶ 81. Wells Fargo and its counsel specifically foresaw that there would be substantial issues if an Article 9 foreclosure was used outside of Bankruptcy Court. *Id*. Patriarch itself had questioned whether they could use assets that had been foreclosed upon after the Chapter 7 filing. Stephen emailed counsel who cautioned him they should discuss the issue with the Trustee in advance. ¶ 230.

Moreover, it was not outside of their control. Patriarch had not established a system for paying remaining employees before the apparently snap decision to file the Chapter 7 petitions. They requested that the Chapter 7 Trustee use TransCare's existing payroll mechanism and he reasonably declined. ¶ 257. They did not prepare in advance for operations and for the most significant asset, the MTA contract, to be transferred. *See* ¶¶ 251; 257. Finally, Patriarch sent the employees home. Ultimately, the Trustee consented to transfer the MTA contract, but Patriarch had already dismissed the employees. ¶¶ 250; 254; 255.

The unforeseeable business circumstances defense is not designed to protect employers from their own poor choices that lead to immediate layoffs. As noted, it only shields employers who are ambushed by something outside of their control. 20 C.F.R. § 639.9(b)(1). Here, Patriarch shocked their lender, created chaotic circumstances for a Chapter 7 Trustee, and robbed

themselves of the ability to pay TransCare's remaining employees – who they then summarily dismissed.  They cannot be bailed out of WARN liability by citing to the chaos that they created.

IV.     **There Are Disputes Precluding Determination of Whether Patriarch and Lynn Tilton are Joint/Single Employers Under State Wage Laws**

A.  **Tilton and Patriarch are Responsible for Unpaid Wages Under New York Law**

The definition of "employer" under the New York Labor Law is coextensive with that of the Fair Labor Standards Act (FLSA), for the purposes of determining whether individuals are liable for unpaid wages.  *See Inclan v. New York Hosp. Grp., Inc*., 95 F. Supp. 3d 490, 511 (S.D.N.Y. 2015) ("district courts in this Circuit have consistently interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA") (citing cases).

The U.S. Supreme Court has observed that the "striking breadth" of the term "employ" under FLSA "effectuates the remedial purposes of the act."  *Barfield v. New York City Health & Hosps. Corp*., 537 F.3d 132, 141 (2d Cir. 2008) (citing in accord *Frankel v. Bally, Inc.,* 987 F.2d 86, 89 (2d Cir. 1993) (noting courts' recognition of "the expansive nature of the FLSA's definitional scope" as beyond the common law agency test in light of "the remedial purpose underlying the legislation").  The Supreme Court further instructs that the determination of whether an employer-employee relationship exists under FLSA should be grounded in "economic reality rather than technical concepts." *Barfield,* at 141–42 (citations omitted). "Economic reality" is considered to be a "flexible concept" to determined by "reference not to 'isolated factors, but rather upon the circumstances of the whole activity'" on a case-by-case basis.  *Id*. (*citing Rutherford Food Corp. v. McComb,* 331 U.S. 722, 730, (1947)).

The Secord Circuit explains that "the overarching concern is whether the alleged employer possessed the power to control the workers in question, with an eye to the 'economic

reality' presented by the facts of each case." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999), *holding modified by Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61 (2d Cir. 2003) (citations omitted).  To assess the "economic reality," the Second Circuit has identified "different sets of relevant factors based on the factual challenges posed by particular cases." *Barfield* at 142, cited in *Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013).

One set of factors, known at the *Carter* factors, focuses on operational actions that can make a joint employer liable even if it does not have "ultimate control" over the payment of wages. They are: whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records  *Barfield*, at 142  Although these factors "can be *sufficient* to establish employ[ment] status," the Second Circuit has "never held "that a positive finding on those four factors is *necessary* to establish an employment relationship." *Id*. at 143.  *(citations omitted)* (emphasis in original)

As illustrative, in *Herman,* one of two shareholders was a lawyer who was also chairman of the board, and had some involvement day-to-day business although he did not supervise the employees.  Some senior executives periodically reported to him and he occasionally gave them instructions.  He was "viewed by others as having control over RSR," and "represented himself ... as having such authority," *Herman*, at 137.  He dominated RSR in part because his access to bank credit permitted him to "'exercise[ ] financial control.'" *Id*. 136-37, citing *Donovan v. Sabine Irrigation Co.,* 695 F.2d 190, 194–95 (5th Cir.1983) (employer includes person who "effectively dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-à-vis its employees")*.*

In finding the shareholder a joint employer, the *Herman* Court "emphasized that the existence of an employer-employee relationship "does not require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees." *Id.* at 139 ("Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA...."). The Circuit instead emphasized the shareholder's exercise of general authority and his financial control *Id.* at 140. *See Inclan v. New York Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 508 (S.D.N.Y. 2015)

Assessing the economic reality in *Irizarry,* the Second Circuit made two sets of inquiry, appropriate for determining the individual liability of Gristede's supermarket's chairman, president, and CEO – John Catsimatidis, 722 F.3d at 111.

The first such area of inquiry identified in *Irizarry* was "the scope of an individual's authority or 'operational control' over a company." *Id*. at 106. This would require some degree of individual involvement in a company in a manner that affects employment-related factors such as workplace conditions and operations, personnel, or compensation." *Id.* at 109. That is, the individual's role must "entail decisions" that "directly affect the nature or conditions of the employees' employment." *Id.* at 110;  The second area of inquiry identified in *Irizarry* was whether Catsimatidis both held and exercised the ultimate power "to control Gristede's operations at a high level," *Id.* at 113 n. 7.  Although the Circuit did not find that Catsimatidis exercise managerial control in stores on the day-to-day level of a manager, he had "functional control over the enterprise as a whole" *Id.* at 116.  The Circuit found it "pellucidly clear that he is the one person who is in charge of the corporate defendant. *Id*. at 117

Defendants rely on a mechanical, technical application of the *Carter* factors.  Mov. Br. at 35-36 (citing *Salinas v. Starjem Rest. Corp.*, 123 F. Supp. 3d 442, 463 (S.D.N.Y. 2015)).  The

facts here are similar to those in *Irizarry*, however, where the Second Circuit found Catsimatidis satisfied two of the *Carter* factors*:* the hiring of managerial employees and overall financial control of the company" but the inquiry continued.  *Irizarry,* 722 F.3d at 114–16.  Under the totality of the circumstances, the panel held it was "logical" to hold him liable to the employees because of the degree of his responsibilities and activities.  *Id*. at 117.  He demonstrated he was their employer for the purposes of the FLSA due to his "active exercise of overall control over the company" and his "ultimate responsibility for the plaintiffs' wages."  *Id*.

It is similarly "logical" to hold Ms. Tilton liable because activities and responsibilities aligned with those of Catsimatidis. *Id.* at 117.  Tilton satisfied two of the *Carter* factors by hiring managerial employees and her overall financial control of the company.  But, the inquiry continues. Tilton, like Catsimatidis, did not report to anyone else.  722 F.3d at 104, 111.  She had "functional control over the enterprise as a whole" *Id.* at 116.  She was the one person who was in charge of the corporate defendant.  She was the employer within the meaning of the FLSA because her operational control over Transcare is amply evidenced by her own testimony.   Her companies were the owners and she described herself as its "Board."  ¶ 21; She had the Authority Matrix.  ¶ 13.  But Tilton's took her responsibility to pay wages even further that Catsimatidis.  He did not pay them out of his own funds the way Tilton did, time and time again.  She funded payroll out of her own accounts when Transcare was out of money.  ¶ 237.  She took her "ultimate responsibility for the plaintiffs' wages" beyond the degree of Catsimatidis, to the highest possible level  *Id*. at 117

There is at the very least a genuine issue of material fact as to whether she was an employer under the New York Labor Law.

**B. Tilton and Patriarch are Responsible for Unpaid Wages Under Maryland Law**

Patriarch contends that "Tilton served as TransCare's sole Director, and her actions taken together with TransCare's Management Team were done on behalf of TransCare." Mov. Br. at 39. This is irrelevant. Patriach cannot use corporate formalities to distance itself from Tilton's actions. "[I]t is well-settled that employees need undertake no veil-piercing venture to recover under the wage statutes" including Maryland's. *Avila v. Caring Hearts & Hands Assisted Living & Elder Care, LLC*, No. CV TDC-15-3943, 2016 WL 4083365, at *4 (D. Md. Aug. 1, 2016). Like the FLSA, the Maryland Wage and Hour Law (MWHL) and Maryland Wage Payment and Collection Law (MWPCL) are "not constrained by the common law corporate veil doctrine. Indeed, other courts in this district have rejected such an application to the MWHL and MWPCL." *Id*. (citing cases).

As in New York, the "economic reality test" of FLSA is used by the Maryland statutes to determine whether an individual can be found to be an "employer." *Id*. *4 Maryland uses various incarnations of the "economic reality" test, including those set forth in *Barfield v. N.Y. City Health & Hosps. Corp. See Campusano v. Lusitano Const. LLC*, 208 Md. App. 29, 39–40, 56 A.3d 303, 309 (2012).

*The Campusano* Court recognized, Maryland's "legislative intent" which is "to incentivize payment by responsible parties." *Id*. at 310. The Court emphasized that the factors of control "are not to be applied mechanistically, and their general purpose must be understood as ultimately assigning *responsibility* under the law." *Id*. at 310 (emphasis in *Campusano*). In addition to *Barfield*, the *Campusano* Court was also guided by First Circuit's decision in *Baystate Alternative Staffing v. Herman,* 163 F.3d 668 (1st Cir.1998), a FLSA case. *See* 208 Md.App. at 40, 56 A.3d at 310.

In *Baystate,* the First Circuit identified "relevant indicia" of control, such as "an individual's operational control over significant aspects of the business and an individual's ownership interest in the business...." *Id.* at 678. It stated: "Such indicia, while not dispositive, are important to the analysis, because they suggest that an individual controls the corporation's financial affairs and can cause the corporation to compensate (or not to compensate) employees in accordance with the FLSA." *Id.* In this regard, the court noted the relevance of "the significant ownership interest of the corporate officers; their operational control of significant aspects of the corporation's day to day functions, including compensation of employees[ ]; and the fact that they personally made decisions to continue operating the business despite financial adversity and the company's inability to fulfill its statutory obligations to its employees." *Baystate,* 163 F.3d at 677–78.

In addition to *Barfield*, Maryland courts are guided by *Irizzary. See e.g. Rivera v. Mo's Fisherman Exch., Inc.,* No. CV ELH-15-1427, 2018 WL 2020423, at *10 (D. Md. May 1, 2018)

Illustrative, is *In Jones v. Hoffberger Moving Servs,* 92 F. Supp. 3d 405, 416 (D. Md. 2015). There, wages were sought under the FLSA, MWPCA, or MWH against Ms. Hoffberger. She was the majority owner and managing member of the company. Co-owner, Michael Hoffberger testified that she had the power to overrule his decisions, though she never executed that authority  Ms. Hoffberger also testified that she signed employee paychecks up until 2012. The Court held there "existed an issue of material fact as to Ms. Hoffberger's 'operational control' over the employees." It denied the defendants' motion for summary judgment to allow for further fact-finding. *Id*. at 415–16.

### C. Tilton and Patriarch are Responsible for Unpaid Wages Under Pennsylvania Law

Pennsylvania's wage law has the same legislative purpose as Maryland's laws. It holds individual directors and officers liable for back wages because "corporate officers are far more likely to use the limited funds of an insolvent corporation to pay wages … if personal liability is imposed on the persons who make these decisions." *Yatron v. Lydon*, 993 WL 762929, 20 Pa. D. & C.4th 251, 270–71 (Com. Pl. 1993)

The Wage Payment and Collection Law ("WPCL") at 43 P.S. § 260.2(a), defines "employer" as including "every person, firm, partnership, association, corporation, receiver or other officer of a court of this Commonwealth and any agent or officer of any of the above-mentioned classes employing any person in this Commonwealth." Courts have interpreted this definition as requiring, at a minimum, some indication that the defendant employer "exercised a policy-making function in the company and/or an active role in the corporation's decision-making process. *Mohney v. McClure*, 390 Pa.Super. 338, 568 A.2d 682, 686 (1990), *citing*, *Bowers v. NETI Technologies, Inc.*, 690 F.Supp. 349 (1988); *Central Pennsylvania Teamsters Pension Fund v. Burten*, 634 F.Supp. 128 (E.D. Pa. 1986).

Courts have deemed members of the board of directors "agents" and thus "employers." *Bowers* 690 F. Supp. at 354. Giving the WPCL its required liberal construction, the *Bowers* Court held that allegations that two directors participated in the decision to terminate plaintiffs' employment stated a claim in violation of the WPCL.

Patriarch appears to agree that an "agent or officer" can be personally liable for unpaid wages, if there is "evidence of an active role in decision making." *Int'l Ass'n of Theatrical Stage Emps., Local Union No. 3 v. Mid-Atl. Promotions, Inc.*, 856 A.2d 102, 105 (2004) (*citing Mohney v. McClure*, 568 A.2d 682 (1990), *aff'd*, 604 A.2d 1021 (1992)).

Tilton certainly made policies and made policy decision. She took an active role in the corporate decision-making process, including the decision to not pay wages for the final pay period. She also had ultimate authority over whether there would be funds to pay payroll and ultimately made the decision not to make those funds available which made her personally liable. Under all three state wage statutes she was a "person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d) (1994).

Likewise, she played an active role in determining which employees would be retained and which would be terminated as part of the launching of Transcendence.

Facts in evidence create a genuine dispute as to Tilton's role as employer, under the expansive interpretation of New York, Maryland and Pennsylvania wage laws. That interpretation is warranted to give them, like FLSA, "the widest possible impact in the national economy." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999), *holding modified by Zheng v. Liberty Apparel Co. Inc.,* 355 F.3d 61 (2d Cir. 2003).

Dated: June 28, 2019
      New York, New York

                                  Respectfully submitted,

                                  /s/Jack A. Raisner

                                  **OUTTEN & GOLDEN LLP**
                                  Jack A. Raisner
                                  René S. Roupinian
                                  Robert N. Fisher
                                  685 Third Avenue, 25th Floor
                                  New York, New York 10017
                                  Telephone: (212) 245-1000

                                  *Attorneys for Plaintiff and the Certified Class*