## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re*<br><br>TRANSCARE CORPORATION, *et al.*,[1]<br><br>               Debtors. | Chapter 7<br>Case No. 16−10407 (SMB)<br>(Jointly Administered) |
| SHAMEEKA IEN on behalf of herself and all others similarly situated,<br><br>               Plaintiff,<br><br>               v.<br><br>TRANSCARE CORPORATION, TRANSCARE NEW YORK, INC., TRANSCARE ML, INC., TC AMBULANCE GROUP, INC., TRANSCARE MANAGEMENT SERVICES, INC., TCBA AMBULANCE, INC., TC BILLING AND SERVICES CORPORATION, TRANSCARE WESTCHESTER, INC., TRANSCARE MARYLAND, INC., TC AMBULANCE NORTH, INC. AND TRANSCARE HARFORD COUNTY, INC., LYNN TILTON, ARK CLO 2001-1 LIMITED, ARK INVESTMENT PARTNERS II, L.P., PATRIARCH PARTNERS, LLC, and PATRIARCH PARTNERS III, LLC,<br><br>               Defendants. | Adv. Proc. No. 16−01033-smb |

## PLAINTIFF'S OPPOSITION TO NON-DEBTOR DEFENDANTS' MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO NON-DEBTOR DEFENDANT ARK II CLO 2001-1 LIMITED

---

[1] The Debtor Defendants are TransCare Corporation, TransCare New York, Inc., TransCare ML, Inc., TC Ambulance Group, Inc., TransCare Management Services, Inc., TCBA Ambulance, Inc., TC Billing and Services Corporation, TransCare Westchester, Inc., TransCare Maryland, Inc., TC Ambulance North, Inc., TransCare Harford County, Inc., TransCare Pennsylvania, Inc., TC Ambulance Corporation and TC Hudson Valley Ambulance Corporation (collectively, the "Debtors," "Debtor Defendants," or "TransCare").

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

SUMMARY OF MATERIAL DISPUTED FACTS ................................................................ 2

ARGUMENT ......................................................................................................................... 5

    I.    SUMMARY JUDGMENT IS INAPPROPRIATE AS TO WHETHER ARK II AND
        TRANSCARE WERE A SINGLE EMPLOYER............................................................. 5

      A.    Single Employer Liability Under the WARN Act ....................................................... 5

      B.    The DOL's Five Single Employer Factors ................................................................ 10

      C.    Single Employer Liability Exists Where Parents Exercise Top-Down Control to Cause
          a Violation of the WARN Act.................................................................................... 10

      D.    ARK II and TransCare Were Parts of Tilton's Single Business Enterprise ................. 11

      E.    All of the Single Employer Factors are Indisputably in Plaintiff's Favor or Subject to
          Disputes of Fact...................................................................................................... 17

          1.    Ark II and TransCare Shared Common Ownership................................................. 17

          2.    Ark II and TransCare Shared Common Officers and Directors .............................. 17

          3.    Tilton and Ark II Exercised a Degree of De Facto Control over TransCare that,
              Without More, Made them a Single Employer...................................................... 18

          4.    Ark II and TransCare Had a Unity of Personnel Policies Emanating from a Common
              Source ............................................................................................................... 23

          5.    There Was Dependency of Operations Between Ark II and TransCare.................. 24

    II.    THERE ARE DISPUTES PRECLUDING DETERMINATION OF WHETHER ARK II
        AND TILTON ARE JOINT/SINGLE EMPLOYERS UNDER THE STATE WAGE
        LAWS .................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Backus v. Mena Newspapers*,
   224 F. Supp. 2d 1228 (W.D. Ark. 2002) ................................................................ 24

*Baystate Alternative Staffing v. Herman*,
   163 F.3d 668 (1st Cir.1998) ..................................................................................... 25

*Blough v. Voisard Mfg., Inc.*,
   2015 WL 366934 (N.D. Ohio Jan. 27, 2015) ....................................... 18, 20, 23, 24

*Campusano v. Lusitano Const. LLC*,
   208 Md. App. 29 (2012) ........................................................................................... 25

*Childress v. Darby Lumber, Inc.*,
   357 F.3d 1000 (9th Cir. 2004) ................................................................................. 19

*Coppola v. Bear Stearns & Co.*,
   499 F.3d 144 (2d Cir. 2007) ................................................................................ 8, 18

*Esmark v. NLRB*,
   887 F.2d 739 (7th Cir. 1989) ..................................................................................... 8

*Guippone v. BH S & B Holdings LLC*,
   737 F.3d 221 (2d Cir. 2013) .............................................................................. Passim

*Herman v. RSR Sec. Servs. Ltd.*,
   172 F.3d 132 (2d Cir. 1999) ..................................................................................... 26

*In re APA Transp. Corp. Consol. Litig.*,
   541 F.3d 233 (3d Cir. 2008) ..................................................................................... 17

*In re HMR Foods Holding*, LP,
   602 B.R. 855 (D. Del. June 13, 2019) ................................................................ 18, 19

*In re Tweeter OPCO, LLC.*,
   453 B.R. 534 (Bankr. D. Del. 2011) ...................................................... 12, 13, 17, 23

*Irizarry v. Catsimatidis*,
   722 F.3d 99 (2d Cir. 2013) ....................................................................................... 25

*Local 2-1971 of Pace Int'l Union v. Cooper*,
   364 F. Supp. 2d 546 (W.D.N.C. 2005) ............................................................. 6, 9, 24

*Mohney v. McClure*,
  390 Pa.Super. 338 (1990)...................................................................................... 26

*Murray v. Miner*,
  74 F.3d 402 (2d Cir. 1996)............................................................................. 6, 7, 11

*Pearson v. Component Tech. Corp.*,
  247 F.3d 471 (3d Cir. 2001)...................................................................... Passim

*United Paperworkers International Union v. Alden Corrugated Container Corp.*,
  901 F. Supp. 426 (D. Mass. 1995) .......................................................................... 10

*United States v. Bestfoods*,
  524 U.S. 51 (1998) ................................................................................................ 11

*Vogt v. Greenmarine Holding*, LLC,
  318 F. Supp. 2d 136 (S.D.N.Y. 2004)................................................................. 6, 22

*Zheng v. Liberty Apparel Co. Inc*.,
  355 F.3d 61 (2d Cir. 2003)..................................................................................... 26

**Statutes**

29 U.S.C. § 2101(a)(1)................................................................................................ 5

**Regulations**

20 C.F.R. § 639.3(a)(2)......................................................................................... 6, 10

29 C.F.R. § 791.2(a)................................................................................................... 7

# PRELIMINARY STATEMENT

One person cannot take complete dominion over a series of LLCs or corporations and expect her insulation from liability to be just as complete. When rights are violated under employee protection laws, the captive entities involved effectively merge and become a single employer. Under wage statutes, the controlling person subjects herself to personal liability. Lynn Tilton's autonomy stretched unimpeded over all the Defendants in this case, including TransCare and the "Patriarch" and "Ark" entities. In the final throes, underlings at such entities often beg the controlling person or parent to infuse capital or pay wages. Here, those managers had already been eliminated at TransCare. Tilton's dictates and money flowed through her powerless entities with no checks and balances. In the annals of single employer cases, no case is more egregious than this one. Tilton used Ark II CLO 2001-1 Limited ("Ark II") to carry out her designs, which made it a single employer with TransCare under the WARN Acts. And, because Tilton took personal responsibility for paying wages from her personal funds through Ark II, they both are liable with TransCare for the final nonpayment of wages under the state collection laws.

Non-Debtor Defendants ("Defendants") cannot claim that Ark II is being targeted as a hapless victim on the roster of Tilton-controlled entities. (*See* Non-Debtor Defendants' Supplemental Memorandum in Support of Their Motion for Summary Judgment, Seeking Summary Judgment in Favor of Non-Debtor Defendant Ark II CLO 2001-1 Limited, Dkt. No. 149.) This is not a case of vicarious liability. Ark II was TransCare's majority owner, its payroll lender and, in the final stretch when TransCare's employees' fate was determined, Ark II in concert with TransCare, held back the funds to continue TransCare's existence before WARN notice could be given. It functionally was a decision maker responsible for the actions giving

rise to the litigation, which undeniably subjects it to single employer liability under these circumstances.

Over the course of this litigation and through summary judgment briefing, Defendants sought to shield Ark II from liability by misrepresenting its identity to Plaintiff and this Court. Now that Ark II's functional role has been unveiled, Defendants seek to isolate it from the rest of Tilton's business enterprise with the veneer of legal hats. None of the case law supports Defendants' millinery approach. When one person dominates entities to this degree, the remedial laws specific to employee protection provide them nowhere to hide. There is ample evidence that all entity Defendants comprised a single employer under the WARN Act and that they, along with Tilton, are collectively liable for the state wage violations in this action. Summary judgment should be denied.

## SUMMARY OF MATERIAL DISPUTED FACTS

Ark II cannot be viewed as a stand-alone Defendant, but rather as a component of Tilton's single business enterprise along with the Patriarch entities and TransCare. Plaintiff incorporates by reference the facts pertaining to those entities briefed in Plaintiff's Opposition to Non-Debtor Defendants' Motion for Summary Judgment (Dkt. No. 131) and Plaintiff's Response to Non-Debtor Defendants' Statement Undisputed Statement of Facts in Support of Their Motion for Summary Judgment ("ASOF," Dkt. 131-1).

Defendants admit in their Answer that Patriarch described itself as vertically integrated, that it shared a common director with TransCare (Doc.18, ¶¶ 6, 33), that Lynn Tilton was an owner and the lone director of each of the TransCare Debtor-Defendants (Doc.18, ¶¶ 25-31), and that Tilton was the sole director, officer and manager of each of the corporate defendants (Doc.18, ¶ 32). Ark II, the direct parent, was also the direct lender to TransCare. Tilton testified

that Ark II was part of TransCare's lender group (Deposition of Lynn Tilton, Oct. 29, 2018 ("Tilton Dep.") at 16:19-17:4, attached hereto as Exhibit "A",) and that "Ark II is my personal funds and I make the decision on whether or how to invest." (Ex. A, Tilton Dep. Tr., 21:21-22:7.)  Letters between TransCare and Patriarch Partners Agency Services sufficed for it to pay bills for TransCare with personal Ark II money in exigent circumstances, as opposed to an amendment to the credit agreement. (Ex. A, Tilton Dep. Tr., 67:13- 69:13.)  Tilton expended her personal funds through Ark II, and funds she owned, to keep TransCare running on a day-to-day basis. (ASOF ¶ 49, 160.)  TransCare's ultimate demise occurred when she elected to fund a different operation, Transcendence. (ASOF ¶¶ 203-06.)

During the period January 15, 2016 to January 29, 2016, Tilton authorized secured loans to TransCare from her personal investment vehicles, Ark II and Ark Angels II, LLC ("Ark Angels").  These lenders collectively loaned more than $2 million dollars to TransCare to support its operations. (ASOF ¶ 49.)

Ultimately, Tilton extended funds to TransCare to allow it to obtain insurance to continue operations. (Tilton Dep. Tr., 60:19-25) (Doc. 131-46, ASOF ¶ 159.) At that point in time, the only source of additional funds for TransCare was Tilton making personal loans as the lender of last resort. (Tilton Dep. Tr. II 61:6-12) (Doc. 131-46, ASOF ¶¶ 159, 160.)  During the day on February 24, 2016, Tilton sent an email to TransCare's bankruptcy counsel complaining that "I have funded payroll all year.  Wells has taken my money and not made payroll."  She attached a list of over $9 million in funding from her various funds to TransCare. (Doc. 131-118, ASOF ¶ 237.)  The Trustee attended a meeting on February 25, the first day after TransCare's bankruptcy filing with counsel for Patriarch, TransCare, and Wells Fargo. (LaMonica Dep. Tr. I 48:25-49:6) (Doc. 131-123, ASOF ¶ 243.)  The purpose of that meeting was to determine

whether payroll funding could be obtained to keep operating and the outcome of the meeting was that there was no source for payroll. (LaMonica Dep. Tr. I 51:15-24.) (Doc. 131-123, ASOF ¶ 244). Neither Patriarch nor Wells Fargo gave the Trustee assurances that the upcoming payroll that was due could be satisfied. (LaMonica Dep. Tr. I 52:17-24.) (Doc. 131-123, ASOF ¶ 245.) After that meeting, the Trustee directed the dispatcher to tell the ambulance drivers to return the ambulances to the Hamilton Avenue location, the facility they were dispatched from, or any local firehouse.

The employees were told that the business was shut down. (Doc. 131-123, ASOF ¶ 246.) After learning that payroll was not going to be made, they stopped coming to work. (Doc. 131-123, LaMonica Dep. Tr. I 54:2-55:19.)

Tilton held strong views on management's payroll practices which fed into her decision to shut it down: "it is very clear that during the period of February 2015 'til the day that Wells pulled the plug in February of 2016, that the company was continuing to bleed and pay its bills in the wrong way, leaving payroll to last and forcing me to either make the decision to shut down the company or to try to save it and continue to fund[.] . . . It had poor management and that is why after funding $9.3 million and stepping in for six weeks to do all the numbers myself and create a plan of restructure, we were on the way of saving most of this company in an orderly wind-down in a business that was bleeding." (Ex. A, Tilton Dep. Tr., 35:14-19.)

Tilton criticized Wells Fargo for paying bills in the wrong order. (Ex. A, Tilton Dep. Tr., 61:5-10.) She did everything she could to keep employees paid. (Ex. A, Tilton Dep. Tr., 62:4-7.) At the end, she offered to pay payroll for the non-liquidated NewCo employees but not to pay the liquidated TransCare entity payroll: "I, out of the generosity of my heart, offered to Wells if not

make the payroll for the 700 employees that I was taking along into Newco to make that payment." (Ex. A, Tilton Dep. Tr., 93:10-13.)

Tilton made the critical decision to shut down by not funding payroll from Ark II as she had in prior "no-payroll" moments. (Ex. A, Tilton Dep. Tr., 49:18-22) ("I was the only person willing to fund into overnight a no-payroll situation…".)

## ARGUMENT

### I. SUMMARY JUDGMENT IS INAPPROPRIATE AS TO WHETHER ARK II AND TRANSCARE WERE A SINGLE EMPLOYER

As a threshold matter, this Court has rightly expressed a resistance to deciding single employer liability in this case at the summary judgment stage. The Second Circuit has recognized that a determination whether separate entities are jointly liable for violations of federal labor law is highly fact-intensive and therefore ill-suited for summary judgment. (*See* Dkt. No. 131 at 9-11(citing cases).) Given the parties' material disputes concerning the integration between TransCare, Ark II, and the Patriarch entities, the question whether these entities constitute a single employer within the WARN Act's regulatory framework should be submitted to the jury. (*Id*.)

#### A. Single Employer Liability Under the WARN Act

Defendants fundamentally misconstrue the purpose and application of WARN's single employer doctrine.

The scope of WARN liability is deliberately broad, extending beyond a nominal employer to include the entire "business enterprise" which causes a mass layoff. 29 U.S.C. § 2101(a)(1). The Department of Labor's ("DOL") regulations explain that, under WARN's definition of "employer," formally separate corporate entities, such as independent contractors or parents and their subsidiaries, may together be a single employer subject to WARN liability.

20 C.F.R. § 639.3(a)(2).  Single employer liability turns on the <u>independence</u> of these nominally separate entities: "Under existing legal rules, independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company *depending upon the degree of their independence* from the parent." *Id*. (emphasis added).  Importantly, however, the single employer doctrine is *not* merely an iteration of the familiar veil-piercing rules of corporate law: "state law tests for veil piercing, applicable as a general matter of state corporate law, are particularly inappropriate" and "not controlling where federal law provides a specifically-applicable liability rule." *Vogt v. Greenmarine Holding*, LLC, 318 F. Supp. 2d 136, 141 (S.D.N.Y. 2004). *See also Local 2-1971 of Pace Int'l Union v. Cooper*, 364 F. Supp. 2d 546, 566 (W.D.N.C. 2005) ("Given the need to consider the purposes of the federal statute, [courts] have crafted what [they] termed a 'less rigorous' veil-piercing standard tailored to [WARN Act] cases in order the fulfill that statute's goals.").

The centrality of "independence" in the regulation's single employer definition is not to be overshadowed by its enumeration of "some of the factors to be considered" in determining the independence of nominally separate entities.  These factors are discussed at length *infra*.  But courts are also encouraged to consider the question of independence "under existing legal rules." 20 C.F.R. § 639.3(a)(2).  WARN is only one of numerous federal labor laws providing an exception to corporate limited liability principles, which otherwise would isolate liability among nominally separate entities. *See Murray v. Miner*, 74 F.3d 402, 405 (2d Cir. 1996) (discussing the single employer doctrine under collective bargaining and employment discrimination statutes).  DOL explains that "to the extent that existing law recognizes the joint employer doctrine … nothing in the [WARN] regulation prevents application of that law" including joint

employment under "such statutes as the NLRA, the Fair Labor Standards Act (FLSA) and the Employee Retirement Income Security Act (ERISA)."

Independence is the preeminent factor in these regulations, as well as in WARN. In its FLSA standard, for example, the DOL similarly contrasts "joint employment" with "separate employment." 29 C.F.R. § 791.2(a). Separate employment exists when "all the relevant facts establish that two or more employers are acting entirely *independently* of each other and are completely disassociated with respect to the" individual's employment. *Id.* (emphasis added). "Joint employment" exists when "employment by one employer is *not completely disassociated* from employment by the other employer(s)." *Id*. (emphasis added). As the Second Circuit explained, the "rationale for the exception is the fairness of imposing responsibility on an entity that *shares decision making authority* with the employing entity." *Murray*, 74 F.3d at 405 (emphasis added).

As a matter of policy, the Second Circuit equates independence with arm's-length relationships, and focuses on their actions, not corporate veneers. It finds it is fair to impose liability for "labor infractions where two *nominally independent entities do not **act** under an arm's length relationship*." *Id.* (emphasis added).

The single employer doctrine has been applied to a wide variety of multi-employer arrangements that have generated WARN events. One such arrangement is the parent-subsidiary relationship: the parent of a nominal employer is held liable for WARN violations where the parent assumed control of the subsidiary and was "the decision-maker responsible for the employment practice giving rise to the litigation," *Guippone v. BH S & B Holdings LLC*, 737 F.3d 221, 227 (2d Cir. 2013), or, "if the parent was involved to a lesser degree," liability arises from "other aspects of the integrated enterprise test." *Pearson v. Component Tech. Corp.*,

247 F.3d 471, 476-77 (3d Cir. 2001). A second multi-employer arrangement is the lender-borrower relationship: where a lender causes the borrower's shutdown by recouping its collateral, courts consider whether the lender had become so entangled with its borrower's affairs so as to engender WARN liability. *See, e.g.*, *Coppola v. Bear Stearns & Co*., 499 F.3d 144, 148 (2d Cir. 2007).

Here, of course, Ark II was both TransCare's parent and its primary lender. But the integration of these two companies was not simply a function of their relationship to each other; it was in their *common subservience* to and complete domination by Lynn Tilton. Tilton's business model relies on vertical integration though a web of interdependent corporations, all of which she controls completely. Not only does Tilton wear all the hats of these entities, but she ensures that there is no one who can go around her or voice anything in opposition to her – at least for very long. *See Esmark v. NLRB*, 887 F.2d 739 (7th Cir. 1989) (single employer liability under the NLRA exists "where a parent disregards the separate legal personality of its subsidiary [and the subsidiary's own decisionmaking 'paraphernalia']"). Ark II, of which Tilton was the lone manager, was the vehicle through which Tilton gained control of TransCare as its majority owner. After appointing herself TransCare's sole Director, she had the power to control the company's day-to-day operation, but mostly exercised that power by marshalling loyal employees of her Patriarch entities to make key decisions. When funding was needed to pay TransCare's employees, Tilton prohibited the company from seeking outside funding, instead funneling capital from her personal funds, as "loans" from Ark II, specifically for payroll. At bottom, while the decisions leading to the WARN violations in this case were made via nominally separate entities, they were not made by entities having even a speck of independence

from Tilton or each other. All were directed by Tilton. These incontrovertible facts make this case unique in the annals of single employer WARN case law.

The most analogous case is *Local 2-1971 of Pace Int'l Union v. Cooper*, 364 F. Supp. 2d 546 (W.D.N.C. 2005). There, employees of the Ecusta paper mill alleged a failure to provide WARN notice before their termination. *Id.* at 550. They sued the company and its chain of four parent corporations, the most senior of which was owned by Nathu Puri, who had "built [his] career on turning around troubled companies." *Id*. at 560. Ecusta's CFO testified that he regularly had contact with Puri concerning the mill's day-to-day operations and that he could not make any significant business decisions without Puri's approval. *Id.* at 561. Puri also "used his other organizations to loan money to Ecusta for day-to-day operations." *Id.* at 563. The court denied summary judgment for Puri and the parent corporations. *Id.* at 565. Although Puri did not formally manage the parent corporations, there was "no doubt that Puri owned and controlled each of these organizations regardless of the other corporate formalities observed." *Id.* at 564. The Court noted that "Puri was the driving force behind each of the[] organizations and, when it was to his advantage, financial interchanges among the organizations occurred with frequency and complexity." *Id.* In other words, "[t]he corporate family tree described by [the Defendants], once the branches are untangled, reveals that only [one] defendant actually owns the various corporate entities, Nathu Puri." *Id.* at 565. (quotations omitted). "As the ship was going down," Ecusta went to Puri for an infusion of money but he refused. *Id*. at 564-65.

Defendants do not dispute that Tilton made the decision to shut down TransCare. (Dkt. No. 149 at 8.) They simply ask the Court to ignore the web of entities she used to manipulate the

company and ultimately bring it to its demise, none of whom were at arm's length with her or one another.[2]  Defendants' position flies in the face of the single employer doctrine.

## B.  The DOL's Five Single Employer Factors

The five non-exclusive factors that the regulations provide for determining if entities are a single employer are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations. 20 C.F.R. § 639.3(a)(2).

The Second Circuit noted that, "[a]s in any balancing test, application of these factors requires a fact-specific inquiry, no one factor set out by the DOL is controlling, and all factors need not be present for liability to attach." *Guippone v. BH S & B Holdings LLC*, 737 F.3d 221, 226 (2d Cir. 2013).  Rather, "[t]hese factors are useful for courts in determining 'whether the nominally separate corporations actually functioned as a single entity with respect to [policy].'" *Id.* (quoting *Pearson*, 247 F.3d 471 at 503–04). *See also United Paperworkers International Union v. Alden Corrugated Container Corp.*, 901 F. Supp. 426, 438 (D. Mass. 1995) (DOL guides courts to focus on all the "circumstances of the case" to see if they are "marked by an absence of an "arm's length relationship found among unintegrated companies").

## C.  Single Employer Liability Exists Where Parents Exercise Top-Down Control to Cause a Violation of the WARN Act

The "very nature of the acts that give rise to WARN Act liability (a plant closure) are likely to result from decisions made from the highest levels within the corporate structure, rendering an examination of a parent corporation's role in the decision more important."

---

[2] Defendants alternatively refer to Tilton's business enterprise as "fictitious" or "non-existent." (Dkt. No. 149 at 14). This more accurately describes her entities' independence when carrying out her designs. At the very least, this is a material dispute precluding summary judgment.

*Pearson*, 247 F.3d at 504 n.9.  When the subsidiary's "wrong" can be "traced to [the] parent through the conduit of its own personnel and management," when the parent is "directly a participant in the wrong complained of" or when it "interferes with the subsidiary's operations in a way that surpasses the control exercised by a parent as an incident of ownership," *id*. at 486-87 (citing *United States v. Bestfoods*, 524 U.S. 51, 64 (1998)), WARN liability can be extended to the parent as a single employer.  This behavior implicates the most critical factor, de facto control.

In *Guippone*, the Second Circuit reversed summary judgment granted to a parent. It noted that the record evidence was sufficient for a reasonable jury to conclude that "Holdings was so controlled by HoldCo that it lacked the ability to make any decisions independently, and that the resolution passed by HoldCo's board 'authoriz[ing] Holdings to effectuate the Reduction in Force' was, in fact, direction from HoldCo to Holdings to undertake the layoffs." *Guippone v. BH S & B Holdings LLC*, 737 F.3d at 227.  In particular, the Court focused on the fact that, "[t]here is sufficient evidence . . . to allow a jury to conclude that Holdings was not free to implement its own decisions, and that the layoffs were . . . directed by HoldCo." *Id*. at 227-28.

Critically, the Court explained the following: "Authorizing layoffs is not just a prerogative of ownership—it's a function of being an employer[.]" *Id*.

### D.  ARK II and TransCare Were Parts of Tilton's Single Business Enterprise

As discussed *supra*, the goal of the single employer doctrine is to detect when "two nominally independent entities do not act under an arm's length relationship." *Pearson v. Component Tech. Corp*., 247 F.3d 471, 494 (3d Cir. 2001) (*citing Murray v. Miner*, 74 F.3d 402, 405 (2d Cir.1996)).  Beyond Defendants' nod to *Pearson* in their "Preliminary Statement," (Dkt. No. 149 at 2), they make no meaningful attempt to show how Ark II and TransCare acted

independently, when in fact both companies—along with the Patriarch entities—were wholly dominated by Tilton. Instead, Defendants attempt to misdirect the Court by focusing myopically on the relationship between Ark II and TransCare and assessing that relationship strictly against the regulatory single employer factors. They seek to buttress their argument with citations to cases where courts held that truly independent entities were not a single employer. But none of those cases involved entities which themselves were completely controlled by a single decision maker.

Here, Tilton owned and controlled Ark II and TransCare. As TransCare was going down there was no "they" who could have asked her for money. She was the "they." The decision she made was TransCare's decision to not ask and Ark II's decision to not give out her money. Their decisions ensured TransCare went down, giving rise to this litigation.

Although the facts here are nearly identical to those in *Pace*, Plaintiff does not seek personal liability from Tilton for WARN damages via alter ego theories in common law. However justified that might be, the evidence here easily supports the much more lenient, arm's-length finding that Ark II was a single employer. That is demonstrated by the grant of summary judgment *in favor of the plaintiffs* in *In re Tweeter OPCO, LLC.*, 453 B.R. 534, 542 (Bankr. D. Del. 2011). There, a minority owner was ruled a single employer on summary judgment based on a combination of ownership, lending decisions, and managerial control. Schultze Asset Management ("SAM") was the debtor's great-great-great-grandparent, five-entities upstream of the debtor, Tweeter OPCO, LLC, which closed without WARN notice. George Schultze owned SAM and employed a person who was a common director of SAM and the debtor. Despite SAM's attenuated ownership of the debtor, the Court held "[f]inancial control itself is sufficient to satisfy the common ownership factor." *Id*. at 542 (citing *Pearson*, 247 F.3d at 494). SAM had

financial control over the debtor through its "lender relationship." *Id.* Schultze controlled three funds (the "Lenders") which lent about $30 million to debtor. The Court noted testimony that "George Schultze arranged for the Lenders to pay off Wells Fargo, the former senior lender, and became "first in line as a lender." … "Thereafter, the Debtor's ability to use its cash collateral was "ultimately ... George Schultze's decision. *It was his money*." *Id.* (emphasis added). The Court found that "Schultze's thoughts on mass terminations were important because "he's a lender of the company ... [and] there are costs associated with terminations, or with any plan that really you go down the road with." *Id.* The "Lender's position enabled Schultze to make critical decisions for the Debtor and, even when he was not directly acting as the decision-maker, the Debtor felt Schultze needed to be brought 'on board.'" *Id.* The Court noted George Schultze had often suggested reductions in payroll as a means to increase profits and urged "tighter control" over the debtor. *Id.* at 544. Schultze was, as least by implication, "on board" for the formal announcement of the terminations and shut down in a liquidation: "for our decided path (most likely liquidation—we will need [Wells Fargo's] support for this), a liquidator in place, security set up in the stores, etc." *Id.* Based on these and other factors, the Court found SAM's de facto control particularly egregious.

The court did not find for the plaintiffs on all the single employer factors. It declined to hold that SAM had a "unity of personal policies with debtor," finding that SAM's involvement with personnel policies was only intermittent. *Id.* at 545 (citations omitted). Nor did the Court find a dependency of operations existed. Although the debtor owed approximately $35 million to SAM, SAM argued that all loans were made at arm's length and were formally documented by the Debtor's outside counsel. *Id.* at 546. The Court nevertheless granted the motion for summary judgment against SAM.

Defendants' sole attempt to distinguish *Tweeter* is to repeat the refrain that Tilton wore her TransCare Director's hat when authorizing TransCare's bankruptcy filing – and that there is no evidence to the contrary. (Dkt. No. 149 at 8.) There is plenty of such evidence. Self-interest imbued every act she took especially when passing the onus of making payroll from her own funds to a Trustee.

Here, unlike in *Tweeter*, there is a direct majority parent owner relationship between Ark II and TransCare. Non-Debtor Defendants admit in their Answer that Patriarch described itself as vertically integrated, and that it shared a common director with TransCare (Doc.18, ¶¶ 6, 33), that Lynn Tilton was an owner and the lone director of each of the TransCare Debtor-Defendants (Doc.18, ¶¶ 25-31), and that Tilton was the sole director, officer, and manager of each of the corporate defendants (Doc.18, ¶ 32). Unlike *Tweeter*, where SAM's owner principal directed other entities to lend to the debtor, here, Ark II, the direct parent, was also the direct lender to TransCare. Tilton testified that Ark II was part of TransCare's lender group (Ex. A, Tilton Dep. Tr., 16:19-17:4) and that "Ark II is my personal funds and I make the decision on whether or how to invest." (Ex. A, Tilton Dep. Tr. , 21:21-22:7). Here, formal documentation of the loans with outside counsel is not necessary. Letters between TransCare and Patriarch Partners Agency Services sufficed for it to pay bills for TransCare with personal Ark II money in exigent circumstances, as opposed to an amendment to the credit agreement. (Ex. A, Tilton Dep. Tr., 67:13- 69:13.) Unlike George Schulze in *Tweeter*, Lynn Tilton was expending her personal funds through Patriarch and funds she owned to keep TransCare running on a day-to-day basis. (ASOF ¶ 237.) TransCare's ultimate demise occurred when she elected to fund a different operation, Transcendence. (ASOF ¶¶ 203-06).

During the period January 15, 2016 to January 29, 2016, Tilton authorized secured loans

to TransCare from her personal investment vehicles, Ark II and Ark Angels II, LLC ("Ark Angels"). These lenders collectively loaned more than $2 million dollars to TransCare to support its operations. (Eichberger Decl., Ex. J, Tilton Dep. Tr. (*LaMonica v. Tilton*., Adv. Proc. No. 18-01021) (Dkt. No. 113).

Ultimately, Tilton extended funds to TransCare to allow it to obtain insurance to continue operations. (Tilton Dep. Tr., 60:19-25) (Doc. 131-46, ASOF ¶ 159.) At that time, the only source of additional funds for TransCare was Tilton making personal loans as the lender of last resort. (Tilton Dep. Tr. II, 61:6-12) (Doc. 131-46, ASOF ¶¶ 159, 160.) During the day on February 24, 2016, Tilton sent an email to TransCare's bankruptcy counsel complaining that "I have funded payroll all year. Wells has taken my money and not made payroll." She attached a list of over $9 million in funding from her various funds to TransCare. (Doc. 131-118, ASOF ¶ 237.) The purpose of that meeting was to determine whether payroll funding could be obtained to keep operating and the outcome of the meeting was that there was no source for payroll. (LaMonica Dep. Tr. I 51:15-24.) (Doc. 131-123, ASOF ¶ 244.) Neither Patriarch nor Wells Fargo gave the Trustee assurances that the upcoming payroll that was due could be satisfied. (LaMonica Dep. Tr. I 52:17-24.) (Doc. 131-123, ASOF ¶ 245.) After that meeting, the Trustee directed the dispatcher to tell the ambulance drivers to return the ambulances to the Hamilton Avenue location, the facility they were dispatched from, or any local firehouse. The employees were told the business was shut down. (Doc. 131, ASOF ¶ 246.) After learning that payroll was not going to be made, they stopped coming to work. (Doc. 131 -123, LaMonica Dep. Tr. I 54:2-55:19.)

Ms. Tilton held strong views on management's payroll practices which fed into her decision of whether to shut it down: "it is very clear that during the period of February 2015 'til

the day that Wells pulled the plug in February of 2016, that the company was continuing to bleed and pay its bills in the wrong way, leaving payroll to last and forcing me to either make the decision to shut down the company or to try to save it and continue to fund[.] . . . It had poor management and that is why after funding $9.3 million and stepping in for six weeks to do all the numbers myself and create a plan of restructure, we were on the way of saving most of this company in an orderly wind-down in a business that was bleeding." (Ex. A, Tilton Dep. Tr., 35:14-19).

Tilton criticized Wells Fargo for paying bills in the wrong order. (Ex. A, Tilton Dep. Tr., 61:5-10.) She did everything she could to keep employees paid. (Ex. A, Tilton Dep. Tr., 62:4-7.) At the end, she offered to pay payroll for the non-liquidated NewCo employees but not to pay the liquidated TransCare entity payroll: "I, out of the generosity of my heart, offered to Wells if not make the payroll for the 700 employees that I was taking along into Newco to make that payment." (Ex. A, Tilton Dep. Tr., 93:10-13).

Lynn Tilton turned the payroll funding faucet at Ark II on and off based on who she wanted to see live on, or not. Having that level of control over the payment to TransCare employees made it their de facto life-line. Unlike *Tweeter*, where Schultze, the owner of SAM, only impliedly favored the shut down of the debtor, Tilton made the critical decision to shut down by not funding payroll from Ark II as she had in prior "no-payroll" moments. (Ex. A, Tilton Dep. Tr., 49:18-22) ("I was the only person willing to fund into overnight a no-payroll situation…"). Tilton's decision to not open the Ark II spigot for the late February payroll left all of the employees without wages and required their termination. The level of de facto control exercised by Tilton at Ark II is egregious and certainly suffices to raise an inference that Ark II was a single-employer with TransCare in making the decision that gave rise to this

litigation. *In re APA Transp. Corp. Consol. Litig*., 541 F.3d 233, 244 (3d Cir. 2008), as amended (October 27, 2008) ("A parent exerts de facto control when it is the decision maker responsible for the WARN violation"), cited in *Guippone v. BH S & B Holdings LLC*, 737 F.3d 221, 227 (2d Cir. 2013). *See also Guippone* at 227 ("Most critically, th[is] evidence [that the operating company had as its board, its parent, which chose its management and negotiated its financing], at a minimum, raise[d] a question of fact as to whether [the parent] made the decisions leading to the alleged illegal employment practice.").

### E. All of the Single Employer Factors are Indisputably in Plaintiff's Favor or Subject to Disputes of Fact

#### 1. Ark II and TransCare Shared Common Ownership

The parties do not dispute the ownership structure between Ark II and TransCare. Ark II was not only TransCare's parent company, owning a majority of TransCare equity, the companies also shared common ownership: Tilton was the sole Director and manager of both. Beyond formal ownership, "[f]inancial control itself is sufficient to satisfy the common ownership factor." *In Re Tweeter OPCO*, 453 B.R. at 542 (citing *Pearson*, 247 F.3d at 494 ("'financial control' will suffice to satisfy the 'common ownership' prong of the integrated enterprise test, and it is likely that the DOL factors should be interpreted similarly...."). Tilton used Ark II to exert financial control over TransCare, expending her personal funds to capitalize TransCare via "loans" from Ark II and her other Patriarch entities.

#### 2. Ark II and TransCare Shared Common Officers and Directors

Defendants do not dispute that Ark II and TransCare shared a common officer/director, Lynn Tilton. (Dkt. No. 149 at 13.) Indeed, Tilton was more than just *a* director of each company, she was *the sole* director of each—her control over the companies was absolute. The absence of independent directors is a factor that has been considered by the courts. *See, e.g.*,

*Blough v. Voisard Mfg., Inc*., No. 1:14 CV 263, 2015 WL 366934 at *9 (N.D. Ohio Jan. 27, 2015).

### 3. Tilton and Ark II Exercised a Degree of De Facto Control over TransCare that, Without More, Made them a Single Employer

Defendants argue that Ark II did not exercise de facto control over TransCare, citing cases where lenders and parent corporations were held not to be single employers. (Dkt. No. 149 at 5-9.) None of Defendants' cases are on point because they did not involve entities which were all subject to the unchecked will of a single individual.

Defendants argue that Ark II was simply a lender to TransCare and that its involvement in TransCare's operations is analogous to Bear Stearns in *Coppola v. Bear Stearns & Co, Inc.*, 499 F.3d 144, 150 (2d 2007). (Dkt. No. 149 at 10-14.) *Coppola* is inapposite for two reasons. First, the *Coppola* "test is applicable only to lenders, and we decline to extend it to…related or parent entities." *Guippone v. BH S & B Holdings*, LLC, 737 F.3d 221, 226 (2d Cir. 2013). Here, the mere fact that Lynn Tilton extended money in the form of loans does not extinguish her equity relationship and common ownership. Second, the high standard of *Coppola* is designed to protect arm's-length commercial lenders like Wells Fargo when seeking to recoup their collateral on bad loans, not owners who make capital contributions of personal funds in the form of loans. Ark II was nothing like the conventional lender in *Bear Stearns*. It was a part of the vertically integrated enterprise controlled completely by Tilton. Through the Patriarch entities and Ark II, Tilton dominated TransCare's operations and the ultimate decision to shut the business down.

Defendants' reliance on *In re HMR Foods Holding*, LP, 602 B.R. 855 (D. Del. June 13, 2019), is similarly misplaced. Although the parent company there had officers who were on the employer's board of directors, the board also had an independent member whose presence acted to constrain the decision making of the other members loyal to the parent company. *Id.* at 862.

Because of this, it could not be said that the parent company controlled the employer entity. Here, as the *sole* member of TransCare's board, Tilton was completely autonomous and free to act in the interests of her own business enterprise. Moreover, the *HMR* court found that the parent company there simply exercised "the control which stock ownership gives to stockholders." *Id*. at 873. Here, Tilton went far beyond that level of control—stockholders do not typically funnel their own personal funds into the company they own to pay its employees.

At the very least, the facts here give rise to an inference that Tilton controlled TransCare as her own personal enterprise, using Ark II and the Patriarch entities to exercise that unfettered control. For example, Leland, TransCare's CEO testified that Jean Luc Pelissier, a PPMG employee, and Michael Greenberg, a Patriarch Partners employee, directed him as to how to make payment on all accounts receivable. (ASOF ¶ 4.) They made him withhold payment from creditors to the point that TransCare could not receive necessary medical items or even use E-Z Pass for its ambulances. (ASOF ¶¶ 4, 113.) Pelissier sat in Leland's office on a daily basis and Greenberg was a constant presence at TransCare's offices as well. (ASOF ¶ 4.) Leland was required to answer to Patriarch employees as if they were Lynn Tilton. (ASOF ¶ 13.) This despite the fact that Patriarch employees would often hide from him whether their instructions actually came from Lynn Tilton. (ASOF ¶ 13.) That is, TransCare's highest level officers effectively "ultimately answer[ed] to higher management at [Patriarch]." *Childress v. Darby Lumber, Inc.*, 357 F.3d 1000, 1006 (9th Cir. 2004).

Moreover, Tilton did not distinguish when she was dealing with Patriarch employees as TransCare's director or in any other capacity, such as in her capacity in a control position of Patriarch entities and Ark II. (ASOF ¶ 13.) She did not have regular TransCare board meetings. (ASOF ¶ 13.) Thus, when Tilton directed Patriarch's employees to act in her interests and

outside of the interests of TransCare, she was clearly directing them not to act as her agent as director of TransCare, but rather in their capacity as Patriarch employees managing her investments. Indeed, the end of TransCare was specifically an action by Tilton to use her Patriarch entities to foreclose on TransCare's assets and transfer them to another corporate entity that she controlled. (*See* ASOF ¶ 54.) This could not have been her acting as director of TransCare and using Patriarch employees to effectuate TransCare goals. Even if Patriarch employees were acting as agents of TransCare director Tilton, the mere fact that they were employees of Patriarch who were de facto exerting upper management level control over TransCare, even if they were not formally named executives, establishes Tilton's business enterprise's de facto control over TransCare. *See, e.g.*, *Blough v. Voisard*, at *9.

Tilton also put in place an authority matrix that severely constrained the ability of TransCare's officers to act in the company's interest. (ASOF ¶¶ 13; 134.) Tilton's dual roles with Patriarch/Ark II and TransCare are precisely what help establish single employer liability. Tilton owned a majority in TransCare largely through Ark II. (ASOF ¶¶ 49, 103.) Her Patriarch enterprise placed her in control of TransCare. Thus, Defendants' indication that "Tilton was the ultimate decision maker, with respect to TransCare's decision to file for Chapter 7 bankruptcy on February 24, 2016," (Dkt. No. 149 at 8,) does not insulate Ark II from liability, it establishes it.

Although it is not necessary for Plainitff to establish this, it is obvious that Tilton was not acting in TransCare's interest when she plunged TransCare into Chapter 7 and attempted to use its assets to launch another business enterprise that she owned, Transcendence. *See Guippone*, 737 F.3d at 227-28 (noting that authorizing layoffs is a function of being an employer under the WARN Act and that de facto control occurs when the subsidiary is ignored as a separate legal entity).

Indeed, it would be backwards and anathema to the single employer doctrine if employers could shield themselves from liability by giving themselves total legal control over a subservient entity and then wielding that legal control to effectuate WARN violating layoffs without recourse. Even direct employers could evade liability that way simply by creating corporate walls between the entity that employed the management team and the rank and file employees.

*Local 2-1971 of Pace Int'l Union v. Cooper* is highly instructive here. There, the Court noted, "there is no doubt that Puri owned and controlled each of these organizations regardless of the other corporate formalities observed." The Court noted "Puri was the driving force behind each of the[] organizations and, when it was to his advantage, financial interchanges among the organizations occurred with frequency and complexity." *Id*. at 564. Based on that record, the Court rejected the defendants' summary judgment motion. Defendants seek to distinguish *Local 2-1971* by observing that the shareholder who exercised control over the employing company was not actually an officer of that company, but instead exerted his influence via his director nephew. (Dkt. No. 149 at 9.) That distinction only lends further support to a finding of de facto control here. The fact that Tilton eliminated the middleman and appointed herself Director of TransCare cemented her ability to further the interests of her investment vehicles without any friction within the company. Similarly, Defendants observe that the shareholder in *Local 2-1971* "made decisions and exercised control far beyond that typically exercised by a shareholder, involving himself in…financial arrangement[s] and meeting with customers." *Id*. The same is true of Tilton. Under her Authority Matrix, management was left unable "to take independent action" or "understand the lending structure of the organization." (ASOF ¶ 13.) Tilton, through her Patriarch employees, controlled which vendors TransCare paid and what vehicles and medical devices it bought and sold. (ASOF ¶ 4.)

Finally, with respect to the most important transactions, those that *Pearson* and *Guippone* court noted could create single employer liability on their own, Tilton and Ark II assumed total control. Tilton made every decision that led to the termination of TransCare's employees without notice while trying to launch Transcendence on Tilton's behalf. When Leland anticipated terminations going into 2016, he wanted to communicate openly with employees but was overruled by Patriarch. (ASOF ¶ 84.) As of eight days into January 2016 there was no TransCare upper level management. Leland and Bonilla were out of their roles. (ASOF ¶¶ 3, 13, 39.) Patriarch was directing TransCare's remaining management on what to tell employees and what to do with TransCare assets. (ASOF ¶¶ 84, 85, 156, 208, 209, 231, 247, 259.) TransCare did not have counsel and Patriarch drafted all documents, including WARN notices, which they controlled the shots on distributing and ultimately decided to withhold. (ASOF ¶ 84.) Jones drafted that communications that were sent to employees. (ASOF ¶ 85.) Tilton and Patriarch planned to launch Transcendence, a new company owned by Tilton with some of TransCare's employees to be transferred at Tilton's will. (ASOF ¶ 54; 206).

Ultimately, Plaintiff disputes or disputes in part all material evidence that Defendants point to in favor of a finding of no de facto control. Tilton, through the Ark and Patriarch entities, determined to eliminate 1100 jobs at TransCare and ultimately all 1800, and made the decision not to deliver WARN Act notice. (ASOF ¶¶ 54-55; 84.) The evidence demonstrates that there is at a minimum an issue of fact as to whether Tilton's business enterprise so dominated TransCare that TransCare could not control its own destiny with respect to laying off its employees and issuing notice. Rather, it was "powerless when it [came] to the decision to effect" its own shut down. *See Vogt v. Greenmarine Holding, LLC*, 318 F. Supp. 2d 136, 143 (S.D.N.Y. 2004); *Guippone* at 227-28; *Pearson* at 490. Accordingly, there are genuine, material

disputes that preclude a finding in Ark II's favor on de facto control. Given the outsized importance of this factor, where a finding of de facto control alone can yield a single employer determination, *see Guippone* at 228, these factual disputes alone are enough to preclude summary judgment in Ark II's favor.

### 4. Ark II and TransCare Had a Unity of Personnel Policies Emanating from a Common Source

Where de facto control is pronounced, the unity of personnel policies carries comparatively little weight. *See In re Tweeter OPCO*, 453 B.R. at 545. That is especially true here, where Ark II had no employees and therefore no personnel policies whatsoever. *Blough v. Voisard Mfg., Inc.*, No. 1:14 CV 263, 2015 WL 366934 at *16 (N.D. Ohio Jan. 27, 2015) (unity of personnel policies prong "weighs in favor of neither party" where the parent company had no employees).

Regardless, here it is disputed whether there was a unity of personnel policies. First, Defendants acknowledge that Patriarch—which, like Ark II, was completely controlled by Tilton—was involved in the hiring and firing of executive officers. (Dkt. No. 109 at 27.) The evidence shows that it also, however, was involved in hiring and firing decisions beyond executives. In particular, in determining who would be kept for Transcendence and who would be fired, Patriarch exerted complete control over the employment of each TransCare employee. (See ASOF ¶¶ 54; 61; 201.) Moreover, Leland testified that a Patriarch employee, John Pothin drafted TransCare employment policies and was involved in day-to-day communications and guidance of TransCare's HR functionality after TransCare's head of HR resigned. (ASOF ¶ 4.) These disputed facts render it impossible for the Court to make a determination as to this factor as a matter of law. A jury must weigh the evidence and credibility of the witnesses.

### 5. There Was Dependency of Operations Between Ark II and TransCare

The evidence shows that TransCare was dependent on Tilton's business enterprise, including Ark II and the Partriach entities. Defendants do not cite any authority where a web of interrelated entities like Tilton's failed the dependency of operations factor.

The *Pearson* Court recognized that undercapitalization and siphoning, standard veil-piercing elements, may support a finding of "dependency of operations" leading to single-employer liability. 247 F.3d at 503. Moreover, the Court in *Blough v. Voisard Mfg., Inc.*, granted summary judgment against a parent who had received about $2.7mm in management fees. No. 1:14 CV 263, 2015 WL 366934 at *16 (N.D. Ohio Jan. 27, 2015). *See also Backus v. Mena Newspapers*, 224 F. Supp. 2d 1228, 1232 (W.D. Ark. 2002) (payment of management fees by a subsidiary to a parent supported single employer status under Title VII); *Local 2-1971*, 364 F. Supp. 2d 546 at 565 ("While there may not have been a dependency of personnel policies or operations, there was certainly a financial dependency.")

Here, the evidence demonstrates that the undercapitalization of TransCare was a significant factor in its failure and demise. (*See, e.g.*, ASOF ¶ 164.) TransCare paid substantial interest and management fees to Tilton through Patriarch entities. (ASOF ¶¶ 118; 154.) Tilton was expending her personal funds through Ark II and funds she owned to keep TransCare running on a day-to-day basis. (ASOF ¶ 237.) TransCare's ultimate demise occurred when she elected to fund a different operation, Transcendence. (ASOF ¶¶ 203-06.)

While Defendants contend that there is no dispute that TransCare's employees were in charge of TransCare's day-to-day operations, (Dkt. No. 149 at 11), that is contested. (*See* ASOF ¶¶ 4, 13.)

Defendants cite to *Pearson* as an example of courts refusing to find a company that engages in a rescue operation as creating financial dependency. (Dkt. No. 149 at 10.) *Pearson* is inapposite. There, the employer "independently sought additional financing from an outside lender to replace [the parent company], which cuts against a conclusion that [the employer] was closely integrated with [the parent] itself." 247 F. 3d. at 502. Here, Patriarch expressly forbade TransCare's CEO from attempting to sell any assets or seek independent financing. (ASOF ¶¶ 39; 183.)

There is ample evidence from which a jury can conclude that TransCare shared a dependency of operations with Tilton, Ark II and the Patriarch entities.

## II. THERE ARE DISPUTES PRECLUDING DETERMINATION OF WHETHER ARK II AND TILTON ARE JOINT/SINGLE EMPLOYERS UNDER THE STATE WAGE LAWS

In the main, Plaintiff relies on her original brief in opposition to summary judgment as it relates to Non-Debtor Defendants' liability, including Ark II, under the state wage laws. (Dkt. No. 131 at 32-39.) However, it is noteworthy that Ark II shares liability, along with Tilton and the Patriarch Defendants, because it assumed responsibility for TransCare's payroll. Ark II was the entity which funded payroll using Tilton's personal funds. (ASOF ¶ 49, 159, 160, 237.) Ark II "control[led] the corporation's financial affairs and [caused] the corporation to compensate (or not to compensate) employees." *Baystate Alternative Staffing v. Herman*, 163 F.3d 668 (1st Cir.1998) (*cited by Campusano v. Lusitano Const. LLC*, 208 Md. App. 29, 39–40 (2012) (Maryland wage law)). In doing so, it took "ultimate responsibility for the plaintiffs' wages." *Irizarry v. Casimatidis*, 722 F.3d 99, 117 (2d Cir. 2013) (New York wage law). The power to fund or not fund payroll is most certainly "a policy-making function in the company" and gave

Ark II "an active role in decision making." *Mohney v. McClure*, 390 Pa.Super. 338, 345 (1990) (Pennsylvania wage law).

Ark II's decision to cease payroll funding was the direct cause of the wage violations in this case. At the very least, the facts in evidence create a genuine dispute as to Tilton's and Ark II's roles as employers, under the expansive interpretation of New York, Maryland and Pennsylvania wage laws. That interpretation is warranted to give them, like FLSA, "the widest possible impact in the national economy." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999), *holding modified by Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61 (2d Cir. 2003).

Dated: January 24, 2020
      New York, New York

Respectfully submitted,

*/s/ Jack A. Raisner*
**RAISNER ROUPINIAN LLP**
Jack A. Raisner
René S. Roupinian
500 Fifth Avenue, Suite 1600
New York, New York 10110
Telephone: 212-221-1774

*Attorneys for Plaintiff and the Certified Class*